**<u>EXHIBIT 1</u>**

*Execution Version*

# FALCATA TECH INVESTMENT FUND I, L.P.

### AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT

Dated April 20, 2018

**THE LIMITED PARTNERSHIP INTERESTS (THE "INTEREST") OF FALCATA TECH INVESTMENT FUND I, L.P. HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE INTEREST MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND IS SUBJECT TO SIGNIFICANT RESTRICTIONS ON TRANSFERABILITY. THE INTEREST MAY NOT BE OFFERED FOR SALE, PLEDGED, CHARGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, ANY APPLICABLE U.S. STATE SECURITIES LAWS AND ANY OTHER APPLICABLE SECURITIES LAWS AND THE TERMS AND CONDITIONS OF THIS LIMITED PARTNERSHIP AGREEMENT, INCLUDING SECTION 10.1(a) HEREOF. THEREFORE, THE PURCHASER OF THE INTEREST WILL BE REQUIRED TO BEAR THE RISK OF ITS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

Table of Contents

Page

ARTICLE I

GENERAL PROVISIONS

1.1   Definitions ............................................................................................................ 1
1.2   Name and Registered Office ................................................................................ 13
1.3   Purposes ............................................................................................................... 14
1.4   Term ..................................................................................................................... 14
1.5   Fiscal Year ........................................................................................................... 14
1.6   Powers .................................................................................................................. 14
1.7   Specific Authorization ......................................................................................... 16
1.8   Amendment and Restatement of Agreement; Admission of the Limited Partner ......... 16
1.9   Expenses ............................................................................................................... 17
1.10  Register ................................................................................................................ 17
1.11  Cayman Register .................................................................................................. 17

ARTICLE II

THE GENERAL PARTNER

2.1   Management of the Fund, etc ............................................................................... 18
2.2   Reliance by Third Parties ..................................................................................... 18
2.3   Conflicts of Interest, etc ...................................................................................... 18
2.4   Liability of the General Partner and Other Covered Persons ............................... 22
2.5   Removal of the General Partner ........................................................................... 23

ARTICLE III

THE LIMITED PARTNERS

3.1   No Participation in Management; Voting, etc ....................................................... 25
3.2   Limitation of Liability .......................................................................................... 25
3.3   Bankruptcy, Dissolution or Withdrawal of the Limited Partner .......................... 25
3.4   Advisory Committee ............................................................................................. 25

ARTICLE IV

INVESTMENTS

4.1   Investments in Portfolio Companies .................................................................... 28
4.2   Investment Restrictions ........................................................................................ 30
4.4   Temporary Investments ........................................................................................ 30
4.5   Related Investment Funds .................................................................................... 31

ARTICLE V

CAPITAL COMMITMENTS; CAPITAL CONTRIBUTIONS

5.1   Capital Commitments ........................................................................................... 36
5.2   Capital Contributions ........................................................................................... 36

Table of Contents (continued)

|  |  | Page |
|---|---|---|
| 5.3 | Return of Unused Capital Contributions | 37 |
| 5.4 | Defaulting Partners | 38 |
| 5.5 | Early Termination of Investment Period | 40 |

## ARTICLE VI

### CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS; WITHHOLDING

| 6.1 | Capital Accounts | 41 |
|---|---|---|
| 6.2 | Adjustments to Capital Accounts | 41 |
| 6.3 | Distributions Attributable to Portfolio Investments | 41 |
| 6.4 | Distributions of Temporary Investment Income | 43 |
| 6.5 | Tax Distributions | 43 |
| 6.6 | General Distribution Provisions | 44 |
| 6.7 | Distributions in Kind | 45 |
| 6.8 | Negative Capital Accounts | 45 |
| 6.9 | No Withdrawal of Capital | 46 |
| 6.10 | Allocations to Capital Accounts | 46 |
| 6.11 | Tax Allocations and Other Tax Matters | 46 |
| 6.12 | Withholding | 48 |
| 6.13 | Segregated Reserve Account | 51 |

## ARTICLE VII

### THE MANAGER

| 7.1 | Appointment of the Manager | 52 |
|---|---|---|
| 7.2 | Management Fee | 53 |

## ARTICLE VIII

### BOOKS AND RECORDS; REPORTS TO PARTNERS; ETC.

| 8.1 | Maintenance of Books and Records | 54 |
|---|---|---|
| 8.2 | Audits and Reports | 54 |
| 8.3 | Annual Meeting | 56 |
| 8.4 | Tax Information | 56 |

## ARTICLE IX

### INDEMNIFICATION

| 9.1 | Indemnification of Covered Persons | 56 |
|---|---|---|
| 9.2 | Return of Certain Distributions to Fund Indemnification | 58 |
| 9.3 | Other Sources of Recovery | 59 |
| 9.4 | Indemnification Agreements for Covered Persons | 60 |

Table of Contents (continued)

Page

ARTICLE X

TRANSFERS

10.1  Transfers by Partners ........................................................................61

ARTICLE XI

WINDING UP AND DISSOLUTION OF THE FUND

11.1  Commencement of Winding-Up .........................................................65
11.2  Winding Up ........................................................................................66
11.3  Clawback ...........................................................................................67
11.4  Dissolution ........................................................................................68

ARTICLE XII

AMENDMENTS; POWER OF ATTORNEY

12.1  Amendments .......................................................................................69
12.2  Power of Attorney ..............................................................................70

ARTICLE XIII

MISCELLANEOUS

13.1  Notices ...............................................................................................72
13.2  Counterparts; Signatures ...................................................................73
13.3  Table of Contents and Headings; Terms Generally ...........................73
13.4  Successors and Assigns ......................................................................73
13.5  Severability ........................................................................................73
13.6  Further Actions ..................................................................................73
13.7  Determinations of the Partners ..........................................................74
13.8  Non-Waiver ........................................................................................74
13.9  Applicable Law ..................................................................................74
13.10 Confidentiality ...................................................................................75
13.11 Survival of Certain Provisions ..........................................................76
13.12 Entire Agreement; Most Favored Nations Provision .........................76
13.13 No Third Party Beneficiaries .............................................................76
13.14 Compliance with Anti-Money Laundering Requirements ..................77
13.15 No Political Contributions by Fund ...................................................77
13.16 Currency .............................................................................................77

## **EXHIBITS**

Exhibit A – Management Agreement
Exhibit B – Clawback Guarantee

# FALCATA TECH INVESTMENT FUND I, L.P.

This AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT of Falcata Tech Investment Fund I, L.P., a Cayman Islands exempted limited partnership acting through its general partner, (the "Fund"), is executed and delivered as a deed on April 20, 2018, by and among FTI GP I, LLC, as the general partner of the Fund, the Initial Limited Partner and the Person listed in the Cayman Register (as amended or supplemented from time to time) as the limited partner of the Fund. Capitalized terms used herein without definition have the meanings specified in Section 1.1. References herein to the Fund shall, wherever the context requires, mean the General Partner acting in its capacity as such (and in its personal capacity) on behalf of the Fund.

## R E C I T A L S:

WHEREAS, the Fund is an exempted limited partnership registered under the Partnership Law pursuant to a Statement filed with the Registrar of Exempted Limited Partnerships in the Cayman Islands on December 14, 2017 (as amended or amended and restated from time to time, the "Certificate") and since its formation has been governed by the Limited Partnership Agreement of the Fund, dated December 14, 2017 (the "Original Agreement"); and

WHEREAS, the General Partner, the Initial Limited Partner and the Limited Partner admitted on the date hereof desire to amend and restate the Original Agreement in its entirety and to enter into this Agreement;

NOW, THEREFORE, the parties hereto hereby agree to continue the Fund and hereby amend and restate the Original Agreement, which is replaced and superseded in its entirety by this Agreement, as follows:

## ARTICLE I

## GENERAL PROVISIONS

1.1  Definitions. As used herein the following terms have the meanings set forth below:

"Adjustment Date" shall mean the last day of each Fiscal Year and any other date that the General Partner determines in its sole discretion to be appropriate for an interim closing of the Fund's books.

*Confidential*

"Advisers Act" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time, and the rules and regulations of the SEC promulgated thereunder.

"Advisory Committee" shall have the meaning set forth in Section 3.4(a).

"AEOI" means one or more of the following, as the context requires, (*a*) : sections 1471 to 1474 of the US Internal Revenue Code of 1986 and any associated legislation, regulations or guidance, commonly referred to as the US Foreign Account Tax Compliance Act (**"FATCA"**), the Common Reporting Standard issued by the Organisation for Economic Cooperation and Development or similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement equivalent tax reporting and/or withholding tax regimes, (*b*) any intergovernmental agreement, treaty or any other arrangement between the Cayman Islands and the US or any other jurisdiction (including between any government bodies in each relevant jurisdiction), entered into to facilitate, implement, comply with or supplement the legislation, regulations or guidance described in paragraph 1; and (c) any legislation, regulations or guidance implemented in the Cayman Islands to give effect to the matters outlined in clauses (a) or (b) of this definition.

"Affiliate" shall mean, with respect to any specified Person, a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified, *provided* that Portfolio Companies (and portfolio companies of any Alternative Investment Funds) and Related Investment Funds shall be deemed not to be "Affiliates" of the Manager, the General Partner or the Fund, *provided, further*, that for the purposes of Section 4.2(a), Portfolio Companies (other than any two or more Portfolio Companies holding Securities the value of which are determined by reference to the results of operations of the same underlying business) shall be deemed not to be "Affiliates" of one another, *provided, further*, that each of the Co-Founders shall be deemed to be an "Affiliate" of the Manager and the General Partner for so long as such Co-Founder is affiliated with the Manager or any of its Affiliates and, *provided, finally*, that the Manager shall be deemed to be an Affiliate of the General Partner and *vice-versa,* and that for so long as one or more of the Co-Founders is employed by Reynolds, the Manager and the General Partner shall be deemed to affiliates of Reynolds, and *vice-versa.*

"Agreement" shall mean this Amended and Restated Exempted Limited Partnership Agreement, but not including any exhibits hereto, as amended, supplemented, restated or otherwise modified from time to time.

"Alternative Investment Fund" shall have the meaning set forth in Section 4.5(d).

"Annual Meeting" shall have the meaning set forth in Section 8.3.

*Confidential*

"Available Assets" shall mean, as of any date, the excess of (*a*) the cash, cash equivalent items, Securities or other property to be distributed pursuant to Section 6.7 and Temporary Investments held by the Fund over (*b*) the sum of the amount of such items as the General Partner reasonably determines to be necessary or appropriate for the payment of the Fund's expenses, liabilities and other obligations (whether fixed or contingent, current or future), or for the establishment of appropriate reserves for such expenses, liabilities and obligations as may arise, including the maintenance of adequate working capital for the continued conduct of the Fund's investment activities and operations and amounts in respect of the exercise price of options, warrants and similar securities or instruments purchased or received or anticipated to be purchased or received in connection with Portfolio Investments.

"Bridge Investment" shall have the meaning set forth in Section 4.2(b).

"Business Day" shall mean any day other than (*a*) Saturday and Sunday and (*b*) any other day on which banks located in Houston, Texas or Bermuda are required or authorized by law to remain closed.

"Capital Account" shall have the meaning set forth in Section 6.1.

"Capital Commitment" shall mean, with respect to the Limited Partner, the amount set forth on the Subscription Agreement of such Limited Partner as accepted by the General Partner on behalf of the Fund, or acquired by a Substitute Partner, as such amount may be adjusted in accordance with the terms of this Agreement and, with respect to the General Partner, the amount set forth in Section 5.1 with respect to the General Partner.

"Capital Contribution" shall mean, with respect to any Partner, the capital contributed pursuant to a single Drawdown or the aggregate capital so contributed, as the context may require, by such Partner to the Fund pursuant to this Agreement, unless such capital is not treated as a Capital Contribution by the express terms of this Agreement.

"Carried Interest" shall have the meaning set forth in Section 6.3(d).

"Cayman Islands" shall mean the Cayman Islands, British West Indies.

"Cayman Record" shall have the meaning set forth in Section 1.11.

"Cayman Register" shall have the meaning set forth in Section 1.11.

"Certificate" shall have the meaning set forth in the recitals hereto.

"Claims" shall have the meaning set forth in Section 9.1(a).

*Confidential*

"Clawback Guarantee" shall have the meaning set forth in Section 11.3.

"Closing" shall mean the Initial Closing and any other closing of the sale of interests in any Parallel Fund in accordance with the partnership agreement or other governing documents of such Parallel Fund.

"Co-Founders" shall mean Bob Brockman and Robert Burnett.

"Co-Investment Fund" shall have the meaning set forth in Section 4.5(b)(i).

"Co-Investors" shall have the meaning set forth in Section 4.5(b)(ii).

"Code" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Communications Act" shall mean the U.S. Communications Act of 1934, as amended from time to time.

"Covered Person" shall mean the General Partner, the Manager and each of their respective Affiliates; each of the current and former shareholders, officers, directors, employees, partners, members, managers agents and other representatives of any of the foregoing; the Limited Partner (and, with respect to Claims or Damages arising out of or relating to the Limited Partner's interest in the Fund, each of the Limited Partner's officers, directors, employees, partners, members, managers, agents and other representatives); each Person serving, or who has served, as a member of the Advisory Committee (and, with respect to Claims or Damages arising out of or relating to such service only, the limited partner that such Person represents and each of such limited partner's officers, directors, employees, partners, members, managers, agents and other representatives); and any other Person designated by the General Partner as a Covered Person who serves at the request of the General Partner or the Manager on behalf of the Fund.

"Damages" shall have the meaning set forth in Section 9.1(a).

"Default" shall have the meaning set forth in Section 5.4(a).

"Defaulted Amount" shall have the meaning set forth in Section 5.4(b).

"Defaulted Capital Commitment" shall have the meaning set forth in Section 5.4(c).

"Defaulting Partner" shall have the meaning set forth in Section 5.4(a).

"Disabling Conduct" shall mean, with respect to any Person other than the Limited Partner and voting members of the Advisory Committee, (*a*) a material violation of this Agreement; (*b*) fraud, willful malfeasance or Gross Negligence by or of such Person;

*Confidential*

(*c*) reckless disregard of duties by such Person in the conduct of such Person's office; (*d*) a willful and material violation of law by such Person; (*e*) a determination by a court of competent jurisdiction or admission by consent or plea of *nolo contendere*, that such Person has committed an indictable offense or a felony or equivalent; and with respect to the Limited Partner and each voting member of the Advisory Committee, fraud or willful malfeasance by or of such Person.

"Distributable Cash" shall mean cash received by the Fund from the sale or other disposition of, or dividends, interest or other income from or in respect of, a Portfolio Investment, or otherwise received by the Fund from any source (other than Capital Contributions, other payments made by the Partners pursuant to this Agreement and Temporary Investment Income and amounts deposited in the Segregated Reserve Account or any income earned thereon), to the extent that such cash constitutes Available Assets.

"DOL" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

"DOL Regulations" shall mean the regulations of the DOL included within 29 C.F.R. section 2510.3-101.

"Drawdown Date" shall have the meaning set forth in Section 5.2(a).

"Drawdown Notice" shall have the meaning set forth in Section 5.2(a).

"Drawdowns" shall mean the Capital Contributions made or to be made to the Fund pursuant to Section 5.2 from time to time by the Partners pursuant to a Drawdown Notice.

"ECI" shall mean income that is "effectively connected with the conduct of a trade or business within the United States" within the meaning of sections 871 and 882 of the Code (other than by reason of section 897 of the Code).

"Event of Withdrawal" shall mean, with respect to the General Partner or otherwise as specified under the Partnership Law, the death, commencement of liquidation, bankruptcy or dissolution proceedings, or the withdrawal, removal or making of a winding up or dissolution order, of the General Partner or such other Person as specified under the Partnership Law.

"FCC" shall mean the U.S. Federal Communications Commission, or any governmental entity that succeeds to the powers and functions thereof.

"FCC Rules" shall mean the rules, regulations or written policies of the FCC (*a*) that limit or restrict ownership in Media Companies on the basis of ownership in

other Media Companies or under which the Fund's ownership of a Media Company may be attributed to the Limited Partner (or the Limited Partner's ownership of another Media Company may be subject to limitation or restriction as a result of the ownership by the Fund of such Media Company or another Media Company), including the rules, regulations or written policies of the FCC that provide for the insulation from such attributable interests in Media Companies, or (*b*) that limit or restrict ownership of Media Companies by non-U.S. persons (as defined by the FCC), as such rules, regulations or written policies may be modified from time to time.

"Fee Income" shall mean 100% of the sum of all directors' fees, transaction fees, investment banking fees, break-up fees, advisory fees, monitoring fees or other similar fees received by the Manager, the General Partner or any of their respective Affiliates, net of any unreimbursed expenses incurred by the Manager or any of its Affiliates in connection with the consummation, holding or disposition of a Portfolio Investment or the termination of an unconsummated investment. For these purposes, directors' fees shall include the Value, on the date of exercise of any options, warrants and other non-cash compensation paid, granted or otherwise conveyed for services as members of boards of directors of Portfolio Companies received by the Manager, the General Partner or any of their respective Affiliates, including any employees thereof. Notwithstanding any other provision of this Agreement, the Manager, the General Partner and their respective Affiliates will use commercially reasonable efforts not to charge directors' fees, transaction fees, investment banking fees, break-up fees, advisory fees, monitoring fees or other similar fees.

"Final Admission Date" shall mean the last day of the twelfth calendar month following the month in which the Initial Closing occurs.

"Fiscal Year" shall have the meaning set forth in Section 1.5.

"Follow-On Investment" shall mean an investment by the Fund in Securities of (*a*) a Portfolio Company in which the Fund holds Securities at the time of investment or (*b*) a Person whose business is related or complementary to that of (and is or will be under common management with) a Portfolio Company.

"Fund" shall have the meaning set forth in the preamble hereto.

"Fund Expenses" shall mean the costs, expenses and liabilities that are incurred by or arise out of the operation and activities of the Fund, as determined by the General Partner in its sole discretion, including: (*a*) the Management Fee; (*b*) reasonable fees and expenses relating to consummated Portfolio Investments, unconsummated investments and Temporary Investments, including the evaluation, acquisition, holding and disposition thereof, to the extent that such fees and expenses are not reimbursed by a Portfolio Company or other third Person; (*c*) reasonable interest on and fees and expenses related to or arising from any Indebtedness of the Fund; (*d*) reasonable

*Confidential*

premiums for insurance protecting the Fund and any Covered Persons from liabilities to third Persons in connection with the Fund's investment and other activities; (*e*) reasonable legal, custodial, administration, auditing, accounting, regulatory and compliance expenses, including expenses associated with (*i*) the preparation of the Fund's financial statements, tax returns and Schedule K-1s, and the representation of the Fund or the Partners by the tax matters partner and (*ii*) U.S. Treasury forms and AEOI compliance, in each case as relates specifically to the Fund and its Portfolio Companies, but excluding, for the avoidance of doubt, the costs of the Manager's general compliance with the Adviser's Act, such as preparation and updating of Form ADV; (*f*) reasonable banking and consulting expenses; (*g*) reasonable appraisal and valuation expenses; (*h*) reasonable expenses related to organizing Persons through or in which Portfolio Investments may be made; (*i*) reasonable expenses of the Advisory Committee; (*j*) except as otherwise provided in Section 6.12, taxes and other governmental charges, fees and duties payable by the Fund; (*l*) Damages; (*m*) costs of reporting to the Partners and to governmental authorities with respect to the Partners, the Fund or the Fund's activities and investments; (*n*) reasonable costs of the Annual Meeting; (*o*) reasonable costs of winding up and liquidating the Fund; and (*p*) all reasonable annual registration fees and registered office fees and expenses, but not including Organizational Expenses.

"General Partner" shall mean FTI GP I, LLC, a Delaware limited liability company, in its capacity as the general partner of the Fund, or any additional or successor general partner admitted to the Fund as a general partner thereof in accordance with the terms hereof, in its capacity as a general partner of the Fund, in each case as the context requires.

"Gross Negligence" shall, notwithstanding section 13.9, have the meaning given such term under the laws of the U.S. State of Delaware.

"Initial Closing" shall mean the closing of the sale on April 20, 2018of the interests in the Fund.

"Initial Limited Partner" shall mean Falcata Capital LLC.

"Investment Company Act" shall mean the U.S. Investment Company Act of 1940, as amended from time to time, and the rules and regulations of the SEC promulgated thereunder.

"Investment Objectives" shall have the meaning set forth in Section 1.3.

"Investment Period" shall mean the period commencing on the date of the Initial Closing and ending on the earliest to occur of (*a*) the fifth anniversary of the last day of the month of the Initial Closing, (*b*) the first date on which all Remaining Capital Commitments (net of amounts reasonably reserved by the General Partner for the

*Confidential*

payment of Fund Expenses throughout the Term and the funding of Follow-On Investments and investments with respect to which commitments have been made) are zero and (*c*) the date of any early termination of the Investment Period pursuant to Section 5.5.

"Limited Partner" shall mean the Person admitted as a limited partner of the Fund, which limited partner shall be listed in the Cayman Register, and shall include its successors and permitted assigns to the extent admitted to the Fund as limited partners in accordance with the terms hereof, in their capacities as limited partners of the Fund, and shall exclude any Person that ceases to be a Partner in accordance with the terms hereof

"Management Agreement" shall have the meaning set forth in Section 7.1.

"Management Fee" shall have the meaning set forth in Section 7.2.

"Manager" shall mean Falcata Capital LLC, a Delaware limited liability company, in its capacity as the manager of the Fund, or any additional or successor manager appointed by the Fund as a manager thereof in accordance with the terms hereof, in its capacity as a manager of the Fund, in each case as the context requires.

"Manager Expenses" shall mean the costs and expenses incurred by the Manager in providing for its and the General Partner's normal operating overhead, including salaries of the Manager's employees, rent and other expenses incurred in maintaining the Manager's place of business, but not including Organizational Expenses or Fund Expenses.

"Marketable Securities" shall mean Securities that are (*a*) tradable on an established U.S. national or non-U.S. securities exchange or (*b*) reported through NASDAQ or a comparable established non-U.S. over-the-counter trading system, in each case that the General Partner determines in good faith are marketable at a price approximating their Value within a reasonable period of time and are not subject to restrictions on transfer (taking into account only such Securities) under the Securities Act or other applicable securities laws or subject to contractual restrictions on transfer.

"Material Adverse Effect" shall mean (*a*) a violation of a statute, rule, order, directive, regulation or governmental administrative policy of a U.S. federal or state or non-U.S. governmental authority or stock exchange regulatory organization applicable to a Partner that is reasonably likely to have a material adverse effect on a Portfolio Company or any Affiliate thereof or on the Fund, any Related Investment Fund, the General Partner, the Manager or any of their respective Affiliates or on any Partner or any Affiliate of any such Partner, (*b*) an occurrence that is reasonably likely to subject a Portfolio Company or any Affiliate thereof or the Fund, the General Partner, the Manager or any of their respective Affiliates or any Partner or any Affiliate of any such

Partner to any material non-tax regulatory requirement to which it would not otherwise be subject, or that is reasonably likely to materially increase any such regulatory requirement beyond what it would otherwise have been, or (*c*) a violation of any written policy of the Limited Partner that the General Partner has agreed in writing on or prior to the date of the Limited Partner's admission to the Fund is likely to have a material adverse effect on the Limited Partner (and such policy remains in effect as of the date on which a determination of material adverse effect is being made).

"Media Company" shall mean any Person that, directly or indirectly, owns, controls or operates a broadcast radio or television station, a cable television system, or a "daily newspaper" (as such term is defined in the FCC Rules), a "broadband radio," any other communications facility operated pursuant to a license granted by the FCC and subject to the provisions of section 310(b) of the Communications Act, or any other business that is subject to the FCC Rules.

"NASDAQ" shall mean the automated screen-based quotation and trade execution system operated by The Nasdaq Stock Market LLC or any successor thereto.

"Non-U.S. Partner" shall mean the Limited Partner, which (*a*) (*i*) is not a "United States person" within the meaning of section 7701(a)(30) of the Code.

"Notice of Dissolution" shall mean a notice of dissolution as provided for in the Partnership Law.

"Organizational Expenses" shall mean all reasonable costs and expenses directly or indirectly incurred in connection with the formation and organization of, and sale of interests in, the Fund or otherwise relating thereto, as determined in good faith by the General Partner, including out-of-pocket legal, accounting, printing, travel and filing fees and expenses.

"Original Agreement" shall have the meaning set forth in the recitals hereto.

"Parallel Fund" shall have the meaning set forth in Section 4.5(c).

"Partners" shall mean the General Partner and the Limited Partner.

"Partnership Law" shall mean the Exempted Limited Partnership Law (2012 Revision) of the Cayman Islands, as amended, and any successor to such statute.

"Payment Date" shall have the meaning set forth in Section 7.2.

"Period" shall mean, for the first Period, the period commencing on the date of the Initial Closing and ending on the next Adjustment Date; and for each subsequent Period shall mean the period commencing on the day after an Adjustment Date and ending on the next Adjustment Date.

*Confidential*

"<u>Person</u>" shall mean any individual or entity, including a corporation, partnership, association, limited liability company, limited liability partnership, joint-stock company, trust, unincorporated association, government or governmental agency or authority.

"<u>Portfolio Company</u>" shall mean an entity in which a Portfolio Investment is made, whether directly or indirectly, and continues to be held, by the Fund.

"<u>Portfolio Company Indemnitor</u>" shall have the meaning assigned to such term in Section 9.3.

"<u>Portfolio Investments</u>" shall mean debt or equity investments (other than Temporary Investments) made by the Fund.

"<u>Post-Distribution Value</u>" shall mean with respect to Marketable Securities (*a*) that are primarily traded on a securities exchange, the average of their closing sale prices on the principal securities exchange on which they are traded for each Business Day during the period commencing on the date of the relevant distribution and ending on the tenth Business Day after the date of such distribution or, if no sales occurred on any such day, the mean between the closing "bid" and "asked" prices on such day and (*b*) the principal market for which is or is deemed to be the over-the-counter market, the average of their closing sales prices on each Business Day during the period specified in clause (a) above, as published by NASDAQ or any similar organization, or if such price is not so published on any such day, the mean between their closing "bid" and "asked" prices, if available, on such day, which prices may be obtained from any reputable pricing service, broker or dealer.

"<u>Pre-Existing Investment</u>" shall have the meaning set forth in Section 2.3(b).

"<u>Prime Rate</u>" shall mean the rate of interest published from time to time in *The Wall Street Journal*, Eastern Edition (or any successor publication thereto), designated therein as the prime rate, or if not so published, the rate of interest publicly announced from time to time by any money center bank as its prime rate in effect at its principal office, as identified in writing by the General Partner to the Limited Partner.

"<u>Proceeding</u>" shall have the meaning set forth in Section 9.1(a).

"<u>Register</u>" shall have the meaning set forth in Section 1.10.

"<u>Related Investment Funds</u>" shall mean all Co-Investment Funds, Parallel Funds and Alternative Investment Funds established by the General Partner or any of its Affiliates pursuant to this Agreement or the governing document of the relevant Co-Investment Fund, Parallel Fund or Alternative Investment Fund, as the context requires.

*Confidential*

"Remaining Capital Commitment" shall mean, with respect to any Partner, determined at any date, the amount of such Partner's Capital Commitment decreased by such Partner's Capital Contributions and increased by all distributions from the Fund to such Partner up to the aggregate amount of such Partner's Capital Contributions (*a*) returned without being used by the Fund, (*b*) as provided in Section 4.1(d), (*c*) returned in connection with the admission of a subsequent closing partner (or similar member) to any Parallel Fund or (*d*) used to pay Fund Expenses or Organizational Expenses, *provided* that if the date of determination with respect to a Partner is after delivery of a Drawdown Notice but before the related Drawdown Date, the amount specified as payable by such Partner in such Drawdown Notice (as the same may be amended by a subsequent Drawdown Notice related thereto) shall not be included in such Partner's Remaining Capital Commitment unless, in the case of a Drawdown Notice for a Portfolio Investment, such Portfolio Investment is abandoned.

"Removal Conduct" shall mean (*a*) a determination by a court of competent jurisdiction, or admission by consent or plea of *nolo contendere* by the General Partner, the Manager or any Co-Founder that such Person has (*i*) committed a material violation of this Agreement or (*ii*) in the performance of the General Partner's obligations under this Agreement (*A*) committed fraud, (*B*) acted with Gross Negligence or engaged in willful malfeasance or (*C*) committed a violation of law that has resulted in a Material Adverse Effect or (*b*) a conviction of the General Partner, the Manager or any of the Co-Founders by a court of competent jurisdiction of, or admission by consent or plea of *nolo contendere* to, an indictable offense or a felony or equivalent that has resulted in a Material Adverse Effect.

"Reynolds" shall mean The Reynolds and Reynolds Company.

"SEC" shall mean the U.S. Securities and Exchange Commission.

"Securities" shall mean shares of capital stock, partnership interests, limited liability company interests, warrants, options, bonds, notes, debentures and other equity and debt securities of whatever kind of any Person, whether readily marketable or not.

"Securities Act" shall mean the U.S. Securities Act of 1933, as amended from time to time, and the rules and regulations of the SEC promulgated thereunder.

"Segregated Reserve Account" shall have the meaning set forth in Section 6.13.

"Sharing Percentage" shall mean, with respect to any Partner and any Portfolio Investment or Temporary Investment, a fraction, expressed as a percentage, (*a*) the numerator of which is the Capital Contributions of such Partner used to fund the cost of such Portfolio Investment or Temporary Investment and (*b*) the denominator of which is the aggregate amount of the Capital Contributions of all of the Partners used to fund the cost of such Portfolio Investment or Temporary Investment.

*Confidential*

"Subscription Agreement" shall mean the Subscription Agreement entered into by the Limited Partner in connection with its purchase of an interest in the Fund.

"Substitute Partner" shall have the meaning set forth in Section 10.1(d).

"Successor Fund" shall have the meaning set forth in Section 2.3(a).

"Tax Distributions" shall have the meaning set forth in Section 6.5.

"Temporary Investment" shall mean investments in (*a*) cash or cash equivalents, (*b*) marketable direct obligations issued or unconditionally guaranteed by the United States, or issued by any agency thereof, maturing within one year from the date of acquisition thereof, (*c*) money market instruments, commercial paper or other short-term debt obligations having at the date of purchase by the Fund the highest or second highest rating obtainable from either Standard & Poor's Ratings Services or Moody's Investors Services, Inc., or their respective successors, (*d*) interest bearing accounts at a registered broker-dealer, (*e*) money market mutual funds, (*f*) certificates of deposit maturing within one year from the date of acquisition thereof issued by commercial banks incorporated under the laws of the United States or any state thereof or the District of Columbia, or organized under the laws of a non-U.S. country, which banks have branches in the United States, or (*g*) overnight repurchase agreements with primary Federal Reserve Bank dealers collateralized by direct U.S. Government obligations or (*h*) pooled investment funds or accounts that invest only in Securities or instruments of the type described in (a) through (d). For the avoidance of doubt, Temporary Investments may be held at, managed by, or purchased from, any Person that satisfies the foregoing requirements.

"Temporary Investment Income" shall mean cash received by the Fund attributable to any net earnings on a Temporary Investment (other than a Temporary Investment acquired with the proceeds of the disposition of, or with income from, any Portfolio Investment).

"Term" shall have the meaning set forth in Section 1.4.

"Third Party Co-Investor" shall have the meaning set forth in Section 4.5(b)(i).

"Transfer" shall mean a direct or indirect transfer in any form, including a sale, assignment, conveyance, pledge, charge, mortgage, encumbrance, securitization, hypothecation or other disposition, any purported severance or alienation of any beneficial interest (including the creation of any derivative or synthetic interest), or the act of so doing, as the context requires.

"Transferee" shall have the meaning set forth in Section 10.1(b)(i).

*Confidential*

"Transferor" shall have the meaning set forth in Section 10.1(b)(i).

"Treasury Regulations" shall mean the regulations of the U.S. Treasury Department issued pursuant to the Code.

"Unrealized Loss" shall mean, with respect to any Portfolio Investment other than a Bridge Investment as of any date of determination, the excess, if any, of its cost over its carrying value as of such date.

"Value" shall mean (*a*) with respect to Marketable Securities (*i*) that are primarily traded on a securities exchange, the average of their closing sale prices on the principal securities exchange on which they are traded for each Business Day during the period commencing five days prior to the date of the relevant distribution or date of determination and ending on the last day prior to the date of such distribution or, if no sales occurred on any such day, the mean between the closing "bid" and "asked" prices on such day and (*ii*) the principal market for which is or is deemed to be the over-the-counter market, the average of their closing sales prices on each Business Day during such period, as published by NASDAQ or any similar organization, or if such price is not so published on any such day, the mean between their closing "bid" and "asked" prices, if available, on such day, which prices may be obtained from any reputable pricing service, broker or dealer and (*b*) with respect to all other Securities or other assets of or interests in the Fund, other than cash, the fair value determined by the General Partner in good faith considering all factors, information and data deemed to be pertinent, including unusual or limited trading volume, prices obtained by private transfers of Securities of the applicable Portfolio Company by other holders of such Securities, prices obtained from purchasers in placements of such Securities or the Securities of similar issuers, estimates of liquidation value, changes in the prospects of such Portfolio Company, liquidity of the Securities and variations in value due to the size of a block of Securities, *provided* that, for purposes of the dissolution of the Fund pursuant to Article XI, with respect to the Securities and other assets described in clause (b) above that are distributed in kind, such value shall have been approved by the Limited Partner, or, if not so approved, by an independent nationally recognized investment banking, accounting or other appraisal firm selected by the General Partner and approved by the Limited Partner.

1.2   Name and Registered Office.

(a)   Name. The name of the Fund is Falcata Tech Investment Fund I, L.P. Upon the termination of the Fund, all of the Fund's right, title and interest in and to the use of the name "Falcata Tech Investment Fund I, L.P." or "Falcata" and any variation thereof, including any name to which the name of the Fund may be changed, shall become the property of the General Partner or the Manager, and the Limited Partner shall have no right, title or interest in and to the use of any such name.

*Confidential*

(b)     Registered Office. The registered office of the Fund in the Cayman Islands is located at Walkers Corporate Limited, Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands and the registered agent for service of process on the Fund at such address is Walkers Corporate Limited, Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands.   At any time, the General Partner may designate another registered agent or registered office in the Cayman Islands.

1.3    Purposes.   The purposes of the Fund are (*a*) to seek long-term capital appreciation by acquiring, holding and disposing of Securities in Persons in the emerging technologies industry, primarily in the United States and Canada (the "Investment Objectives"), in accordance with and subject to the other provisions of this Agreement, (*b*) to engage in such other activities as the General Partner deems necessary, advisable, convenient or incidental to the foregoing and (*c*) to engage in any other lawful acts or activities consistent with the foregoing for which limited partnerships may be formed under the Partnership Law, *provided* that the Fund shall not undertake business with the public in the Cayman Islands (other than so far as may be necessary to carry on the activities of the Fund exterior to the Cayman Islands).

1.4    Term.   The term of the Fund commenced on December 14, 2017 and shall continue, unless the Fund is sooner wound-up and dissolved, until the tenth anniversary of the Initial Closing, *provided* that, unless the Fund is wound-up sooner dissolved, the term of the Fund may be extended by the General Partner with the consent of the Advisory Committee for up to three successive periods of one year each (such term, including any such extensions, being referred to as the "Term").   Notwithstanding the expiration of the Term, the Fund shall continue in existence until the filing of a Notice of Dissolution of the Fund in accordance with Section 11.4.

1.5    Fiscal Year.   The fiscal year of the Fund shall end on the 31st day of December in each year (the "Fiscal Year").   Except as otherwise required by law, the Fund shall have the same Fiscal Year for financial and partnership accounting purposes.

1.6    Powers.   Subject to the other provisions of this Agreement, the Fund acting by the General Partner shall be and hereby is authorized and empowered to do or cause to be done any and all acts determined by the General Partner to be necessary, advisable, convenient or incidental in furtherance of the purposes of the Fund, without any further act, approval or vote of any Person, including the Limited Partner; and without limiting the generality of the foregoing, the Fund (and the General Partner on behalf of the Fund) is hereby authorized and empowered:

(a)     to acquire, hold, Transfer, manage, vote and own Securities and any other assets held by the Fund, in accordance with and subject to the Investment Objectives;

(b)    to establish, maintain or close one or more offices outside the Cayman Islands and in connection therewith to rent or acquire office space and to engage personnel;

(c)    to open, maintain and close bank, brokerage and money market accounts, to draw checks or other orders for the payment of moneys, to exchange U.S. dollars held by the Fund into non-U.S. currencies and vice-versa, to enter into currency forward and futures contracts and to hedge with respect to Portfolio Investments held or proposed to be acquired (but not for speculative purposes, and the Fund may not sell any Securities or other assets short or enter into a similar transaction for a purpose other than to hedge currency exposure or manage duration), and to invest such funds as are temporarily not otherwise required for Fund purposes in Temporary Investments;

(d)    to set aside funds for reasonable reserves, anticipated contingencies and working capital, including for expenses and liabilities of the Fund and amounts in respect of the exercise price of options, warrants and similar securities or instruments purchased or received or anticipated to be purchased or received in connection with Portfolio Investments;

(e)    to bring, defend, settle and dispose of Proceedings;

(f)    to engage or discharge consultants, custodians, attorneys, placement agents, accountants and other agents and employees, including Persons that may be the Limited Partner or Affiliates thereof or Affiliates of the General Partner, *provided* that the terms of any such engagement with an Affiliate of the General Partner are no less favorable to the Fund than could be obtained in arm's-length negotiations with unrelated third Persons for similar services, and to authorize each such agent and employee (who may be designated as officers) to act for and on behalf of the Fund;

(g)    to (*i*) retain the Manager to render investment advisory and managerial services to the Fund as contemplated by Section 7.1, *provided* that such retention shall not relieve the General Partner of any of its obligations hereunder, (*ii*) execute, deliver and perform its obligations under the Management Agreement and (*iii*) with the consent of the Limited Partner, amend or supplement such agreement;

(h)    to execute, deliver and perform its obligations under contracts and agreements of every kind, and amendments thereto, necessary or incidental to the offer and sale of interests in the Fund, to the acquisition, holding and Transfer of Securities, or otherwise to the accomplishment of the Fund's purposes, and to take or omit to take such other actions in connection with such offer and sale, with such acquisition, holding or Transfer, or with the investment and other activities of the Fund, as may be necessary, advisable, convenient or incidental to further the purposes of the Fund;

(i)    to borrow money and to issue guarantees, to enter into agreements with respect to obligations of the Fund or one or more Portfolio Companies, to pledge or charge

assets of the Fund and to enter into any instrument or arrangements in connection therewith, including entering into any pledge, charge, security, lien, assignment or indemnity agreement and any modification, extension or renewal thereof;

(j)    to prepare and file all tax returns of the Fund; to make such elections under the Code (including an election under section 743(e) or 754 of the Code) and other relevant tax laws as to the treatment of items of Fund income, gain, loss, deduction and credit, and as to all other relevant matters, as the General Partner deems necessary or appropriate; and, subject to Section 8.1, to select the method of accounting and bookkeeping procedures to be used by the Fund;

(k)    to take all action that may be necessary, advisable, convenient or incidental for the continuation of the Fund's valid existence as an exempted limited partnership under the Partnership Law (including making such filings with the Registrar of Exempted Limited Partnerships in the Cayman Islands as are necessary to continue the registration of the Fund as an exempted limited partnership under and to comply with the Partnership Law) and in each other jurisdiction in which such action is necessary to protect the limited liability of the Limited Partner or to enable the Fund, consistent with such limited liability, to conduct the investment and other activities in which it is engaged; and

(l)    to carry on any other activities necessary to, in connection with, or incidental to any of the foregoing or the Fund's investment and other activities.

1.7    <u>Specific Authorization</u>.    Notwithstanding any other provision of this Agreement, the Fund, and the General Partner on behalf of the Fund, may execute, deliver and perform the Management Agreement, the Clawback Guarantee, the Subscription Agreement and any amendments to such agreements, all without any further act, approval or vote of any Partner or other Person. The General Partner is hereby authorized to enter into and perform on behalf of the Fund the agreements described in the immediately preceding sentence, but such authorization shall not be deemed a restriction on the power of the General Partner to enter into other agreements on behalf of the Fund (subject to any other restrictions expressly set forth in this Agreement).

1.8    <u>Amendment and Restatement of Agreement; Admission of the Limited Partner</u>.    The parties hereto hereby agree to continue the Fund and hereby amend and restate the Original Agreement, which is replaced and superseded in its entirety by this Agreement. Immediately following the admission of the Limited Partner on the date of the Initial Closing, the Initial Limited Partner shall cease to be a partner of the Fund and the Fund shall return the original capital contribution made by the Initial Limited Partner, who shall have no further rights or claims against, or obligations as a partner of, the Fund. A Person shall be admitted at the Initial Closing as a limited partner of the Fund at the time that (*a*) this Agreement or a counterpart hereof is executed by or on behalf of such Person and a Subscription Agreement or a counterpart thereof is executed by or on behalf of such Person and by the General Partner on behalf of the Fund and (*b*) such Person is

*Confidential*

16

listed by the General Partner as the limited partner of the Fund on the Register. The General Partner shall inscribe, or arrange the inscription of, the names of the Limited Partner in the Cayman Register, and shall update the Cayman Register as necessary to accurately reflect the information therein in accordance with the Partnership Law. After the Initial Closing, Persons shall be admitted as limited partners of the Fund as provided in Article X.

1.9    Expenses. All Organizational Expenses and Fund Expenses shall be paid by or out of the assets of the Fund. To the extent that any of the General Partner, the Manager, a Related Investment Fund or any of their respective Affiliates pays any Organizational Expenses or Fund Expenses, the Fund shall reimburse such Person upon request. Manager Expenses shall not be borne by the Fund.

1.10    Register. The General Partner shall cause to be maintained in the principal office of the Manager a register setting forth the name, address and amount of the Capital Commitment of each Partner and such other information as the General Partner may deem necessary or desirable (the "Register"). The Register shall not be part of this Agreement. The General Partner shall from time to time update the Register as necessary to accurately reflect the information therein. Any reference in this Agreement to the Register shall be deemed a reference to the Register as in effect from time to time. Subject to the terms of this Agreement, the General Partner may take any action authorized hereunder in respect of the Register without any need to obtain the consent of any other Partner. No action of the Limited Partner shall be required to amend or update the Register. Subject to applicable law, the General Partner shall deliver a copy of the Register to each Partner that submits a written request to the General Partner that the General Partner provide such Partner with a copy of the Register for any purpose reasonably related to such Partner's interest as a partner in the Fund.

1.11    Cayman Register and the Cayman Record. The General Partner shall cause to be maintained a register of limited partnership interests of the Fund which shall include, as required by the Partnership Law, the name and address of each Limited Partner, the date on which a person became a Limited Partner and the date on which a person ceased to be a Limited Partner (the "Cayman Register"). The General Partner shall further cause to be maintained a record of the amount and date of the contribution or contributions of each Limited Partner and the amount and date of any payment representing a return of the whole or any part of the contribution of any Limited Partner (the "Cayman Record"). The Cayman Register and the Cayman Record shall not be part of this Agreement. The General Partner shall cause the Cayman Register or the Cayman Record, as the case may be, to be amended from time to time to reflect any change in the particulars therein within twenty-one days of the date of such change, or otherwise in accordance with the Partnership Law.Any reference in this Agreement to the Cayman Register or the Cayman Record shall be deemed a reference to the Cayman Register or the Cayman Record as in effect from time to time. Subject to the terms of this Agreement,

the General Partner may take any action authorized hereunder in respect of the Cayman Register or the Cayman Record without any need to obtain the consent of any other Partner. No action of the Limited Partner shall be required to amend or update the Cayman Register or the Cayman Record.

## ARTICLE II

## THE GENERAL PARTNER

2.1    <u>Management of the Fund, etc.</u>  The management, control and operation of and the determination of policy with respect to the Fund and its investment and other activities shall be vested exclusively in the General Partner (acting directly or through its duly appointed agents), which is hereby authorized and empowered on behalf and in the name of the Fund and in its own name, if necessary or appropriate, but subject to the other provisions of this Agreement, to carry out any and all of the purposes of the Fund and to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary, advisable, convenient or incidental thereto, including organizing any Related Investment Funds. The General Partner may exercise on behalf of the Fund, and may delegate to the Manager, all of the powers set forth in Sections 1.6 and 1.7, *provided* that the management and the conduct of the activities of the Fund shall remain the sole responsibility of the General Partner, and all decisions relating to the selection and disposition of the Fund's investments shall be made exclusively by the General Partner in accordance with this Agreement.

2.2    <u>Reliance by Third Parties</u>.  In dealing with the General Partner and its duly appointed agents, including the Manager, no Person shall be required to inquire as to the General Partner's or any such agent's authority to bind the Fund.

2.3    <u>Conflicts of Interest, etc.</u>

(a)    <u>Sponsorship of Successor Funds</u>.  Until the earlier of (*i*) the date on which at least 75% of the aggregate Capital Commitments of the Non-Defaulting Partners have been contributed to the Fund or committed in writing to make Portfolio Investments, used to pay Organizational Expenses and Fund Expenses, or reserved for the funding of Follow-On Investments, the refinancing of any outstanding Bridge Investments and the payment of Organizational Expenses and Fund Expenses, and (*ii*) the last day of the Investment Period, neither the General Partner nor any of its Affiliates will admit investors to any pooled multiple-investment vehicle (other than the Fund, any Related Investment Funds and any entity formed in connection with a Portfolio Investment) having investment objectives and strategies substantially similar to the Investment Objectives of the Fund (a "<u>Successor Fund</u>") without the consent of the Limited Partner.

*Confidential*

(b)     Personal Investments.  During the Term, neither the General Partner nor any of its Affiliates may acquire, invest in or hold Securities of any Portfolio Company, or any Securities that would be required to be offered to the Fund pursuant to Section 2.3(c), without the consent of the Advisory Committee, *provided* that the foregoing restriction shall not apply to (*i*) Securities held by the General Partner and its Affiliates through the General Partner, the Fund, any Related Investment Fund or any Successor Fund or (*ii*) Securities of a Portfolio Company that were received as a distribution from the Fund, any Related Investment Fund or any Successor Fund or that were granted or paid to the General Partner, the Manager or any of their respective Affiliates in such Person's capacity as a director of such Portfolio Company or an Affiliate thereof (it being understood that for the purposes of the definition of "Fee Income" any such Securities shall be treated as included in directors' fees), and *provided, further,* that nothing in this Section 2.3(b) shall prohibit any Affiliate of the General Partner from acquiring, investing in, reinvesting in, holding or disposing of Securities of a Person or an Affiliate of a Person (*A*) in which such Affiliate of the General Partner either holds an investment, or as to which such Affiliate of the General Partner has entered into a prior written commitment to invest, prior to the Initial Closing (or, in the case of any Person that becomes an Affiliate of the General Partner after the date of the Initial Closing, prior to the date on which such Person becomes such an Affiliate) (any such investment by an Affiliate of the General Partner being referred to as a "Pre-Existing Investment"), (*B*) as a limited partner or other passive investor in a public or private investment vehicle or (*C*) that are held in an account or trust maintained for the benefit of, or owned by, any Person, *provided* that such Person does not exercise investment discretion with respect to such Securities.

(c)     Allocation of Deal Flow.  The Limited Partners acknowledges and agrees that the Co-Founders are currently employed by Reynolds, and while it is not expected that Reynolds will make investments outside its existing core strategies and the Fund does not intend to target investments within the Reynolds existing core strategies, it is possible that Reynolds may in the future make an investment that might otherwise be suitable for the Fund and that such investment by Reynolds shall not be considered an investment opportunity for the Fund.   Except as otherwise permitted by immediately preceding sentence and Section 4.5, during the Investment Period any investment opportunity, other than Pre-Existing Investments, that is presented to the General Partner or any of its Affiliates and that the General Partner determines in good faith to be suitable and appropriate for the Fund and consistent with the Investment Objectives will be offered by the General Partner to the Fund, and the General Partner shall cause its Affiliates to offer any such investment opportunities to the Fund, to the extent that the Fund has available Remaining Capital Commitments net of reserves, including amounts reserved for (*i*) payment of Organizational Expenses and Fund Expenses throughout the Term, (*ii*) funding of Follow-On Investments and (*iii*) funding of any written commitments of the Fund, sufficient to enable the Fund effectively to participate in such investment opportunity. Notwithstanding the foregoing, with the consent of the Limited Partner, the Fund may co-invest with a Successor Fund in any investment opportunity offered to the

*Confidential*

Fund, and the General Partner may allocate such portion of such investment opportunity to such Successor Fund as the General Partner believes to be fair and reasonable, *provided* that any such co-investment shall be subject to the co-investment conditions set forth in Section 4.5(b)(ii), and *provided, further*, the Fund shall not make an initial investment in a Person in which Reynolds, the General Partner or a Successor Fund or their respective Affiliates own Securities without the consent of the Limited Partner, the Limited Partner hereby acknowledging and agreeing that the first Portfolio Investment made by the Fund will be the acquisition of XpressDocs acquired form Reynolds.

(d)  <u>Transactions with Affiliates</u>. The Limited Partner hereby acknowledges and agrees to the following: (*i*) the Fund may enter into contracts and transactions with any of the General Partner and its Affiliates and (*ii*) the General Partner and its Affiliates may enter into contracts and transactions with the Fund and with any Portfolio Company, *provided*, in each case, that (*A*) such contract or transaction is authorized by this Agreement or (*B*) such contract or transaction has been approved by the Limited Partner. Notwithstanding anything in this Agreement to the contrary and except as provided in the last proviso of Section 2.3(c), without the consent of the Limited Partner, the Fund shall not (*w*) sell any Security to or purchase any Security from the General Partner, a Successor Fund or their respective Affiliates, (*x*) sell or purchase any Security in a transaction in which the General Partner or one of its Affiliates is acting as "broker," as such term is used in section 206(3) of the Advisers Act, for another Person, (*y*) consent to the "assignment" (as defined under the Advisers Act) of any management agreement referred to in Section 7.1 or (*z*) enter into any other transaction in which the Advisers Act requires the consent of the Fund as client. Notwithstanding the foregoing, the consent of the Advisory Committee or the Limited Partner shall not be required under this Section 2.3(d) with respect to any payments of or arrangements with respect to Fee Income and the Limited Partner hereby consents to loans made by Reynolds to any Portfolio Company, *provided* such loans are on terms no less favorable to the Portfolio Company than would be a comparable loan provided by the third-party commercial lender in which case the consent of the Limited Partner shall be required.

(e)  <u>Devotion of Time</u>. During the Investment Period, the General Partner and the Manager shall cause the Co-Founders, for so long as they are employed by the Manager or any of its Affiliates, to devote substantially all of their business time and efforts to the investment and other activities of the Fund and any Related Investment Funds. Notwithstanding the foregoing, each of the Co-Founders may (*i*) for so long as each remains an employ of The Reynolds and Reynolds Company, devote such time and efforts to the business of The Reynolds and Reynolds Company as they shall deem reasonably necessary to the affairs of such company, (*ii*) devote such time and efforts as they deem reasonably necessary to the affairs of any Successor Funds and any Pre-Existing Investments, (*iii*) serve on boards of directors of public and private companies and retain fees for such services for such Co-Founder's own account (other than fees that constitute Fee Income), (*iv*) engage in such civic, professional, industry and charitable activities as

such Co-Founder shall choose, (*v*) conduct and manage such Co-Founder's personal and family investment activities and *(vi)* engage in any other activities approved by the Limited Partner. After the end of the Investment Period, the General Partner and the Manager shall, and shall cause each of the Co-Founders for so long as each such Co-Founder is affiliated with or employed by the Manager or any of its Affiliates to, devote such time to the Fund and any Related Investment Fund as is reasonably required to conduct the investment and other activities of the Fund and such Related Investment Fund. Subject to the foregoing and to the other provisions of this Agreement, the General Partner, the Manager, the Co-Founders and their respective Affiliates may engage independently or with others in other investments or business ventures of any kind.

(f)     Other Potential Conflicts of Interest.

(i)     While the General Partner and the Manager intend to avoid situations involving conflicts of interest, the Limited Partner acknowledges that there may be situations in which the interests of the Fund, in a Portfolio Company or otherwise, may conflict with the interests of any Related Investment Fund, any Successor Fund, the General Partner, the Manager, the Co-Founders or their respective Affiliates. The Limited Partner agrees that the activities of any Related Investment Fund, any Successor Fund, the General Partner, the Manager, the Co-Founders and their respective Affiliates expressly authorized by this Section 2.3 or in any other provision of this Agreement may be engaged in by such Related Investment Fund, such Successor Fund, the General Partner, the Manager, the Co-Founders or any such Affiliate, as the case may be, and will not, in any case or in the aggregate, be deemed a breach of this Agreement or any other agreement contemplated herein or any duty that might be owed by any such Person to the Fund or to any Partner at law or in equity or otherwise.

(ii)     On any matter involving a conflict of interest not provided for in this Section 2.3 or elsewhere in this Agreement, (*A*) each of the General Partner and the Manager will be guided by its good faith judgment as to the best interests of the Fund and shall take such actions as are determined by the General Partner or the Manager, as the case may be, to be necessary or appropriate to ameliorate such conflicts of interest and (*B*) the General Partner or the Manager will consult with the Advisory Committee with respect to any matter as to which the General Partner determines in good faith that such a conflict of interest exists. If the General Partner or the Manager consults with the Advisory Committee with respect to a matter giving rise to a conflict of interest, and if the Advisory Committee waives such conflict of interest or the General Partner or the Manager acts in a manner, or pursuant to standards or procedures, approved by the Advisory Committee with respect to such conflict of interest, then none of the Related Investment Funds, the Successor Funds, the General Partner, the Manager, the Co-Founders or any of their respective Affiliates shall have any liability to the Fund or any Partner for such actions in respect of such matter taken in good faith by them, including actions in the pursuit of their own interests, and such actions shall not constitute a breach

*Confidential*

of this Agreement or any other agreement contemplated herein or of any duty or obligation of such Person at law or in equity or otherwise.

2.4    Liability of the General Partner and Other Covered Persons.

(a)    General.    The General Partner has the liabilities specified under the Partnership Law, except as otherwise modified herein to the extent permitted by applicable law, to (*i*) Persons other than the Fund and the other Partners and (*ii*) the Fund and the other Partners. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any other agreement contemplated herein or applicable provisions of law or equity or otherwise, no Covered Person shall be liable to the Fund or any Partner, and each Partner does hereby release such Covered Person, for any act or omission, including any mistake of fact or error in judgment, taken, suffered or made by such Covered Person in good faith and in the belief that such act or omission is in or is not contrary to the best interests of the Fund and is within the scope of authority granted to such Covered Person by this Agreement or in any other agreement contemplated herein, *provided* that such act or omission does not constitute Disabling Conduct by the Covered Person. No Partner shall be liable to the Fund or any Partner for any action taken by any other Partner. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person otherwise existing at law or in equity and to the extent permitted by law, are agreed by the Partners to replace such other duties and liabilities of such Covered Person.

(b)    Reliance.    A Covered Person shall incur no liability to the Fund or any Partner in acting in good faith upon any signature or writing believed by such Covered Person to be genuine, may rely in good faith on a certificate signed by an executive officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, and may rely in good faith on an opinion of counsel selected by such Covered Person with respect to legal matters, except to the extent that such belief, reliance or selection constituted Disabling Conduct by the Covered Person. Each Covered Person may act directly or through such Covered Person's agents or attorneys. Each Covered Person may consult with counsel, appraisers, engineers, accountants and other skilled Persons selected by such Covered Person and shall not be liable to the Fund or any Partner for anything done, suffered or omitted in good faith in reliance upon the advice of any of such Persons, *provided* that such selection, action or omission does not constitute Disabling Conduct. No Covered Person shall be liable to the Fund or any Partner for any error of judgment made in good faith by an officer or employee of such Covered Person, *provided* that such error does not constitute Disabling Conduct of such Covered Person.

(c)    General Partner Not Liable for Return of Capital Contributions.    Except as provided in Section 11.3, neither the General Partner nor any of its Affiliates shall be liable for the return of the Capital Contributions of any Partner, and such return shall be made solely from Available Assets of the Fund, if any, and the Limited Partner hereby waives

*Confidential*

any and all claims that it may have against the General Partner or any Affiliate thereof in this regard.

2.5   <u>Removal of the General Partner</u>.   The General Partner shall promptly notify the Limited Partner in writing of any Removal Conduct.  The General Partner may be removed as the general partner of the Fund within 120 days after such notice by the written election of the Limited Partner, at which time a replacement general partner of the Fund shall be designated by the written election of the Limited Partner, *provided* that any such replacement general partner shall be a Person permitted by applicable law.  The General Partner shall file, or cause to be filed, a Section 10 Statement with the Cayman Islands Registrar of Exempted Limited Partnerships or any other document required to be filed pursuant to the Partnership Law to give effect to the provisions of this section 2.5. Upon such election and the filing of the Section 10 Statement:

(a)     the General Partner shall thereupon become, without any further action being required of any Person, a Limited Partner and shall cease being the general partner of the Fund, but shall not thereafter be obligated to fund any Capital Contributions other than Fund Expenses (*i*) relating to Portfolio Investments made prior to the removal of the replaced General Partner or (*ii*) arising out of or relating to its activities during the period prior to the removal of the replaced General Partner as the general partner of the Fund or otherwise arising out of the replaced General Partner's service as general partner of the Fund;

(b)     the replacement general partner of the Fund shall be admitted to the Fund as a general partner of the Fund pursuant to Section 2.5(a) and shall promptly amend this Agreement without any further action, approval or vote of any Person, including any other Partner, to reflect (*i*) the admission of such replacement general partner, (*ii*) the removal of the General Partner as the general partner of the Fund, (*iii*) the removal of any obligations or limitations that expressly relate to any Affiliates of the replaced General Partner, including in its capacity as a Limited Partner and (*iv*) the change of the name of the Fund so that it does not include the words "Falcata Tech Investment Fund I" or "Falcata" or any variation thereof, including any name to which the name of the Fund may have been changed;

(c)     the replaced General Partner shall thereafter be entitled to receive all distributions that otherwise would have been distributable to it pursuant to this Agreement as if it had not been removed as the general partner of the Fund with respect to Portfolio Investments made by the Fund on or before the effective date of the removal of the replaced General Partner and without regard to Portfolio Investments made, or fees and expenses incurred, thereafter, except that amounts otherwise distributable to the General Partner pursuant to clauses (c) and (d) of Section 6.3 shall be reduced by 50%.  For the avoidance of doubt, such reduction shall not constitute damages with respect to any act or omission. The Limited Partner preserves the right to pursue the General Partner for any legal claims

*Confidential*

relating to or arising out of the investment or other activities of the Fund or otherwise relating to or arising out of this Agreement.

(d)    the replaced General Partner and its Affiliates shall continue to be Covered Persons and to be entitled to indemnification hereunder pursuant to Section 9.1, but only with respect to Damages (*i*) relating to Portfolio Investments made prior to the removal of the replaced General Partner or (*ii*) arising out of or relating to their activities during the period prior to the removal of the replaced General Partner as the general partner of the Fund or otherwise arising out of the replaced General Partner's service as general partner of the Fund or any Related Investment Fund;

(e)    Section 11.3 shall be applied to the replaced General Partner (and all calculations thereunder shall be made) as though the only Portfolio Investments, Organizational Expenses and Fund Expenses were those made and incurred prior to the effective date of the removal of the replaced General Partner;

(f)    any amounts held in the Segregated Reserve Account shall be transferred to an escrow account established in the name of the Fund at a bank selected by the replacement general partner for such purpose, and such escrow account shall constitute the Segregated Reserve Account and amounts deposited therein shall be held, applied and released as provided in Sections 6.13 and 11.2(b) and not used for any other purpose;

(g)    for all other purposes of this Agreement, the replacement general partner of the Fund shall be deemed to be the "General Partner" hereunder and shall be deemed to be admitted as the general partner of the Fund without any further action, approval or vote of any Person, including any other Partner, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, effective immediately prior to the removal of the replaced General Partner and shall continue the investment and other activities of the Fund without dissolution; and

(h)    the appointment of the Manager pursuant to Article VII, the right of the Manager to receive future installments of the Management Fee and any management agreement between the Fund and the Manager pursuant to Article VII shall terminate.

2.6    <u>Modifications Relating to the Governing Documents of the General Partner</u>. The General Partner agrees that it will not (*a*) amend the provisions of the limited liability agreement governing the allocation, distribution and vesting of the Carried Interest or (*b*) increase the allocation of the Carried Interest to the Co-Founders, except as otherwise permitted by such limited liability agreement, in each case without the prior written consent of the Limited Partner.

2.7    <u>Bankruptcy, Dissolution or Withdrawal of the General Partner</u>. The eneral Partner or its legal representative shall promptly serve notice on all Limited Partners informing them of an Event of Withdrawal. Upon the occurrence of any Event of

*Confidential*

Withdrawal the Fund shall be wound-up and dissolved as provided in Article XI and in accordance with the Partnership Law, unless a new qualifying general partner is elected by the Limited Partner within ninety days after the service if notice of an event of withdrawal and the assignee is admitted as a replacement general partner of the Fund pursuant to Section 10.1(e). The General Partner shall take no action to accomplish its voluntary dissolution. The General Partner shall not withdraw as general partner of the Fund prior to the dissolution of the Fund except pursuant to Section 10.1(e).

## ARTICLE III

## THE LIMITED PARTNERS

3.1    No Participation in Management; Voting, etc. The Limited Partner shall not take part in the conduct of the activities of the Fund or in the management or control of the Fund's investment or other activities, transact any business in the Fund's name, deal with any Person on behalf of the Fund who or that is not a Partner or have the power to sign documents for or otherwise bind the Fund. Except as expressly provided herein and in the Partnership Law, the Limited Partner shall not have the right to vote for the election, removal or replacement of the General Partner. No provision of this Agreement shall obligate the Limited Partner to refer investments to the Fund or restrict any investments that the Limited Partner may make. The exercise by the Limited Partner of any right conferred herein shall not be construed to constitute participation by the Limited Partner in the conduct of the business of the Fund or in the control of the investment or other activities of the Fund so as to make the Limited Partner liable as a general partner for the debts and obligations of the Fund for purposes of the Partnership Law or otherwise. For the avoidance of doubt, to the fullest extent permitted by applicable law, this Agreement shall not create any fiduciary duty on the part of the Limited Partner to the Fund or any other Partner.

3.2    Limitation of Liability. Except as may otherwise be required by the Partnership Law or as expressly provided for herein, the liability of the Limited Partner is limited to its Capital Commitment.

3.3    Bankruptcy, Dissolution or Withdrawal of the Limited Partner. The bankruptcy, dissolution or withdrawal of the Limited Partner shall not in and of itself dissolve or terminate the Fund. The Limited Partner shall not withdraw from the Fund prior to the dissolution of the Fund except pursuant to Section 4.5(c)(iii) or 10.1.

3.4    Advisory Committee.

(a)    Appointment of Members, etc. If a Parallel Fund is established, the General Partner shall establish, no later than 30 days after the establishment of such Parallel Fund, a single advisory committee (the "Advisory Committee") for the Fund and certain Related

*Confidential*

Investment Funds, appointed by the General Partner and may from time to time appoint one or more additional voting members to the Advisory Committee with the consent of the Limited Partner. If a Parallel Fund is not established, all references in this Agreement to the consent of the Advisory Committee shall be deemed to mean the consent of the Limited Partner. If the Advisory Committee is formed, a representative of the Limited Partner shall be a voting member of the Advisory Committee. Each other voting member of the Advisory Committee shall be a representative of a limited partner (or similar member) of the Parallel Fund, *provided* that no such limited partner shall have more than one representative on the Advisory Committee. Each member who is a representative of a limited partner may be required to designate in writing to the General Partner one or more alternate representatives; such alternates shall have authority to act in the place of such member in the event that such member is unavailable for any reason to participate in any vote, consent or other action of the Advisory Committee. The General Partner shall have the right to appoint one representative of the General Partner to serve as a non-voting member and the Chairman of the Advisory Committee. Any member of the Advisory Committee may resign by giving the General Partner 30 days' prior written notice, and shall be deemed removed if the limited partner that the member represents (*i*) becomes a Defaulting Partner (or a defaulting partner of the applicable Parallel Fund), (*ii*) assigns in excess of 50% of its interest in the Fund (or such Parallel Fund) to a Person that is not an Affiliate of such limited partner, (*iii*) removes or replaces such member upon notice to the General Partner or (*iv*) is notified that such member has been removed upon the recommendation of the General Partner with the consent of the Limited Partner. For the avoidance of doubt, upon the death or resignation of a voting member of the Advisory Committee or the removal of such member upon the recommendation of the General Partner or the limited partner that such member represents prior to the expiration of such member's term, the limited partner that such member represents may appoint a replacement for such member for the balance of such term. Upon the deemed removal of a voting member of the Advisory Committee, the General Partner may appoint a replacement for the balance of such member's term. Upon the expiration of the term of a voting member of the Advisory Committee, the General Partner may reappoint such member for an additional term or appoint a replacement member.

(b)    Scope of Authority. The Advisory Committee shall be authorized to (*i*) consent to, approve, review or waive any matter requiring the consent, approval, review or waiver of the Advisory Committee, including transactions requiring the approval of the Fund as client pursuant to section 206(3) or any other provision of the Advisers Act, as set forth in this Agreement, *provided* that any matter for which the affirmative or negative consent or approval of the Advisory Committee is required under this Agreement or that may be waived by the Advisory Committee under this Agreement may instead be consented to, approved or waived by the Limited Partner, which action will be effective as if such consent, approval or waiver were given by the Advisory Committee and (*ii*) provide such advice and counsel as is requested by the General Partner or required pursuant to this Agreement in connection with potential conflicts of interest, valuation matters and other

*Confidential*

matters relating to the Fund and any Related Investment Funds. The Advisory Committee shall constitute a committee of the Fund and shall neither conduct any business on behalf of the Fund with Persons who or that are not Partners nor take any part in the control or management of the Fund, nor shall it have any power or authority to act for or on behalf of the Fund, and all investment decisions, as well as all responsibility for the management of the Fund, shall rest with the General Partner. For the avoidance of doubt, the Advisory Committee shall not, nor shall any member thereof, constitute a general partner of the Fund and no action undertaken by the Advisory Committee, nor any action by any member thereof, shall constitute participation in the control of the investment or other activities of the Fund under the Partnership Law. Except for those matters for which the consent, approval, review or waiver of the Advisory Committee is required by this Agreement, any actions taken by the Advisory Committee shall be advisory only, and none of the General Partner, the Manager or any of their respective Affiliates shall be required or otherwise bound to act in accordance with any decision, action or comment of the Advisory Committee or any of its members. Notwithstanding anything to the contrary in this Agreement, in no event shall a member of the Advisory Committee be permitted to take any action that would result in the Limited Partner being considered a general partner of the Fund by agreement, estoppel, as a result of the performance of such member's duties or otherwise. Under no circumstances may members of the Advisory Committee communicate with any third party in connection with the investment activities of the Fund, other than the General Partner in its capacity as a general partner or the Limited Partner in its capacity as Limited Partner.

(c)     <u>Other Activities of the Members</u>.  The Partners acknowledge that the members of the Advisory Committee (*i*) will not be obligated, to the fullest extent permitted by applicable law, to act in a fiduciary capacity with respect to the Fund and any Related Investment Funds or any Partner, other than to act in accordance with the implied contractual covenant of good faith and fair dealing, (*ii*) have substantial responsibilities in addition to their Advisory Committee activities and are not obligated to devote any fixed portion of their time to the activities of the Advisory Committee and (*iii*) other than any non-voting member appointed by the General Partner, will not be subject to the restrictions set forth in Section 2.3 and will not be prohibited from engaging in activities that compete or conflict with those of the Fund or any Related Investment Fund, nor shall any such restrictions apply to any of their respective Affiliates.

(d)     <u>Meetings</u>.  Regular meetings of the Advisory Committee shall be held at least annually, commencing after the formation of the Advisory Committee, upon not less than 30 days' prior written notice by the General Partner to the members of the Advisory Committee. Special meetings of the Advisory Committee may be called either by the General Partner or by the Limited Partner at any time to consider matters for which the consent, approval, review or waiver of the Advisory Committee is required by this Agreement or is requested by the General Partner or by the Limited Partner. Notice of each such special meeting shall be given by telephone, hand delivery or air courier service

or sent by fax or other electronic means to each member of the Advisory Committee at least five Business Days prior to the date on which the meeting is to be held. Attendance at any meeting of the Advisory Committee shall constitute waiver of such notice. The quorum for a meeting of the Advisory Committee shall be a majority of its voting members, which majority must include the member representing the Limited Partner. Members of the Advisory Committee may participate in a meeting of the Advisory Committee by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other. All actions taken by the Advisory Committee shall be by a vote of a majority of the voting members present who do not abstain from such vote, which majority must include the member representing the Limited Partner, at a meeting thereof at which a quorum is present or by a written consent setting forth the action so taken and approved by a majority of the voting members of the Advisory Committee, which majority must include the member representing the Limited Partner. Except as expressly provided in this Section 3.4, the Advisory Committee shall conduct its business in such manner and by such procedures as a majority of its members deems appropriate, which majority must include the member representing the Limited Partner.

(e)    <u>Fees and Expenses, etc</u>. The members of the Advisory Committee shall serve without compensation, but shall be reimbursed by the Fund for all reasonable out-of-pocket expenses incurred in attending meetings of the Advisory Committee. The members of the Advisory Committee shall be indemnified by the Fund as provided in Section 9.1.

# ARTICLE IV

# INVESTMENTS

4.1    <u>Investments in Portfolio Companies</u>.

(a)    <u>Portfolio Investments</u>.    The General Partner will seek to obtain opportunities for the Fund to make Portfolio Investments in accordance with the Investment Objectives. Prior to making a new Portfolio Investment, the General Partner shall provide a description of such investment to the Limited Partner, which description shall include a preliminary indication of the anticipated purchase price and acquisition structure of the investment, and obtain the written consent of the Limited Partner with respect to such investment prior the commencement of substantial due diligence relating thereto; the Limited Partner may at any time waive the application of this obligation to any or all future Portfolio Investments. The Limited Partner shall, within 10 Business Days after receipt of such information, either provide such consent or notify the General Partner that it declines to consent; *provided*, however that in the absence of any such consent or notice within such 10 Business Day period, the General Partner may commence such due diligence. The Limited Partner hereby acknowledges and agrees that it has approved the acquisition by the Fund of XpressDocs from Reynolds for a purchase price of approximately $180 million. The General Partner shall endeavor to cause the Fund to sell,

refinance or otherwise dispose of each Portfolio Investment within five years after such Portfolio Investment is first acquired by the Fund, and if not so disposed of within such five year period, shall in any event cause the Fund to so dispose of such Portfolio Investment within eight years after such Portfolio Investment is first acquired by the Fund, unless the Limited Partner otherwise consents that the Fund may continue to hold such Portfolio Investment for up to two additional years, or for such other holding period with the consent of the Limited Partner.

(b)     Bridge Investments. The Fund may provide interim financing to, or make investments that are intended to be of a temporary nature in Securities of, any Portfolio Company or any subsidiary thereof in connection with or subsequent to a Portfolio Investment by the Fund in such Portfolio Company (each a "Bridge Investment"), provided that the cost of all Portfolio Investments, including Bridge Investments, in any Portfolio Company shall not exceed 35% of aggregate Capital Commitments. The General Partner may increase the Partners' Remaining Capital Commitments with respect to Distributable Cash received by the Fund in respect of a Bridge Investment repaid, refinanced or otherwise disposed of prior to the 18-month anniversary of the date on which such Bridge Investment was made, in an amount up to and in proportion to the Capital Contributions of the Partners with respect to such Bridge Investment. In the event that a Bridge Investment is not repaid, refinanced or otherwise disposed of prior to the 18-month anniversary of the date that such Bridge Investment was made, such Bridge Investment shall cease to be treated as a Bridge Investment on such 18-month anniversary, shall be treated as a Portfolio Investment that is not a Bridge Investment and any amounts theretofore distributed pursuant to Section 6.4(b) with respect to such Bridge Investment shall thereafter be taken into account in determining subsequent distributions under Section 6.3 with respect to such Portfolio Investment so that each Partner receives, to the extent possible, the aggregate amount of distributions that it would have received had such Bridge Investment been deemed to be a Portfolio Investment that is not a Bridge Investment for purposes of this Agreement from and after the date that such Bridge Investment was made.

(c)     Investments Following Termination of Investment Period.  Following the termination of the Investment Period, no new Portfolio Investments will be made by the Fund, *provided* that Remaining Capital Commitments may be drawn down from time to time following the termination of the Investment Period to (*i*) complete investments with respect to which a commitment has been made or a written proposal to invest has been submitted or with respect to which a transaction was contemplated by the terms of Securities held by the Fund as of the end of the Investment Period and (*ii*) for a period not to exceed three years thereafter fund Follow-On Investments in an aggregate amount not to exceed 15% of aggregate Capital Commitments.

(d)     Reinvestment. The General Partner may increase the Partners' Remaining Capital Commitments by an amount equal to all or any portion of (*i*) Distributable Cash received by the Fund in respect of a Portfolio Investment prior to the 18-month anniversary

of the Fund's acquisition of such Portfolio Investment, up to and in proportion to the Capital Contributions of the Partners with respect to such Portfolio Investment and (*ii*) Distributable Cash received by the Fund and distributed to the Partners in an amount equal to Capital Contributions made by the Partners to pay Fund Expenses or Organizational Expenses. The General Partner shall give notice to the Limited Partner of the amount subject to recall pursuant to this Section 4.1(d) (*A*) in the case of Distributable Cash described in clause (i) above, at the time such Distributable Cash is distributed to the Limited Partner, and (*B*) in the case of Distributable Cash described in clause (ii) above, promptly after the General Partner determines that such amount shall be subject to recall.

4.2    Investment Restrictions.  Without the consent of the Limited Partner, the Fund shall not:

(a)    make any Portfolio Investment in any Person that (when taken together with all other Portfolio Investments by the Fund in such Person and any of such Person's Affiliates run as a single enterprise of such Person) would result in an investment by the Fund at that time of an aggregate amount in such Person and such Person's Affiliates in excess of 20% of the aggregate Capital Commitments;

(b)    invest in excess of 20% of the aggregate Capital Commitments in Portfolio Companies that are organized and operated principally outside the United States and Canada, *provided* that, prior to making any such investment, the Fund shall receive advice of counsel qualified in the jurisdiction where the applicable Person was organized substantially to the effect that under the laws of such jurisdiction the limited liability of the Limited Partner will be recognized;

(c)    borrow money or otherwise incur indebtedness;

(d)    make any Portfolio Investment in any other pooled multiple-investment vehicle that provides for a payment by the Fund of a management fee or a carried interest or other incentive or performance-based fee; or

(e)    make any Portfolio Investment unless the General Partner determines that such investment is not "hostile" as such term is then commonly understood in the investment community.

4.3    ECI.  The Fund shall not make a Portfolio Investment that will result in the realization of ECI by a Non-U.S. Partner, unless such a Non-U.S. Partner otherwise consents.

4.4    Temporary Investments.   To the extent commercially reasonable, the General Partner shall cause the Fund to invest cash held by the Fund in Temporary Investments pending investment in Portfolio Investments, distribution or payment of Organizational Expenses or Fund Expenses.

*Confidential*

4.5    Related Investment Funds.

(a)    General. Notwithstanding any other provision of this Agreement, at any time the General Partner or any of its Affiliates may establish one or more Related Investment Funds as provided in this Section 4.5.

(b)    Co-Investment Funds.

(i)    *Co-Investment by Third Party Co-Investors.* If a co-investment opportunity arises, the General Partner may offer such opportunity on substantially similar terms in with the consent of the Limited Partner to one or more limited partners of any Related Investment Fund or to one or more Third Party Co-Investors, in addition to or to the exclusion of, any other Person. Any such co-investment may, if the General Partner so requires, be made through one or more investment partnerships or other vehicles (each a "Co-Investment Fund") formed to facilitate such co-investment, the terms of which may differ from those of the Fund. Each Co-Investment Fund will be controlled by the General Partner or an Affiliate thereof and may be managed by the Manager or an Affiliate thereof. In determining the appropriateness of offering any such opportunity, the General Partner may take into account the advisability of offering such opportunity to a Person other than the Limited Partner and other than the General Partner, the Manager and their respective Affiliates (a "Third Party Co-Investor"). With the consent of the Limited Partner, any such offer shall be made to Third Party Co-Investors in such proportions as the General Partner shall determine, and the General Partner may allocate such portion of an investment opportunity to a Co-Investment Fund as the General Partner determines in its sole discretion to be appropriate. To the extent there is a Follow-On Investment with respect to any Portfolio Investment with respect to which a co-investment was made by a Co-Investment Fund, such Follow-On Investment shall be allocated *pro rata* to the Fund, any co-investing limited partners of any Related Investment Funds and Third Party Co-Investors in proportion to their respective initial investments.

(ii)    *Co-Investment Conditions.* The terms on which a Co-Investment Fund or other co-investors contemplated by Section 4.5(b)(i) (collectively, "Co-Investors") acquire interests in a Portfolio Company shall, subject to legal, tax, regulatory or other considerations, be no more favorable to such Co-Investors than those received by the Fund, *provided* that, notwithstanding any other provision of this Agreement to the contrary, if the General Partner so determines in its sole discretion, any Portfolio Company to be acquired by the Fund and any Co-Investment Fund may be acquired initially by the Fund, with the applicable portion of such Portfolio Company to be subsequently transferred to such Co-Investment Fund at cost plus interest at a rate equal to the Prime Rate plus 2% from the date such Portfolio Company is made by the Fund to the date of such transfer. With respect to each investment in which Co-Investors co-invest with the Fund, any investment expenses or indemnification or repayment obligations related to such investments shall be borne by the Fund and such Co-Investors

*Confidential*

31

in proportion to the capital committed by each to such investment. For the avoidance of doubt, the General Partner may, with consent of the Limited Partner, structure any co-investment opportunity so that the proposed co-investors do not bear any broken deal expenses, *provided* that if so structured, such co-investors shall not be entitled to receive any break-up or similar fees that may be earned with respect to such transaction. The Fund and any Parallel Funds shall then bear all such broken deal expenses (and in such case shall be entitled to any such break-up or other similar fees). Unless the Advisory Committee otherwise consents, the General Partner shall not permit any Co-Investor to dispose of any such investment in a Portfolio Company before the Fund disposes of its investment in such Portfolio Company. If any such investment by a Co-Investor in a Portfolio Company and the Fund's investment in such Portfolio Company are disposed of at substantially the same time, such Co-Investor shall dispose of no more than its *pro rata* share of the Fund's and its investments in such Portfolio Company and on terms no more favorable to such Co-Investor than those received by the Fund. The General Partner shall cause the Co-Investors to dispose of any such investment in a Portfolio Company on a *pro rata* basis with the Fund and at substantially the same time that the Fund disposes of its investment in such Portfolio Company, unless the Co-Investors desire, for tax or other reasons, to hold some or all of such investment until a later date and the General Partner has determined that it would not be contrary to the best interests of the Fund for the Co-Investors to do so.

(iii)    *Mechanics of Formation of Co-Investment Funds.*  Notwithstanding any other provision of this Agreement, in the event that the General Partner or an Affiliate thereof forms one or more Co-Investment Funds, the General Partner shall have full authority, without the consent of any Person, including any other Partner, to amend this Agreement as may be necessary or appropriate in the good faith judgment of the General Partner to facilitate the formation and operation of such Related Investment Funds and the investments contemplated by this Section 4.5(b), and to interpret in good faith any provision of this Agreement, whether or not so amended, to give effect to the intent of the provisions of this Section 4.5(b).

(c)    <u>Parallel Funds.</u>

(i)    *Formation of Parallel Funds to Accommodate Investor Considerations.*  Prior to the Final Admission Date, the General Partner or an Affiliate thereof may, to accommodate legal, tax, regulatory or other considerations of certain investors (including employees of the Manager), form one or more pooled investment vehicles (each a "<u>Parallel Fund</u>") to co-invest with the Fund.  Any Parallel Fund will be controlled by the General Partner or an Affiliate thereof, will be managed by the Manager or an Affiliate thereof and will be governed by organizational documents containing provisions substantially similar in all material respects to those of the Fund (other than such differences as may be appropriate to accommodate legal, tax, regulatory or other considerations or such other differences with the consent of the Limited

*Confidential*

Partner). Subject to such legal, tax, regulatory or other considerations, the Parallel Funds will co-invest with the Fund in each Portfolio Company in proportion to the respective remaining capital commitments of the Parallel Funds and the Fund immediately prior to such investment. All references in this Section 4.5(c) to the limited partners of a Parallel Fund shall be deemed to include all investors in a Parallel Fund formed as a vehicle other than a limited partnership and all references in this Agreement to limited partners of a Parallel Fund shall, where the context so requires, include any feeder funds that are limited partners of such Parallel Funds.

(ii)    *Parallel Investment Conditions.* Each investment by a Parallel Fund shall, subject to legal, tax, regulatory or other considerations, be on substantially the same terms as and on economic terms that are no more favorable to such Parallel Fund than those received by the Fund. With respect to each investment in which Parallel Funds participate (or propose to participate) with the Fund, any investment expenses or any indemnification or repayment obligations related to such investment shall be borne by, the Fund and any Parallel Funds in proportion to the capital committed by each to such investment, *provided* that each Parallel Fund shall bear its share of the Fund's Organizational Expenses and Fund Expenses in proportion to the respective capital commitments of the Fund and the Parallel Funds, subject to such adjustment as the General Partner deems fair and equitable to the Fund and the Parallel Funds and to which the Limited Partner consents. Unless the Limited Partner otherwise consents, the General Partner shall not permit any Parallel Fund to dispose of its investment in a Portfolio Company before the Fund disposes of its investment in such Portfolio Company. If any investment by a Parallel Fund in a Portfolio Company and the Fund's investment in such Portfolio Company are disposed of at substantially the same time, such Parallel Fund shall dispose of no more than its *pro rata* share of the Fund's and its investments in such Portfolio Company (unless required or appropriate to meet the legal, tax, regulatory or other similar considerations that warranted the formation of such Parallel Fund) and on terms no more favorable to such Parallel Fund than those received by the Fund. The General Partner shall cause the Parallel Funds to dispose of their investments in a Portfolio Company on a *pro rata* basis with the Fund and at substantially the same time that the Fund disposes of its investment in such Portfolio Company, unless the Parallel Fund wishes to hold some or all of any such investment until a later date, the General Partner has determined that it would not be contrary to the best interests of the Fund for the Parallel Fund to do so and the Limited Partner consents.

(iii)    *Mechanics of Formation of Parallel Funds.* Notwithstanding any other provision of this Agreement to the contrary, in the event that the General Partner or an Affiliate thereof forms one or more Parallel Funds, the General Partner shall have full authority, without the consent of any Person, including any other Partner, to amend this Agreement as may be necessary or appropriate in the good faith judgment of the General Partner to facilitate the formation and operation of such Parallel Funds and the investments contemplated by this Section 4.5(c), and to interpret in good faith any

*Confidential*

provision of this Agreement, whether or not so amended, to give effect to the intent of the provisions of this Section 4.5(c).

(iv)   *Certain Adjustments.*   If one or more Parallel Funds are formed, notwithstanding any other provision of this Agreement (*A*) Fund Expenses shall include only the Fund's *pro rata* share of any costs, expenses or liabilities that are incurred by or arise out of the activities of the Fund (determined based on the relative capital commitments to the Fund and any Parallel Fund, unless the General Partner determines in its sole discretion that a different share is appropriate in the case of a particular cost, expense or liability), (*B*) Organizational Expenses shall include only the Fund's share of any costs or expenses in connection with the formation and organization of, and sale of interests in, the Fund and any Parallel Fund (determined based on the relative capital commitments to the Fund and any Parallel Fund) and (*C*) the General Partner shall make such other adjustments as it shall deem to be appropriate to the operation of this Agreement, including adjustments to the limitations set forth in Sections 4.1 and 4.2 to take into account the capital commitments to a Parallel Fund and adjustments to the co-investment percentages in the event of default.

(d)   Alternative Investment Funds.

(i)   *Formation of Alternative Investment Funds for Particular Investments.* Notwithstanding any other provision of this Agreement to the contrary, if at any time the General Partner determines that for legal, tax, regulatory or other considerations certain or all of the Partners should participate in a potential or existing Portfolio Investment through one or more alternative investment structures, the General Partner may effect the making of all or any portion of such investment either outside of or through the Fund (*A*) in the case of a potential Portfolio Investment, by requiring certain or all Partners to be admitted as limited partners or other similar investors and to make capital contributions with respect to such potential portfolio investment directly to one or more limited partnerships or other similar vehicles (each, an "Alternative Investment Fund") or by utilizing different investment structures below the Fund and requiring different classes of investors to invest through different investment structures or (*B*) in the case of an existing Portfolio Investment, by Transferring the Portfolio Investment to one or more Alternative Investment Funds, distributing such Portfolio Investment to all or any portion of the Partners and having them contribute such Portfolio Investment to an Alternative Investment Fund or Funds, or any other similar restructuring that would result in such Portfolio Investment being held through one or more Alternative Investment Funds and (*C*) in either case, if an Alternative Investment Fund is used, by creating such Alternative Investment Fund(s) and distributing interests therein to certain or all the Partners as limited partners or other similar investors therein.  In the case of an investment by the Fund in a Media Company or in a Portfolio Company that subsequently becomes a Media Company the General Partner shall require all of the Partners to make capital contributions with respect to such investment or shall Transfer

*Confidential*

34

all Capital Contributions previously made with respect to such Portfolio Investment, as the case may be, to an Alternative Investment Fund formed for such purpose. In addition, the General Partner shall also have the right to direct that capital contributions of certain or all Partners with respect to a potential Portfolio Investment be made through an Alternative Investment Fund if, in the determination of the General Partner, the consummation of the potential Portfolio Investment would be prohibited or unduly burdensome for the Fund because of legal or regulatory constraints but would be permissible or less burdensome if an Alternative Investment Fund were utilized. Each Alternative Investment Fund will be controlled by the General Partner or an Affiliate thereof, will be managed by the Manager or an Affiliate thereof, and will be governed by organizational documents containing provisions substantially similar in all material respects to those of the Fund (other than such differences as may be appropriate to accommodate legal, tax, regulatory or other considerations, including, in the case of an investment in a Media Company, such differences as are necessary to provide that the limited partners investing therein will not be attributed with an ownership interest in such Media Company for purposes of the FCC Rules). If the Limited Partner participates in an Alternative Investment Fund, it shall not be generally liable for the obligations of such Alternative Investment Fund. All references in this Section 4.5(d) to the limited partners of an Alternative Investment Fund shall be deemed to include all investors in an Alternative Investment Fund formed as a vehicle other than a limited partnership.

(ii)     *Alternative Investment Conditions.* Each Partner admitted to and investing in an Alternative Investment Fund shall be obligated to make capital contributions to such Alternative Investment Fund in a manner similar to that provided by Section 5.2, and each such Partner's Remaining Capital Commitment shall be reduced by the amount of such contributions to the same extent as if such contributions were made to the Fund as Capital Contributions. With respect to each investment in which an Alternative Investment Fund participates with the Fund, any investment expenses or indemnification or repayment obligations related to such investment shall be borne by the Fund, such Alternative Investment Fund and any other Related Investment Fund in proportion to the capital committed by each to such investment. Any management fee funded by a Partner with respect to an Alternative Investment Fund shall reduce such Partner's share of the Management Fee funded by such Partner, and payable to the Manager by the Fund, by a corresponding amount. The investment results of an Alternative Investment Fund will be aggregated with the investment results of the Fund for purposes of determining distributions by the Fund and such Alternative Investment Fund.

(iii)     *Mechanics of Formation of Alternative Investment Funds.* In the event that the General Partner or an Affiliate thereof forms one or more Alternative Investment Funds, the General Partner shall have full authority, without the consent of any Person, including any Partner, to amend this Agreement as may be necessary or appropriate in

*Confidential*

the good faith judgment of the General Partner to facilitate the formation and operation of such Alternative Investment Fund and the investments contemplated by this Section 4.5(d), and to interpret in good faith any provision of this Agreement, whether or not so amended, to give effect to the intent of the provisions of this Section 4.5(d). The General Partner shall make all appropriate adjustments as may be necessary or otherwise appropriate to give effect to the intent of this Section 4.5(d). The limited partnership agreement or other organizational or Transfer documents of any Alternative Investment Fund and any other documents reflecting the admission of the Limited Partner to such Alternative Investment Fund may be executed on behalf of the Limited Partner investing therein by the General Partner pursuant to the power of attorney granted by the Limited Partner pursuant to Section 12.2.

## ARTICLE V

## CAPITAL COMMITMENTS; CAPITAL CONTRIBUTIONS

5.1    Capital Commitments.  The Capital Commitment of the General Partner shall equal $5 million. The Limited Partner shall make a Capital Commitment of $1.0 billion, as set forth in the Subscription Agreement of the Limited Partner.

5.2    Capital Contributions.  Except as otherwise provided elsewhere in this Agreement, the Capital Contributions of the Partners shall be paid in separate Drawdowns in amounts determined pursuant to the terms of Section 5.2(d), subject to the following terms and conditions:

(a)    Timing of Drawdown Notices; Use of Drawdowns.  The General Partner shall provide each Partner with a notice of each Drawdown (a "Drawdown Notice") at least 10 Business Days prior to the date on which such Drawdown is due and payable (the "Drawdown Date").  Each Drawdown may be used for any purpose authorized or contemplated by this Agreement.

(b)    Contents of Drawdown Notices.  In the case of a Drawdown to be used to make a Portfolio Investment, the relevant Drawdown Notice shall give such description of such Portfolio Investment as the General Partner shall determine is appropriate, including a general description of the business to be acquired, the Securities expected to be acquired and the purchase price therefor, to the extent practicable, such further information as shall have been reasonably requested by the Limited Partner in a written notice given to the General Partner prior to the Drawdown Date and information reasonably necessary for the Limited Partner to make the determinations contemplated by Section 4.2(f).  In addition, such Drawdown Notice shall specify, to the knowledge of the General Partner as of the date thereof, the amount of such Drawdown that will be used by the Fund to make Portfolio Investments or pay Organizational Expenses or Fund Expenses.

*Confidential*

(c)    Revised Drawdown Notices.  Notwithstanding Section 5.2(a), if the actual Capital Contribution to be paid by a Partner changes after delivery of a Drawdown Notice (due, for example, to a change in the amount or nature of the Securities to be acquired by the Fund), the General Partner shall issue a revised Drawdown Notice to the Partners, *provided* that the new Drawdown Date shall be no earlier than the prior Drawdown Date and at least three Business Days after the date that such revised Drawdown Notice is given. Such Partners shall pay any additional Capital Contribution thereby required no later than the Drawdown Date specified in such revised Drawdown Notice.

(d)    Calculation of Each Partner's Share of a Drawdown.  Each Partner shall pay the Capital Contributions determined in accordance with the provisions of this Section 5.2(d) and specified in the relevant Drawdown Notice, as the same may be revised pursuant to Section 5.2(c), by wire transfer in immediately available funds to the account specified therein.  The required Capital Contribution of each Partner shall be made no later than the Drawdown Date specified in such Drawdown Notice and shall equal such Partner's *pro rata* share (based on Capital Commitments of all the Partners), in each case up to an amount not to exceed such Partner's Remaining Capital Commitment.

(e)    Use of Distributable Cash or Temporary Investment Income to Fund Drawdowns.  The General Partner may determine in its sole discretion to retain and use Distributable Cash or Temporary Investment Income that otherwise would be distributable to a Partner pursuant to Article VI to pay all or part of any Capital Contribution that is required to be made by such Partner, and the amount of such Distributable Cash or Temporary Investment Income so retained shall be deemed for all purposes of this Agreement to have been distributed to such Partner and then recontributed to the Fund by such Partner as a Capital Contribution.  In the event that the retained amount with respect to any Partner is not sufficient to cover such Partner's Capital Contribution requirement, the amount necessary to cover the balance of such Capital Contribution shall be paid by such Partner pursuant to a Drawdown Notice as provided in this Section 5.2.  Prior to or concurrent with the payment of any Capital Contributions to be used to make a Portfolio Investment out of retained Distributable Cash or Temporary Investment Income, the General Partner shall provide to the Limited Partner the distribution notice described in Section 6.3 and the information required to be provided in a Drawdown Notice issued pursuant to Section 5.2(b).  In addition to the foregoing, the Limited Partner agrees that the General Partner may hold back and use Distributable Cash or Temporary Investment Income that would otherwise be distributable to the Limited Partner to pay all or part of any amounts otherwise owing by the Limited Partner to the Fund, the General Partner or the Manager pursuant to the terms of this Agreement.

5.3    Return of Unused Capital Contributions.   If any proposed Portfolio Investment with respect to which there has been a Drawdown is not consummated within 60 days following the relevant Drawdown Date or if the amount of funds drawn down for any particular Portfolio Investment exceeds the amount necessary to consummate

*Confidential*

such Portfolio Investment, as the case may be, the General Partner shall promptly return such Drawdown or such excess amount of funds, together, in each case, with any interest or gains thereon (net of any Fund Expenses in respect thereof), to the Partners in the same proportions that such funds were contributed by the Partners, *provided* that some or all of such Drawdown or such excess amount of funds (and any interest or gains thereon) may be retained by the Fund and not so returned to the extent that the Fund is likely, as determined by the General Partner in its sole discretion, to consummate a proposed Portfolio Investment or require payment of Fund Expenses within 60 days following the relevant Drawdown Date, and instead may be used to fund such proposed Portfolio Investment or to pay such Fund Expenses, and *provided, further*, that if the General Partner determines to rely on the first proviso of this Section 5.3, the General Partner shall provide to the Limited Partner the information required to be provided in a Drawdown Notice issued pursuant to Section 5.2(b). Any amounts drawn down and returned pursuant to this Section 5.3 shall not be treated as Capital Contributions.

    5.4   Defaulting Partners.

    (a)    General. If the Limited Partner fails to make, in a timely manner, all or any portion of any Capital Contribution or any other amount required to be funded by the Limited Partner hereunder, and such failure continues for five Business Days after receipt of written notice thereof from the General Partner, or the Limited Partner purports to Transfer all or any part of its interest in the Fund other than in accordance with this Agreement (a "Default"), then the Limited Partner may be designated by the General Partner in its sole discretion as in Default under this Agreement (a "Defaulting Partner") and shall thereafter be subject to the provisions of this Section 5.4. The General Partner may (without limiting any legal rights or remedies it or the Fund may have), in its sole discretion, choose not to designate the Limited Partner as a Defaulting Partner and may agree to waive or permit the cure of any Default by a Partner, subject to such conditions as the General Partner and the Defaulting Partner may agree upon. For the avoidance of doubt, the failure of the General Partner to make all or any portion of its Capital Contribution shall not be considered a Default to the extent that such failure is attributable solely to the failure of the contribution loan lender to fund the required portion of the General Partner's Capital Contribution.

    (b)    Funding of Defaulted Amount. With respect to any amount (other than the Management Fee) that is in Default (including any expenses contemplated by Section 5.4(e)) (the "Defaulted Amount"), the General Partner may in its sole discretion if the Defaulted Amount was to be used to fund a Portfolio Investment, (*i*) offer to such third parties as the General Partner may determine, subject to such timing and other conditions as the General Partner may impose, the opportunity to co-invest in such Portfolio Investment an aggregate amount equal to the Defaulted Amount or (*ii*) forfeit the opportunity for the Fund to make the Portfolio Investment.

*Confidential*

(c)     Defaulted Capital Commitment.  With respect to the Remaining Capital Commitment of any Defaulting Partner (the "Defaulted Capital Commitment"), the General Partner may elect to admit to the Fund a Substitute Partner to assume all or a portion of the balance of such Defaulted Capital Commitment on such terms and upon the delivery of such documents as the General Partner shall determine in its sole discretion to be appropriate.  The General Partner shall make such revisions to the Cayman Register as may be necessary to reflect the change in Partners and Capital Commitments contemplated by this Section 5.4(c).

(d)     Forfeiture and Application of Forfeited Amounts.  Without prejudice to its rights under Section 5.4(e), the General Partner may in its sole discretion take any or all of the following actions with respect to a Defaulting Partner:  (*i*) reduce amounts otherwise distributable to such Defaulting Partner  attributable to Capital Contributions as of the date of such Default by 50%, and withhold 100% of any future distributions that otherwise would be payable to such Defaulting Partner pursuant to Article VI until the dissolution of the Fund and (*ii*) require such Defaulting Partner to remain fully liable for payment of up to its *pro rata* share of Organizational Expenses and Fund Expenses as if the Default had not occurred.  The General Partner may apply amounts withheld from such Defaulting Partner, and to the extent such amounts are not sufficient, amounts forfeited by such Defaulting Partner (such forfeited amounts applied to amounts payable pursuant to this sentence to be reimbursed by such Defaulting Partner, if appropriate), in satisfaction of all amounts payable by such Defaulting Partner, including pursuant to this Section 5.4(d) and Section 5.4(e).  In addition, such Defaulting Partner shall (*A*) have no further right to make Capital Contributions to participate in any Portfolio Investment and (*B*) to the fullest extent permitted by applicable law, (*1*) shall be treated for purposes of Sections 5.2, 8.1, 8.2 and 8.3 as no longer a Partner and (*2*) if such Defaulting Partner is no longer entitled to receive distributions shall, in the General Partner's sole discretion, cease to be a Partner.  The General Partner may charge such Defaulting Partner interest on the Defaulted Amount and any other amounts not timely paid at a rate per annum equal to the Prime Rate plus 4% from the date such amounts were due and payable through the date that full payment of such amounts is actually made or, if such amounts are not paid, through the end of the Term, and to the extent not paid such interest charge may be deducted from amounts otherwise distributable to such Defaulting Partner.  Amounts forfeited and not otherwise applied to the payment of the expenses specified in clause (ii) of the first sentence of this Section 5.4(d) or in Section 5.4(e) (to the extent not reimbursed by such Defaulting Partner), plus any interest thereon, shall be distributed to the General Partner.  If at any time the Limited Partner becomes a Defaulting Partner, (*x*) the Limited Partner shall, upon the written request and with the reasonable cooperation of the General Partner, use best efforts to dispose of its entire interest in the Fund (or such portion of its interest as the General Partner shall determine is sufficient to prevent or remedy such Default) to any Person in a transaction that complies with Section 10.1 (in which case the General Partner shall use commercially reasonable efforts to cooperate with the Limited Partner to facilitate the transaction) and (*y*) the General Partner may, in its sole discretion, dissolve the Fund in

*Confidential*

accordance with Article XI. All costs and expenses incurred in connection with actions taken by or with respect to the Limited Partner under this Section 5.4 shall be paid by the Limited Partner. The General Partner shall make such adjustments as it determines to be appropriate to give effect to the provisions of this Section 5.4.

(e)     Other Remedies; Payment of Expenses. The General Partner shall have the right to pursue all remedies at law or in equity available to it with respect to the Default of a Defaulting Partner. The parties hereto agree that no course of dealing between the General Partner and any Defaulting Partner and no delay in exercising any right, power, waiver or remedy conferred in this Section 5.4 or now or hereafter existing at law, in equity or by statute or otherwise shall operate as a waiver or otherwise prejudice any such right, power, waiver or remedy. In addition to the foregoing, to the fullest extent permitted by applicable law, the General Partner may in its sole discretion institute a lawsuit against any Defaulting Partner for specific performance of its obligation to make Capital Contributions and any other payments to be made by the Limited Partner pursuant to this Agreement and to collect any overdue amounts hereunder. Notwithstanding any other provision of this Agreement, the Limited Partner agrees, in the event of a Default by such Partner, to pay on demand all costs and expenses (including attorneys' fees and any borrowing costs) incurred by or on behalf of the Fund in connection with the enforcement of this Agreement against such Partner sustained as a result of such Default and that any such payment shall not constitute a Capital Contribution to the Fund. Each Partner acknowledges by its execution hereof that it has been admitted to the Fund in reliance upon its agreement under this Agreement that the General Partner and the Fund may have no adequate remedy at law for a breach hereof and that damages resulting from a breach hereof may be impossible to ascertain at the time hereof or of such breach.

(f)     Consents. Whenever the vote, consent or decision of the Limited Partner is required or permitted pursuant to this Agreement or under the Partnership Law, if the Limited Partner is a Defaulting Partner, it shall not be entitled to participate in such vote or consent, or to make such decision, and such vote, consent or decision shall be tabulated or made as if such Defaulting Partner were not a Partner. The foregoing restriction shall not apply to any inalienable voting rights conferred on the Limited Partner under the Partnership Law.

(g)     Acknowledgement. The Limited Partner hereby acknowledges that it has been admitted to the Fund in reliance upon its agreements under this Section 5.4 (as well as the other provisions of this Agreement), that the General Partner and the Fund may have no adequate remedy at law for a breach of this Agreement and that damages resulting from such breach may be impossible to ascertain as of the date of the Closing at which the Limited Partner is admitted to the Fund or as of the date of such breach.

5.5     Early Termination of Investment Period.     The Limited Partner may terminate the Investment Period at any time after one or more Co-Founders cease to be affiliated with the Manager, whether voluntarily, by death or permanent disability or

otherwise. From and after the date that the Investment Period ends as contemplated by this Section 5.5, the General Partner shall continue to act on behalf of the Fund and perform the functions of the General Partner and shall have all of the rights and privileges of the General Partner hereunder.

## ARTICLE VI

## CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS; WITHHOLDING

6.1   Capital Accounts.  There shall be established on the books and records of the Fund a capital account (a "Capital Account") for each Partner.

6.2   Adjustments to Capital Accounts.  As of the last day of each Period, the balance in each Partner's Capital Account shall be adjusted by (*a*) increasing such balance by (*i*) such Partner's allocable share of each item of the Fund's income and gain for such Period (allocated in accordance with Section 6.10) and (*ii*) the Capital Contributions, if any, made by such Partner during such Period and (*b*) decreasing such balance by (*i*) the amount of cash or the Value of Securities or other property distributed to such Partner by the Fund during such Period and (*ii*) such Partner's allocable share of each item of the Fund's loss and deduction for such Period (allocated in accordance with Section 6.10).  Each Partner's Capital Account shall be further adjusted with respect to any special allocations or adjustments pursuant to this Agreement.

6.3   Distributions Attributable to Portfolio Investments.  Except as otherwise provided herein, Distributable Cash (other than *de minimis* amounts) attributable to any Portfolio Investment shall be distributed within 90 days after receipt by the Fund (or, if distribution within such 90-day period is not practicable, as soon as practicable thereafter).  Distributable Cash attributable to any such Portfolio Investment shall initially be apportioned among the Partners in proportion to their Sharing Percentages with respect to such Portfolio Investment.  Except as otherwise provided herein, the amount apportioned to the General Partner shall be distributed to the General Partner, and the amount apportioned to the Limited Partner shall be distributed as follows (with each determination made as of the time of distribution):

(a)   *Return of Capital on Disposed of Deals, Unrealized Losses and Apportioned Expenses:*  First, 100% to the Limited Partner until the cumulative amount distributed to the Limited Partner pursuant to this Section 6.3(a) is equal to the sum of:

(i)   the Capital Contributions of the Limited Partner used to fund the cost of each Portfolio Investment disposed of or used to fund the portion of the cost of each Portfolio Investment held by the Fund that represents an Unrealized Loss, and

(ii)    the Capital Contributions of the Limited Partner used to fund Organizational Expenses and Fund Expenses that are apportioned pursuant to Section 6.6(b) to Portfolio Investments described in Section 6.3(a)(i);

(b)    *Preferred Return*: Second, 100% to the Limited Partner until the cumulative amount distributed to the Limited Partner pursuant to this Section 6.3 is sufficient to provide the Limited Partner with an 8% annualized effective internal rate of return on the Capital Contributions of the Limited Partner described in Section 6.3(a) (computed from the due dates specified in the applicable Drawdown Notices until the dates distributions are made pursuant to this Section 6.3);

(c)    *Catch Up*: Third, 100% to the General Partner (or 100% to the Limited Partner, as the case may be) until the cumulative amount distributed to the General Partner attributable to the Limited Partner pursuant to this Section 6.3 is equal to 20% of the excess of (*i*) the cumulative amount distributed to the Limited Partner and to the General Partner attributable to the Limited Partner pursuant to this Section 6.3 over (*ii*) the Capital Contributions of the Limited Partner described in Section 6.3(a); and

(d)    *80/20 Split*: Fourth, 80% to the Limited Partner and 20% to the General Partner (the amounts distributed to the General Partner pursuant this Section 6.3(d) and Section 6.3(c) being referred to as the General Partner's "Carried Interest").

*Distributions Generally.*  The General Partner shall (*x*) in good faith determine the Portfolio Investment to which any Distributable Cash is considered attributable and (*y*) annually (and at such other times as the General Partner shall determine in its sole discretion) make such determinations of Value as may be required by the definition of "Unrealized Loss". Notwithstanding the foregoing, the General Partner may elect to waive or defer the receipt of any portion of the Carried Interest amounts distributable to it pursuant to Sections 6.3(c) and (d), and instead distribute such portion to the Limited Partner, *provided* that in such event the General Partner may subsequently elect to distribute to itself out of amounts otherwise distributable to the Limited Partner any amount previously deferred, so long as the cumulative amount distributed to the General Partner with respect to the Limited Partner does not exceed the cumulative amount that would have been distributed to the General Partner with respect to the Limited Partner in the absence of this sentence (except, if applicable, to the extent necessary to take into account the Limited Partner's achieving the preferred return earlier than it would have in the absence of this sentence). The General Partner shall equitably determine pursuant to which paragraph of Section 6.3 each distribution made in accordance with the previous sentence shall be deemed to have been made.

*Reduction of Carried Interest Allocation.*  Notwithstanding the foregoing, the 20% allocation of Carried Interest to the General Partner pursuant to Sections 6.3(c) and (d) above may in the sole discretion of the Limited Partner be reduced at any time, but not below a 15% allocation of Carried Interest, if (*A*) the Limited Partner determines, in its sole

discretion, that the hiring objectives set forth in **Schedule A** hereto have not been substantially achieved by the Manager by the target dates specified therein, *provided* that such reduction shall apply prospectively only to Portfolio Investments disposed after such reduction or (*B*) if one or more Portfolio Companies have been held by the Fund for more than eight years, *provided* that such reduction shall apply only to such Portfolio Companies. The General Partner agrees, that in connection with any such reduction of Carried Interest, such reduction shall be applied only to the interests in the General Partner held by the Co-Founders and their associated members, *pro rata* consistent with the dilution principles applicable to the Co-Founders and their associated members described in the limited liability agreement governing the General Partner.

*Notice of Distributions.* Prior to or concurrent with any distribution of Distributable Cash pursuant to this Section 6.3, the General Partner will provide a notice to the Limited Partner stating the amount to be distributed or deemed to be distributed to the Limited Partner and the source or sources of such Distributable Cash.

*Distributions of Marketable Securities; Adjustments Attributable to Changes in Value.* If any distribution pursuant to this Section 6.3 includes a distribution in kind of Marketable Securities, the General Partner shall, as soon as reasonably practicable after such distribution, determine the Post-Distribution Value of such Marketable Securities. If such Post-Distribution Value of such Marketable Securities differs from the Value of such Marketable Securities on the date of their distribution, subsequent distributions pursuant to this Section 6.3 shall be made so as to cause the aggregate distributions under this Section 6.3 received by each Partner to equal the aggregate distributions such Partner would have received under this Section 6.3 had the original distribution of such Marketable Securities been made assuming that such Marketable Securities were sold for an amount equal to the average of their Value as of the date of distribution and their Post-Distribution Value and the proceeds thereof distributed in the form of Distributable Cash.

6.4    Distributions of Temporary Investment Income.    Except as otherwise provided herein, Temporary Investment Income with respect to any Temporary Investment shall be distributed to the Partners in proportion to their Sharing Percentages in such Temporary Investment or, if the General Partner so determines, in proportion to their Capital Commitments, at such times and in such amounts as the General Partner determines to be appropriate, *provided* that if, as of the end of any Fiscal Year, Temporary Investment Income exceeds $100,000, the General Partner shall distribute such Distributable Cash to the Partners within 60 days after the last day of such Fiscal Year.

6.5    Tax Distributions. Notwithstanding Section 6.3 or 6.4, with respect to any Portfolio Investment, the Fund may, at any time, out of Distributable Cash from any source, make distributions ("Tax Distributions") to all Partners (other than any Defaulting Partners), regardless of their tax status, in amounts intended to enable such Partners (or any Person whose tax liability is determined by reference to the income of

any such Partner) to discharge their U.S. federal, state and local (and, as the General Partner shall determine in its sole discretion, non-U.S.) tax liabilities arising from allocations made (or to be made) pursuant to Section 6.11, and any distributions made, with respect to such Portfolio Investment. The amount of each Tax Distribution shall be determined by the General Partner in its sole discretion, taking into account the maximum combined U.S. federal, Texas State tax rate applicable to individuals on ordinary income and income subject to tax at capital gain rates (taking into account the applicable holding period), as the case may be, the amounts of ordinary income and income subject to tax at capital gain rates allocated to the Partners pursuant to this Agreement, and otherwise based on such assumptions as the General Partner determines in its sole discretion to be appropriate. The amount distributable to any Partner pursuant to any clause of Sections 6.3 or 6.4 (as applicable) shall be reduced by any Tax Distributions made to such Partner and not previously taken into account pursuant to this sentence, and such Tax Distributions shall also be deemed to have been distributed pursuant to such clause of Sections 6.3 or 6.4 (as applicable) for purposes of making the calculations required by this Agreement, so that to the extent possible each Partner receives in the aggregate pursuant to Sections 6.3 and 6.4 and this Section 6.5 the amount it would have received pursuant to Sections 6.3 and 6.4 as if this Section 6.5 were not included in this Agreement. For purposes of the preceding sentence, the General Partner shall allocate in its sole discretion any distributions received by it pursuant to this Section 6.5 among Distributable Cash apportioned to each Partner.

6.6   General Distribution Provisions.

(a)   Overriding Limitations on Distributions.   Notwithstanding any other provision of this Agreement, distributions shall be made only to the extent of Available Assets and in compliance with the Partnership Law and other applicable law.

(b)   Apportionment of Expenses.   For the purposes of Section 6.3, Capital Contributions of a Partner that were used to pay Fund Expenses determined by the General Partner to be attributable to a particular Portfolio Investment shall be apportioned to such Portfolio Investment.

(c)   Distributions to Persons Shown on the Register.   Any distribution by the Fund pursuant to Articles VI and XI to the Person shown on the Register as a Partner or to such Person's legal representatives, or to the Transferee of such Person's right to receive such distributions as provided herein, shall, to the fullest extent permitted by applicable law, acquit the Fund and the General Partner of all liability to any other Person that may be interested in such distribution by reason of any Transfer of such Person's interest in the Fund for any reason (including a Transfer of such interest by reason of the death, incompetence, bankruptcy or liquidation of such Person).

*Confidential*

6.7    <u>Distributions in Kind</u>.

(a)    <u>General</u>.  Prior to the winding up and dissolution of the Fund, the General Partner may distribute only Marketable Securities as distributions in kind to any Partner unless such Partner consents otherwise.  Upon the winding up and dissolution of the Fund, the General Partner may also distribute any other Securities or other property as distributions in kind.  In the event that a distribution of Marketable Securities or other Securities or property is made, such Securities or property shall be deemed to have been sold at their Value and the proceeds of such sale shall be deemed to have been distributed in the form of Distributable Cash to the Partners pursuant to Section 6.3.  Distributions of Marketable Securities and, upon dissolution, winding up and liquidation of the Fund, distributions of any other Securities or other property shall be made in proportion to the aggregate amounts that would be distributed to each Partner pursuant to Section 6.3, as determined by the General Partner.  If a distribution consists of both cash and Securities or Securities of more than one class (with each lot of Securities with a separate basis or holding period being treated as a separate class of Securities), each Partner receiving such distribution shall, to the extent practicable, receive the same proportion of cash and Securities of each class being distributed.   To the extent that the foregoing is not practicable, a Partner may be compelled to accept a distribution of any asset in kind from the Fund to the extent that the percentage of the asset distributed to such Partner exceeds a percentage of that asset that is equal to the percentage in which such Partner shares in distributions from the Fund.  The General Partner may cause certificates evidencing any Securities (other than Marketable Securities) to be distributed to be imprinted with legends as to such restrictions on Transfer as it may determine are necessary or appropriate, including legends as to applicable U.S. federal or state or non-U.S. securities laws or other legal or contractual restrictions, and may require any Partner to which Securities are to be distributed, as a condition to such distribution, to agree in writing (*i*) that such Partner will not Transfer such Securities except in compliance with such restrictions and (*ii*) to such other matters as the General Partner may determine are necessary or appropriate.

(b)    <u>Legal, Regulatory or Contractual Restrictions Relating to Distributions in Kind</u>.  If any Partner would otherwise be distributed an amount of any Securities that would cause such Partner to own or control in excess of the amount of such Securities that it may lawfully own or control, would subject such Partner to any material regulatory filing or would raise material contractual or regulatory issues for such Partner, the General Partner may (*i*) cause the Fund, as agent for such Partner, to sell all or any portion of such Securities distributable to such Partner on behalf of such Partner or (*ii*) deposit such Securities in a trust established by the General Partner for the benefit and at the expense of such Partner (with voting control and other terms that are satisfactory to such Partner).

6.8    <u>Negative Capital Accounts</u>.  Except as otherwise expressly provided in Section 9.2, the Limited Partner shall not be required to make up a negative balance in its Capital Account.  Except as otherwise expressly provided in this Agreement or as

*Confidential*

required by law, the General Partner shall not be required to make up a negative balance in its Capital Account.

6.9   No Withdrawal of Capital.   Except as otherwise expressly provided in this Agreement, no Partner shall have the right to withdraw capital from the Fund at its option or to receive any distribution of or return on such Partner's Capital Contributions.

6.10   Allocations to Capital Accounts.

(a)   Except as otherwise provided herein, each item of income, gain, loss or deduction of the Fund (determined in accordance with U.S. tax principles as applied to the maintenance of capital accounts) shall be allocated among the Capital Accounts of the Partners with respect to each Period, as of the end of such Period, in a manner that as closely as possible gives economic effect to the provisions of Articles VI and XI and the other relevant provisions of this Agreement, *provided* that, for the avoidance of doubt, the Management Fee shall be allocated to the Limited Partner in accordance with the amount calculated with respect to the Limited Partner as provided in Section 7.2.

(b) Notwithstanding any other provision of this Agreement, (*i*) the amount otherwise payable by the General Partner pursuant to Section 11.3 with respect to the Limited Partner shall be reduced to the extent necessary to give economic effect to the allocations contemplated by Section 6.10(a)(i) and (*ii*) to the extent any such reduction is made with respect to the Limited Partner, upon dissolution of the Fund (*A*) the Management Fee calculated with respect to the Limited Partner shall be reduced by a like amount, (*B*) the Manager shall return such amount to the Fund and (*C*) the Fund shall (subject to Section 6.12 and applicable law) distribute such amount to the Limited Partner.

6.11   Tax Allocations and Other Tax Matters.

(a)   Tax Allocations.   Each item of income, gain, loss or deduction recognized by the Fund shall be allocated among the Partners for U.S. federal, state and local income tax purposes in the same manner that each such item is allocated to the Partners' Capital Accounts or as otherwise provided herein, *provided* that the General Partner may adjust such allocations as long as such adjusted allocations have substantial economic effect or are in accordance with the interests of the Partners in the Fund, in each case within the meaning of the Code and the Treasury Regulations.   Tax credits and tax credit recapture shall be allocated in accordance with the Partners' interests in the Fund as provided in Treasury Regulations section 1.704-1(b)(4)(ii).   All matters concerning allocations for U.S. federal, state and local and non-U.S. income tax purposes, including accounting procedures, not expressly provided for by the terms of this Agreement shall be determined by the General Partner in its sole discretion.

(b)   Tax Matters Partner.   The General Partner is hereby designated as the tax matters partner of the Fund, in accordance with the Treasury Regulations promulgated

*Confidential*

pursuant to section 6231 of the Code and any similar provisions under any other state or local or non-U.S. tax laws. Each Partner hereby consents to such designation and agrees that, upon the request of the General Partner, it will execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Limited Partner shall have the right to participate in any administrative proceedings related to the determination of Fund items at the Fund level. If the Limited Partner elects to participate in such proceedings, the Limited Partner shall be responsible for any expenses incurred by the Limited Partner in connection with such participation. The cost of any resulting audits or adjustments of the Limited Partner's tax return shall be borne solely by the Limited Partner.

(c)     Partnership for Tax Purposes.     Either the General Partner shall have executed and filed a U.S. Internal Revenue Service Form 8832 prior to the date hereof electing to classify the Fund as a partnership for U.S. federal income tax purposes pursuant to section 301.7701-3 of the Treasury Regulations as of a date no later than the date hereof, or the General Partner shall timely execute and file such Form 8832 on or after the date hereof electing to classify the Fund as a partnership for United States federal income tax purposes as of a date no later than the date hereof, and the General Partner is hereby authorized to execute and file such Form 8832 for all of the Partners. The General Partner shall not subsequently elect to change such classification. The General Partner is hereby authorized to execute and file for all of the Partners any comparable form or document required by any applicable United States tax law for the Fund to be classified as a partnership under such tax law.   The Fund shall not participate in the establishment of an "established securities market" (within the meaning of section 1.7704-1(b) of the Treasury Regulations) or a "secondary market or the substantial equivalent thereof" (within the meaning of section 1.7704-1(c) of the Treasury Regulations) or, in either case, the inclusion thereon of "interests" in the Fund (within the meaning of section 1.7704-1(a)(2) of the Treasury Regulations).

(d)     Certain Actions.  Notwithstanding any other provision of this Agreement, (*i*) the Limited Partner shall, and shall cause each of its Affiliates and transferees to, take any action requested by the General Partner, and the General Partner may take any action, to ensure that the fair market value of any interest in the Fund that is transferred in connection with the performance of services is treated for U.S. federal income tax purposes as being equal to the "liquidation value" (within the meaning of Prop. Treas. Reg. section 1.83-3(l)) of that interest (and that each such interest in the Fund is afforded pass-through treatment for all applicable U.S. federal, state or local income tax purposes) and (*ii*) without limiting the generality of the foregoing, to the extent required in order to attain or ensure such treatment under any applicable law, Treasury Regulation, Revenue Procedure, Revenue Ruling, Notice or other guidance governing partnership interests transferred in connection with the performance of services, such action may include authorizing and directing the Fund or the General Partner to make any election, agreeing to any condition imposed on the Limited Partner, its Affiliates or its transferees, executing any amendment

to this Agreement or other agreements, executing any new agreement, making any tax election or tax filing, and agreeing not to take any contrary position.

(e)     Limited Partner Notification Requirements.  The Limited Partner shall notify the General Partner in a timely manner of its intention to (*i*) file a notice of inconsistent treatment under section 6222(b) of the Code, (*ii*) file a request for administrative adjustment of Fund items, (*iii*) file a petition with respect to any Fund item or other tax matters involving the Fund, or (*iv*) enter into a settlement agreement with the Secretary of the Treasury with respect to any Fund items.  Upon receipt of any such notification the General Partner, if it agrees with the Limited Partner's position, may in its sole discretion elect to make such filing or enter into such agreement, as applicable and practicable, on behalf of the Fund.  The cost of any audits or adjustments of the Limited Partner's tax return shall be borne solely by the Limited Partner.  The Limited Partner shall promptly upon request furnish to the General Partner any information that the General Partner may reasonably request in connection with any election or contemplated election or adjustment under section 734, 743 or 754 of the Code or with filing the tax returns of the Fund, any Affiliate thereof or any Portfolio Company.

6.12  Withholding.

(a)     General.  Each Partner shall, to the fullest extent permitted by applicable law, unless otherwise agreed by the General Partner in writing, indemnify and hold harmless the Fund and the General Partner, and each Partner hereby agrees that the Fund shall, to the fullest extent permitted by applicable law, similarly indemnify and hold harmless each other Covered Person pursuant to one or more separate indemnification agreements with such Covered Persons, in each case where such Person is or is deemed to be the responsible withholding agent for U.S. federal, state or local or non-U.S. income tax purposes against all claims, liabilities and expenses of whatever nature relating to such Covered Person's obligation to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Fund with respect to such Partner or as a result of such Partner's participation in the Fund.  If, pursuant to a separate indemnification agreement or otherwise, the Fund shall indemnify or be required to indemnify any Covered Person against any claims, liabilities or expenses of whatever nature relating to such Covered Person's obligation to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by such Covered Person as a result of any Partner's participation in the Fund, such Partner shall pay to the Fund the amount of the indemnity paid or required to be paid.

(b)     Authority to Withhold; Treatment of Withheld Tax.  Notwithstanding any other provision of this Agreement, each Partner hereby authorizes the Fund and the General Partner to withhold and to pay over, or otherwise pay, any withholding or other taxes payable or required to be deducted by the Fund or any of its Affiliates (pursuant to the Code or any provision of U.S. federal, state or local or non-U.S. tax law or otherwise) with respect to such Partner or as a result of such Partner's participation in the Fund (including

*Confidential*

as a result of a distribution in kind to such Partner). If and to the extent that the Fund shall be required to withhold or pay any such withholding or other taxes, such Partner shall be deemed for all purposes of this Agreement to have received a payment from the Fund as of the time that such withholding or other tax is withheld or required to be paid, whichever is earlier, which payment shall be deemed to be a distribution of Distributable Cash with respect to such Partner's interest in the Fund to the extent that such Partner (or any successor to such Partner's interest in the Fund) would have received a cash distribution but for such withholding. To the extent that such payment exceeds the cash distribution that such Partner would have received but for such withholding, the General Partner shall notify such Partner as to the amount of such excess and such Partner shall make a prompt payment to the Fund of such amount by wire transfer, which payment shall not constitute a Capital Contribution and, consequently, shall not reduce the Remaining Capital Commitment or increase the Capital Account of such Partner. The Fund may hold back from any such distribution in kind property having a Value equal to the amount of such taxes until the Fund has received payment of such amount.

(c)    <u>Withholding Tax Rate</u>. Any withholdings referred to in this Section 6.12 shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel, or other evidence, satisfactory to the General Partner to the effect that a lower rate is applicable or that no withholding is applicable.

(d)    <u>Withholding from Distributions to the Fund</u>. In the event that the Fund receives a distribution or payment from or in respect of which tax has been withheld, the Fund shall be deemed to have received cash in an amount equal to the amount of such withheld tax, and each Partner shall be deemed for all purposes of this Agreement to have received a payment from the Fund as of the time of such distribution or payment equal to the portion of such amount that is attributable to such Partner's interest in the Fund as determined by the General Partner in its sole discretion, which payment shall be deemed to be a distribution of Distributable Cash pursuant to the relevant clause of Section 6.3 or Section 6.4 to the extent that such Partner (or any successor to such Partner's interest in the Fund) would have received a cash distribution but for such withholding. To the extent that such payment exceeds the cash distribution that such Partner would have received but for such withholding, the General Partner shall notify such Partner as to the amount of such excess and such Partner shall make a prompt payment to the Fund of such amount by wire transfer, which payment shall not constitute a Capital Contribution and, consequently, shall not reduce the Remaining Capital Commitment or increase the Capital Account of such Partner. In the event that the Fund anticipates receiving a distribution or payment from which tax will be withheld in kind, the General Partner may elect to prevent such in-kind withholding by paying such tax in cash and may require each Partner in advance of such distribution to make a prompt payment to the Fund by wire transfer of the amount of such tax attributable to such Partner's interest in the Fund as equitably determined by the General Partner, which payment shall not constitute a Capital Contribution and,

*Confidential*

consequently, shall not reduce the Remaining Capital Commitment or increase the Capital Account of such Partner.

(e)     AEOI. Each Partner shall provide the General Partner and the Fund with any information, representations, certificates or forms relating to such Partner (or its direct or indirect owners or account holders) that are requested from time to time by the General Partner and that the General Partner determines in its sole discretion are necessary or appropriate in order for any fund entity (including (*i*) the Fund and any Alternative Investment Fund, (*ii*) any entity in which the Fund or any Alternative Investment Fund holds (directly or indirectly) an interest (whether in the form of debt or equity), (*iii*) any member of any "expanded affiliated group" (as defined in section 1471(e)(2) of the Code) of which any Person described in clause (i) or (ii) is a member and (*iv*) the Manager or any of its Affiliates) to (*A*) enter into, maintain or comply with the agreement contemplated by section 1471(b) of the Code, (*B*) satisfy any requirement imposed under FATCA in order to avoid any withholding required under FATCA (including any withholding upon any payments to such Partner under this Agreement), (*C*) comply with any reporting or withholding requirements under AEOI or (*D*) comply with any fiscal or regulatory legislation, rules or practices adopted pursuant to AEOI. In addition, each Partner shall take such actions as the General Partner may reasonably request in connection with the foregoing. In the event that any Partner fails to provide any of the information, representations, certificates or forms (or undertake any of the actions) required under this Section 6.12(e), the General Partner shall have full authority to (*1*) (*x*) form an entity organized in such jurisdiction as the General Partner shall determine with the consent of the Limited Partner, transfer such Partner's interest in the Fund to such entity, admit such Partner as an owner of such entity and cause such Partner to cease to be a Partner of the Fund or (*y*) form a Parallel Fund organized as a limited partnership in such jurisdiction as the General Partner shall determine with the consent of the Limited Partner and require such Partner to be admitted as a partner or other similar investor in such Parallel Fund, and in connection therewith and in consideration for the cancellation of such Partner's interest in the Fund, such Partner will receive an equivalent interest in such Parallel Fund and cause such Partner to cease to be a Partner of the Fund, (*2*) close such Limited Partner's "account" with the Fund by causing a transfer of such Partner's interest in the Fund to a Person selected by the General Partner in a transaction that complies with Section 10.1 in exchange for any consideration that can be obtained for such interest or (*3*) take any other steps as the General Partner determines in its sole discretion are necessary or appropriate to mitigate the consequences of such Partner's failure to comply with this Section 6.12(e) on the fund entities and the other Partners. The General Partner shall make such revisions to the Cayman Register or the Register as may be necessary to reflect the change in Partners and Capital Commitments contemplated by this Section 6.12(e). If requested by the General Partner, such Partner shall execute any and all documents, opinions, instruments and certificates as the General Partner shall have reasonably requested or that are otherwise required to effectuate the foregoing. Any Partner that fails to comply with this Section 6.12(e) shall, together with all other Partners that fail to comply with this Section 6.12(e),

*Confidential*

unless otherwise agreed by the General Partner in writing, to the fullest extent permitted by law, indemnify and hold harmless the General Partner and the Fund for any costs or expenses arising out of such failure or failures, including any withholding tax imposed under FATCA or as a result of AEOI and any withholding or other taxes imposed as a result of a transfer effected pursuant to this Section 6.12(e). Each Partner acknowledges and agrees that any personal data in respect of such Partner (or any Persons that indirectly hold an interest in the Fund through such Partner) provided to the General Partner or the Fund in accordance with this Section 6.12(e) may, if required, be disclosed to any tax authority.

6.13  Segregated Reserve Account. The Fund shall establish an account for the Limited Partner (a "Segregated Reserve Account") into which a portion of the Carried Interest amounts otherwise distributable to the General Partner pursuant to Section 6.3(c) or (d) shall, subject to the terms of this Section 6.13, be deposited. If, at the time a Portfolio Investment is disposed of, the value of the remaining Portfolio Investments then held by the Fund is less than the unreturned Capital Contributions (determined based on the Fund's most recent report distributed to the Limited Partner pursuant to Section 8.2), prior to making any such distribution to the General Partner, the Fund shall hold back, and shall not distribute to the General Partner, an amount equal to 20% of the amount otherwise distributable to the General Partner pursuant to Section 6.3(c) or (d) and shall deposit such amounts in the Segregated Reserve Account, unless the Limited Partner agrees that a lesser amount, or no amount, shall be held back and deposited in the Segregated Reserve Account. Unless the context otherwise requires, with the consent of the Limited Partner, amounts deposited in the Segregated Reserve Account shall be deemed to have been distributed to the General Partner for purposes of making the calculations required by Sections 6.3 and 11.2(b).  The funds attributable to the Segregated Reserve Account shall be invested by the General Partner in Temporary Investments or, with the consent of the Limited Partner from time to time, other Marketable Securities, *provided* that, if the General Partner invests such funds in other Marketable Securities with the consent of the Limited Partner, the General Partner shall contribute cash to the Segregated Reserve Account to make up for any losses on such other Marketable Securities on a quarterly basis or, if earlier, on the date on which such losses exceed 20% of the amount required to be held in the Segregated Reserve Account pursuant to this Section 6.13. Income earned on amounts held in the Segregated Reserve Account shall, subject to applicable law, be distributed from time to time to the General Partner, with the consent of the Limited Partner.  The Securities in the Segregated Reserve Account shall be valued on a marked to market basis and such valuation shall be included in the quarterly reports provided to the Limited Partner pursuant to Section 8.2(b). Notwithstanding the foregoing provisions of this Section 6.13 and subject to applicable law, from time to time all or any portion of the funds attributable to the Segregated Reserve Account may be released with the consent of the Limited Partner, *provided* that after the Investment Period, the consent of the Limited Partner shall not be required to release the funds attributable to the Segregated Reserve Account to the extent

that the Fund has no unreturned Capital Contributions.  Upon dissolution of the Fund, any remaining assets in the Segregated Reserve Account shall be applied as provided in Section11.3.

## ARTICLE VII

## THE MANAGER

7.1   Appointment of the Manager.   The General Partner will appoint the Manager to provide portfolio management and administrative services to the Fund as set forth in a management agreement (the "**Management Agreement**"), the form of which is attached hereto as **Exhibit A**:

(a)   The Manager shall manage the operations of the Fund, shall have the right to execute and deliver documents on behalf of the Fund and otherwise bind the Fund in lieu of the General Partner and shall have discretionary authority with respect to investments of the Fund, including the authority to investigate, analyze, structure and negotiate potential investments and to evaluate, monitor, exercise voting rights, advise as to disposition opportunities and take other appropriate action with respect to investments on behalf of the Fund, *provided* that the management and the conduct of the activities of the Fund shall remain the ultimate responsibility of the General Partner and all decisions relating to the selection and disposition of the Fund's investments shall be made exclusively by the General Partner in accordance with this Agreement.  The appointment of the Manager by the Fund shall not relieve the General Partner from its obligations to the Fund hereunder or under the Partnership Law.

(b)   The Manager shall act in conformity with this Agreement and with the instructions and directions of the General Partner, and in no event shall the Manager be considered a general partner of the Fund by agreement, estoppel, as a result of the performance of its duties or otherwise.

The General Partner agrees that the Limited Partner may, in its sole discretion, by written notice, direct the General Partner to terminate the appointment of the Manager set forth in the Management Agreement at any time by written notice to such effect, and if so directed, the General Partner shall terminate the Manager, which termination shall be effective as of the first to occur of end of the next quarter and the date that is at least 60 days after such written notice from the Limited Partner, and the General Partner shall not appoint a replacement manager without the prior written consent of the Limited Partner, which consent may be withheld in the Limited Partner's sole discretion; otherwise, the engagement of the Manager set forth in the Management Agreement shall terminate upon the earlier of the filing of a Notice of Dissolution of the Fund in accordance with Section 11.4 or the removal of the General Partner pursuant to Section 2.5.  In the event of the termination of the Manager and the appointment of a replacement manager as provided in

*Confidential*

this Section 7.1, the General Partner shall cause the replacement manager to (*i*) assume the obligations of the Manager's office lease, unless the Manager otherwise objects to such assumption and (*ii*) retain the senior employees of the Manager, other than the Co-Founders, and such other employees as appropriate under the circumstances, *provided* that such employees desire to be so retained by the replacement manager and are not at that time also employees of Reynolds, in each case with the then same responsibilities, compensation and interests (including interests in the Carried Interest) in the General Partner.

7.2    Management Fee.  In consideration of the management and other services referred to in Section 7.1, the Fund shall pay the Manager an annual management fee (the "Management Fee") beginning as of the Initial Closing and continuing throughout the Term.  The Management Fee shall be payable in quarterly installments in advance commencing on the Initial Closing (or such later date as may be specified in writing by the General Partner) and on each January 1, April 1, July 1 and October 1 thereafter (each a "Payment Date"), and any payment for a period of less than three months shall be adjusted on a *pro rata* basis according to the actual number of days during the period: notwithstanding the foregoing, the first payment of the Management Fee shall be payable on May 1, 2018 and shall include the period including the actual number of days from the Initial Closing through May 1, 2018.  Through the last day of the Investment Period, the annual Management Fee shall be an aggregate amount, calculated with respect to each Limited Partner, equal to 1.5% per annum of the Capital Commitment of the Limited Partner and, thereafter, an aggregate amount, calculated with respect to the Limited Partner, equal to 1.5% per annum of the Capital Contributions of the Limited Partner that were used to fund the cost of Portfolio Investments that are held by the Fund as of the relevant Payment Date, *provided* that the Management Fee shall be reduced to 1.0% to the extent that the Fund has not invested at least (*a*) 20% of the Capital Commitments by December 31, 2019, (*b*) 40% of the Capital Commitments by December 31, 2020, or (*c*) 60% of the Capital Commitments by December 31, 2021, in each case unless and until the Limited Partner otherwise consents that no such reduction shall be applied. Notwithstanding the foregoing, the reductions described in clauses (a)-(c) above shall not apply if the General Partner can demonstrate to the satisfaction of the Limited Partner that the pipeline of potential investments likely to be consummated by June 30 of the year following the year specified in the applicable clause will satisfy the invested percentage requirements. Each quarterly installment of the Management Fee calculated with respect to the Limited Partner shall be *reduced*, but not below zero, by an amount equal to the Limited Partner's *pro rata* share (based on Capital Commitments of the Partners) of all Fee Income received since the preceding Payment Date.  To the extent that the Management Fee with respect to the Limited Partner is not reduced as of any given Payment Date by the amounts referred to in the preceding sentence (or any portion thereof determined with respect to a previous Payment Date and carried over to the current Payment Date pursuant to this sentence) because the Management Fee with respect to the Limited Partner has been reduced to zero, the excess shall be carried over

*Confidential*

to the next succeeding Payment Date (and, if necessary, to one or more subsequent Payment Dates) and applied as a reduction of the Management Fee with respect to the Limited Partner, but not below zero, for such succeeding Payment Date (or a subsequent Payment Date). The General Partner may at any time defer or waive payment to the Manager of all or any part of any installment of the Management Fee.

## ARTICLE VIII

## BOOKS AND RECORDS; REPORTS TO PARTNERS; ETC.

8.1  <u>Maintenance of Books and Records</u>.  Until the filing of a Notice of Dissolution of the Fund in accordance with Section 11.4, the General Partner shall maintain full and accurate accounts of the transactions of the Fund in proper books and records of account, which shall set forth all information required by the Partnership Law. Such books and records shall be maintained in accordance with U.S. generally accepted accounting principles, *provided* that if such accounting principles shall require the financial statements of the Fund to be consolidated with those of the General Partner or of any Portfolio Company, the Fund shall also provide supplemental unaudited "stand-alone" financial statements that are not consolidated with those of the General Partner or of any Portfolio Company, under which the carrying value of the Fund's investments in the Portfolio Companies shall be the cost thereof. The General Partner shall keep or cause to be kept at the address of the General Partner (or at such other place as the General Partner or the Manager shall determine and, until the filing of the Notice of Dissolution pursuant to Section 11.4, shall advise the Limited Partner in writing) copies of such books and records until the filing of the Notice of Dissolution pursuant to Section 11.4 and for a period of five years thereafter. The books and records of the Fund as so maintained shall be the basis for the preparation of the financial reports to be mailed to current and former Partners pursuant to this Article VIII. Such books and records shall be available, upon five Business Days' notice to the General Partner, for inspection and copying at reasonable times during business hours by the Limited Partner or its duly authorized agents or representatives.

8.2  <u>Audits and Reports</u>.

(a)  <u>Financial Reports</u>.  The books and records of account of the Fund shall be audited as of the end of each Fiscal Year beginning after January 1, 2018 by a nationally recognized independent public accounting firm selected by the General Partner. During the Term, the General Partner shall prepare and mail, deliver by fax, email or other electronic means or otherwise make available a financial report (audited in the case of a report sent as of the end of a Fiscal Year and unaudited in the case of a report sent as of the end of a quarter) to the Limited Partner within 90 days after the end of each Fiscal Year, or as soon as practicable thereafter (commencing after December 31 of the Fiscal Year in which the Initial Closing is held) and 45 days after the end of each of the first three quarters

*Confidential*

of each Fiscal Year, or as soon as practicable thereafter (commencing with the first full quarter after the date of the first Drawdown), in each case subject to delays in the event of the late receipt by the Fund of any necessary financial statements from any Portfolio Company, setting forth for such Fiscal Year or quarter:

(i)     the assets and liabilities of the Fund as of the end of such Fiscal Year or quarter;

(ii)    the net profit or net loss of the Fund for such Fiscal Year or quarter; and

(iii)   in the case of a Fiscal Year only, the Limited Partner's closing Capital Account balance as of the end of such Fiscal Year.

(b)     Quarterly Reports.  During the Term, the General Partner shall use commercially reasonable efforts to cause to be prepared and mailed, delivered by fax, email or other electronic means or otherwise made available to the Limited Partner, with the financial reports described in Section 8.2(a), descriptive investment information for each Portfolio Company, including a description of material changes in the financial condition or results of operations of each Portfolio Company and such other information concerning the Fund's investments as the General Partner may determine to provide, and, with respect to any quarter, (*i*) a description of the relevant facts relating to any settlements during such quarter of Claims for which indemnification has been provided pursuant to Section 9.1 and (*ii*) notice if any Co-Founder ceases during such quarter to provide the Fund with the time and effort required pursuant to the first sentence of Section 2.3(e).

(c)     Annual Reports.  During the Term, the General Partner shall deliver by fax, email or other electronic means or otherwise make available to the Limited Partner within 90 days after the end of each Fiscal Year a notice setting forth the Fee Income received by the General Partner, the Manager and their respective Affiliates during such Fiscal Year.

(d)     Other Information.  In addition to the Limited Partner's rights under Section 8.1, during the Term, the General Partner shall use commercially reasonable efforts to deliver by fax, email or other electronic means or otherwise make available to the Limited Partner such other information as is reasonably requested by the Limited Partner from time to time for any purpose reasonably related to such Limited Partner's interest as a limited partner in the Fund to the extent that any such efforts shall not impose any undue cost or burden on the General Partner or the Fund.

(e)     Right to Account.  The Limited Partner hereby waives, to the fullest extent permitted by law, any and all right to account that they may have under the Partnership Law

(f)     Change of Accounting Firm.  The General Partner shall not change the accounting firm of the Fund without the prior written consent of the Limited Partner.

*Confidential*

8.3   Annual Meeting; Other Requested Meetings.   The General Partner shall cause the Fund to have a meeting with the Limited Partner at least once each year during the Term, beginning in the year after the year of Initial Closing (the "Annual Meeting"), and at such other times at the Limited Partner shall reasonably request with at least 30 days' notice.   At the Annual Meeting and such other requested meetings, which at the election of the Limited Partners, shall be held either in person in the location specified by the Limited Partner, or telephonically, the General Partner will review the investment performance of the Fund.

8.4   Tax Information.   The General Partner shall use commercially reasonable efforts to prepare and mail, deliver by fax, email or other electronic means or otherwise make available to the Limited Partner (and each other Person that was a Limited Partner during such Fiscal Year or its legal representatives) within 90 days after the end of each Fiscal Year, or as soon as practicable thereafter such tax information as the Limited Partner shall reasonable request.

## ARTICLE IX

## INDEMNIFICATION

9.1   Indemnification of Covered Persons.

(a)   General.   The Fund shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless each Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings and actions, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Fund or activities undertaken in connection with the Fund, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and counsel fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to in this Section 9.1 are referred to collectively as "Damages"), except to the extent that such Damages arose from Disabling Conduct of such Covered Person, *provided* that in the event that a court of competent jurisdiction determines that such Damages arose partially from the Disabling Conduct of such Covered Person, such Covered Person's right to indemnification hereunder shall be reduced proportionately to reflect the relative liability of such Covered Person for such Damages.   Notwithstanding the foregoing, a Covered Person will only be eligible for indemnification pursuant to this Section 9.1 for Claims relating to or arising out of transactions that took place during the time such Covered Person was a shareholder, officer, director, employee, partner, member,

*Confidential*

agent or manager of any of the General Partner, the Manager or any of their respective Affiliates or during the time such Covered Person was the Limited Partner or a member of the Advisory Committee. The termination of any Proceeding by settlement shall not, of itself, create a presumption that any Damages relating to such settlement or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Person. For the avoidance of doubt, (*i*) Claims among the Co-Founders or other employees of the Manager solely relating to or arising out of the internal affairs of the Manager or the General Partner shall not be considered investment or other activities of the Fund and shall not be covered by the indemnification provisions of this Section 9.1 and (*ii*) no Covered Person shall be liable to the Fund or any Partner with respect to the accuracy or completeness of any information furnished by such Covered Person or any other Covered Person regarding any Portfolio Company where such information is obtained from a third party and not prepared by such Covered Person to the extent that such Covered Person acts in good faith and in reasonable reliance upon such information and that such Covered Person discloses those facts when it furnishes such information.

(b)     Expenses, etc. Reasonable expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder (other than in defense of a derivative action brought by the Limited Partner) may be advanced by the Fund to such Covered Person prior to the final disposition thereof upon receipt of an undertaking by or on behalf of such Covered Person to repay such amount if it shall be determined ultimately by a court of competent jurisdiction that the Covered Person was not entitled to be indemnified hereunder. Subject to Section 9.3 and to the fullest extent permitted by applicable law, judgments against the Fund and either or both of the General Partner or the Manager, in respect of which the General Partner or the Manager is entitled to indemnification, shall first be satisfied from Fund assets, including Capital Contributions and any payments under Section 9.2, before the General Partner or the Manager, as the case may be, is responsible therefor.

(c)     Notices of Claims, etc. Promptly after receipt by a Covered Person of notice of the commencement of any Proceeding, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Fund, give written notice to the Fund of the commencement of such Proceeding, *provided* that the failure of any Covered Person to give such notice as provided herein shall not relieve the Fund of its obligations under this Section 9.1 except to the extent that the Fund is actually prejudiced by such failure to give such notice. If any such Proceeding is brought against a Covered Person (other than a derivative suit in right of the Fund), the Fund will be entitled to participate in and to assume the defense thereof to the extent that the Fund may wish, with counsel reasonably satisfactory to such Covered Person. After notice from the Fund to such Covered Person of the Fund's election to assume the defense of such Proceeding, the Fund will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof. The Fund will not consent to entry of any judgment or enter into any settlement of such Proceeding that does not include as an unconditional term thereof

the giving by the claimant or plaintiff to such Covered Person of a release from all liability in respect to such Proceeding and the related Claim.

(d)     Survival of Protection. The provisions of this Section 9.1 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.1 and regardless of any subsequent amendment to this Agreement, and no amendment to this Agreement shall reduce or restrict the extent to which these indemnification provisions apply to actions taken or omissions made prior to the date of such amendment.

(e)     Reserves. If the General Partner determines in its sole discretion that it is appropriate or necessary to do so, the General Partner may cause the Fund to establish reasonable reserves, escrow accounts or similar accounts to fund its obligations under this Section 9.1.

(f)     Rights Cumulative. The right of any Covered Person to the indemnification provided herein shall be cumulative with, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Covered Person's successors, assigns, heirs and legal representatives.

9.2    Return of Certain Distributions to Fund Indemnification. Notwithstanding any other provision of this Agreement, the General Partner may require the Partners to return distributions to the Fund in an amount sufficient to satisfy all or any portion of the indemnification or repayment obligations of the Fund pursuant to Section 9.1 or other liabilities of the Fund, whether such obligations or liabilities arise before or after the last day of the Term or, with respect to any Partner, before or after such Partner's withdrawal from the Fund, *provided* that each Partner shall return distributions in respect of its share of any such indemnification or repayment obligation or liability as follows:

(a)     if the obligation or liability arises out of a Portfolio Investment,

(i)     first, up to the amount of the Distributable Cash distributed in connection with such Portfolio Investment, in such amounts as shall result (to the maximum extent practicable) in each Partner's retaining cumulative distributions from the Fund (net of any returns of distributions under this Section 9.2 or under Section 11.3) equal to the cumulative amount that would have been distributed to and retained by such Partner had the amount of such Distributable Cash been, at the time of such distribution, reduced by the amount of such obligation or liability, as equitably determined by the General Partner; and,

(ii)    thereafter, by the Partners in proportion to their Sharing Percentages with respect to such Portfolio Investment, or

*Confidential*

58

(b)    in any other circumstances, by the Partners in proportion to their Capital Commitments.

The Limited Partner's liability under the first sentence of this Section 9.2 is limited to an amount equal to 50% of all distributions received by such Partner from the Fund or any Alternative Investment Fund. In addition to the foregoing, no Partner shall be required to return distributions to the Fund pursuant to this Section 9.2 after the second anniversary of the last day of the Term, *provided* that if at the end of such period there are any Proceedings pending or Claims outstanding, the General Partner shall notify the Limited Partner in writing of the general nature of such Proceedings or Claims and an estimate of the amount of distributions that may be required to be returned pursuant to this Section 9.2 and the obligation of the Partners to return distributions pursuant to this Section 9.2 shall be extended with respect to each such Proceeding or Claim until the date such Proceedings or Claims are ultimately resolved and distributions are returned to the Fund in respect thereof pursuant to this Section 9.2. Any distributions returned pursuant to this Section 9.2 and equivalent provisions of the organizational documents of any Alternative Investment Fund, or any payments (other than Capital Contributions) made by the General Partner in respect of any Damages, shall not be treated as Capital Contributions, but shall be treated as returns of distributions and reductions in Distributable Cash, for all purposes of this Agreement other than for purposes of computing the Limited Partner's internal rate of return for purposes of this Agreement, which shall be computed based on actual Capital Contributions made, payments made pursuant to this Section 9.2 and distributions received. Nothing in this Section 9.2, express or implied, is intended or shall be construed to give any Person other than the Fund or the Partners any legal or equitable right, remedy or claim under or in respect of this Section 9.2 or any provision contained herein. To the extent any distributions are returned under this Section 9.2 after the dissolution of the Fund, subject to the limitations set forth in this Section 9.2, the General Partner shall in good faith adjust the amounts required to be returned by each Partner to reflect any returns of distributions that would have been required under Section 11.3 if the contributions required under this Section 9.2 had been made immediately prior to the dissolution of the Fund.

9.3    <u>Other Sources of Recovery</u>. The General Partner shall cause the Fund to use its commercially reasonable efforts to obtain the funds needed to satisfy its indemnification or repayment obligations under Section 9.1 from Persons other than the Partners (for example, out of Fund assets or pursuant to insurance policies or Portfolio Company indemnification arrangements) before causing the Fund to make payments pursuant to Section 9.1 and before requiring the Partners to return distributions to the Fund pursuant to Section 9.2. Notwithstanding the foregoing, nothing in this Section 9.3 shall prohibit the General Partner from causing the Fund to make such payments or requiring the Partners to return such distributions if the General Partner determines in its sole discretion that the Fund is not likely to obtain sufficient funds from such other sources in a timely fashion, or that attempting to obtain such funds would be futile or not in the best interests of the Fund (for example, nothing in this Section 9.3 shall require the

General Partner to cause the Fund to sell any Portfolio Investment before such time as the General Partner shall determine is advisable).

Notwithstanding Section 9.1, to the extent that any Covered Person is entitled to receive advancement of expenses from, or be indemnified or reimbursed (*a*) by the Fund pursuant to Article IX of this Agreement and (*b*) by (*i*) any current or former Portfolio Company under any other agreement or instrument, (*ii*) any insurer under a policy maintained by such Portfolio Company and second, (*iii*) any insurer under a policy maintained by the Manager or any of its Affiliates, the Fund will treat the obligations of such Portfolio Company or such insurers (each, a "Portfolio Company Indemnitor") as primary and the obligations of the Fund hereunder as secondary. Notwithstanding Section 9.1, unless the General Partner determines otherwise in its sole discretion, the Fund shall not advance expenses or satisfy any claim for indemnification hereunder unless and until such Covered Person has demonstrated that it has first sought advancement, indemnification or reimbursement from such Portfolio Company and any insurer under a policy maintained by such Portfolio Company and second, if advancement, indemnification or reimbursement is not provided by any such Portfolio Company or any such insurer on a timely basis, from any insurer under a policy maintained by the Manager or any of its Affiliates, if any. If such Covered Person is other than the General Partner, such Covered Person shall obtain the written consent of the General Partner, not to be unreasonably withheld, prior to entering into any compromise or settlement that would result in an obligation of the Fund to indemnify such Covered Person. To the fullest extent permitted by law, if the Fund pays or causes to be paid, for any reason, any amounts to a Covered Person that should have been paid by a Portfolio Company Indemnitor, then the Fund shall be fully subrogated to all rights of such Covered Person with respect to such payment and such Covered Person shall assign to the Fund all of its rights to advancement, indemnification or reimbursement from or with respect to such Portfolio Company Indemnitor. To the fullest extent permitted by law, the Fund's obligation to indemnify or advance expenses to any Covered Person shall be reduced by any amount such Covered Person collects as indemnification, reimbursement or advancement from any Portfolio Company Indemnitor.

9.4    Indemnification Agreements for Covered Persons. The General Partner is hereby instructed to cause the Fund to indemnify and hold harmless each Covered Person, in each case pursuant to a separate indemnification agreement. It is the express intention of the parties hereto that the provisions of this Article IX for the indemnification of Covered Persons may be relied upon by such Covered Persons and may be enforced by such Covered Persons (or by the General Partner on behalf of any such Covered Person, provided that the General Partner shall not have any obligation to so act for or on behalf of any such Covered Person) against the Fund pursuant to this Agreement or to a separate indemnification agreement, as if such Covered Persons were parties hereto.

*Confidential*

## ARTICLE X

## TRANSFERS

10.1 <u>Transfers by Partners</u>.

(a)    <u>Transfers by the Limited Partner</u>.  Except as set forth in this Article X or in Sections 4.5(c) and 5.4(c), the Limited Partner may not Transfer all or any part of its interest in the Fund, including any interest in the capital or profits of the Fund and the right to receive distributions from the Fund.  In the case of any attempted or purported Transfer of an interest in the Fund not in compliance with this Agreement, the transferring Limited Partner may be designated as a Defaulting Partner under Section 5.4.  The consent of the General Partner to (*i*) any such Transfer by the Limited Partner and (*ii*) admission of a Transferee as a Substitute Partner may be withheld by the General Partner in its sole discretion, *provided* that such consent will not be unreasonably withheld if such Transfer is (*A*) to an Affiliate of the Limited Partner or (*B*) to another Partner that is not a Defaulting Partner.  Notwithstanding the foregoing, unless agreed to by the General Partner in writing, the Limited Partner may not enter into, create, sell or Transfer any financial instrument or contract the value of which is determined in whole or in part by reference to the Fund (including the amount of Fund distributions, the value of Fund assets, or the results of Fund operations), within the meaning of section 1.7704-1(a)(2)(i)(B) of the Treasury Regulations.

(b)    <u>Conditions to Transfer</u>.  Any purported Transfer of an interest in the Fund by the Limited Partner pursuant to the terms of this Article X shall, in addition to requiring the prior written consent referred to in Section 10.1(a), be subject to the satisfaction of the following conditions:

(i)    the Limited Partner that proposes to effect such Transfer (a "<u>Transferor</u>") or the Person to whom such Transfer is to be made (a "<u>Transferee</u>") shall have paid all expenses incurred by the Fund, the General Partner and the Manager in connection therewith (whether or not such proposed Transfer is consummated);

(ii)    the General Partner shall have been given at least 30 days' prior written notice of the proposed Transfer;

(iii)    the Fund shall have received from the Transferee and, in the case of clause (C) below, from the Transferor to the extent specified by the General Partner, (*A*) such assignment agreement and other documents, instruments and certificates as may be reasonably requested by the General Partner, pursuant to which such Transferee shall have agreed to be bound by this Agreement, including if requested a counterpart of this Agreement executed by or on behalf of such Transferee, (*B*) a certificate or representation to the effect that the representations set forth in the Subscription Agreement of such Transferor are (except as otherwise disclosed to and consented to by

*Confidential*

the General Partner) true and correct with respect to such Transferee as of the date of such Transfer and (*C*) such other documents, opinions, instruments and certificates as the General Partner shall have reasonably requested;

(iv)     upon written request of the General Partner, such Transferor or Transferee shall have delivered to the Fund the opinion of counsel, which counsel and opinion shall be reasonably satisfactory to the General Partner, described in Section 10.1(c);

(v)     each of the Transferor and the Transferee shall have provided a certificate or representation to the effect that (*A*) the proposed Transfer will not be effected on or through (*1*) a U.S. national, regional or local securities exchange, (*2*) a non-U.S. securities exchange or (*3*) an interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers and (*B*) it is not, and its proposed Transfer or acquisition (as the case may be) will not be made by, through or on behalf of, (*1*) a Person, such as a broker or a dealer, making a market in interests in the Fund or (*2*) a Person that makes available to the public bid or offer quotes with respect to interests in the Fund;

(vi)     (*A*) such Transfer will not be made on a "secondary market or the substantial equivalent thereof" within the meaning of section 1.7704-1 of the Treasury Regulations, unless (*i*) such Transfer is disregarded in determining whether interests in the Fund are readily tradable on a secondary market or the substantial equivalent thereof under section 1.7704-1 of the Treasury Regulations (other than section 1.7704-1(e)(1)(x) thereof) or (*ii*) the Fund satisfies the requirements of section 1.7704-1(h) of the Treasury Regulations at all times during the taxable year of such Transfer and (*B*) such Transfer will not be made on an "established securities market" within the meaning of section 1.7704-1 of the Treasury Regulations;

(vii)     such Transfer would not result in the Fund at any time during its taxable year having more than 100 partners, within the meaning of section 1.7704-1(h)(1)(ii) of the Treasury Regulations (taking into account section 1.7704-1(h)(3) of the Treasury Regulations); and

(viii)     such Transfer would not result in the Fund being treated as a corporation for U.S. federal income tax purposes.

The General Partner may in its sole discretion waive any or all of the conditions set forth in this Section 10.1(b), other than clauses (vi), (viii) and (ix), of the preceding sentence.

(c)     <u>Opinion of Counsel</u>.    The opinion of counsel referred to in Section 10.1(b)(iv) with respect to a proposed Transfer shall, unless otherwise specified by the General Partner, be substantially to the effect that:

(i)     such Transfer will not require registration under the Securities Act or violate any provision of any applicable non-U.S. securities laws;

(ii)     the Transferee is a Person that is a "qualified purchaser" as such term is defined in section 2(a)(51) of the Investment Company Act;

(iii)     such Transfer will not require any of the Manager, the General Partner or any Affiliate of the Manager or the General Partner to register as an investment adviser under the Advisers Act if such Person is not already so registered;

(iv)     such Transfer will not cause the Fund to be treated as a corporation under the Code; and

(v)     such Transfer will not violate either this Agreement or the laws, rules or regulations of any state or any governmental authority applicable to the Transferor, the Transferee or such Transfer.

In giving such opinion, counsel may, with the consent of the General Partner, rely as to factual matters on certificates of the Transferor, the Transferee and the General Partner and may include in its opinion customary qualifications and limitations.

(d)     Substitute Partners.  A Transferee may be admitted to the Fund as a substitute Limited Partner of the Fund (a "Substitute Partner") only with the consent of the General Partner as described in Section 10.1(a).  Unless the General Partner, the Transferor and the Transferee otherwise agree, in the event of the admission of a Transferee as a Substitute Partner, from and after the date of such admission all references herein to the Transferor shall be deemed to apply to such Substitute Partner, and such Substitute Partner shall succeed to all of the rights and obligations of the Transferor hereunder, in each case with respect to the interest in the Fund being Transferred, *provided* that the Transferor shall continue to remain subject to Sections 6.11, 6.12 and 13.10.  A Person shall be deemed admitted to the Fund as a Substitute Partner at the time that the foregoing conditions are satisfied and such Person is listed by the General Partner as a limited partner of the Fund on the Register.

(e)     Transfers, Assignments and Changes in Membership by the General Partner.  The General Partner shall not Transfer all or any part of its interest in the Fund, *provided* that, subject to applicable law, the General Partner may (*i*) be reconstituted as, or converted into, a corporation, partnership or other form of entity (any such reconstituted or converted entity being deemed to be the General Partner for all purposes hereof) by merger, consolidation, conversion or otherwise, or (*ii*) in the case of a Transfer all or a portion of its interest in the Fund to a Person directly or indirectly controlled by the General Partner or by one or more the Co-Founders in which the General Partner or the Co-Founders, as the case may be, retain an economic interest equal to at least 75% of their economic interest in the Fund or the General Partner, respectively, immediately prior to such transfer.  If the

*Confidential*

General Partner assigns its entire interest in the Fund pursuant to this Section 10.1(e), the assignee shall automatically be admitted to the Fund as a replacement general partner immediately prior to such assignment without any further action, approval or vote of any Person, including any other Partner, upon execution of a counterpart of this Agreement and such assignee shall continue the investment or other activities of the Fund without dissolution of the Fund. In addition, the Co-Founders will not effect a transfer or transfers to third Persons of their interests in the General Partner such that after giving effect thereto the Co-Founders would cease to control the General Partner or would cease to own (together with trusts or similar vehicles for the primary benefit of the Co-Founders or their family members) a majority of the beneficial interests in the General Partner. The General Partner shall notify the Fund of any change in the general partner of the General Partner promptly after such change. For the avoidance of doubt the restrictions on transfers in this Section 10.1(e) shall not apply to any transfers of interests in the General Partner in connection with the admission or termination of members to the General Partner to the extent that such member, in the case of the admission of a member to the General Partner, is an employees of the Manager at the time of admission, and in the case of the termination of such member's interest, such termination is in connection with the termination of such member's employment with the Manager.

(f)     <u>Transfers in Violation of Agreement Not Recognized</u>.  Unless effected in accordance with and as permitted by this Agreement, no attempted Transfer or substitution shall be recognized by the Fund, any purported Transfer or substitution not effected in accordance with and as permitted by this Agreement shall, to the fullest extent permitted by law, be void and the Fund shall recognize no rights of the purported Transferee, including the right to receive distributions (directly or indirectly) from the Fund or to acquire an interest in the capital or profits of the Fund.  In addition, as a result of such attempted Transfer, the General Partner may designate the purported Transferor a Defaulting Partner pursuant to Section 5.4(a).

(g)     <u>Certain Changes in Record Ownership</u>.  A change in record ownership of an interest in the Fund by reason of the succession of a successor trust or a change in the custodian of the Limited Partner shall be deemed not to be a Transfer within the meaning of this Section 10.1, *provided* that the Limited Partner shall notify the General Partner in writing of such change promptly and in no event later than 30 days after such event.  The records of the Fund, the Cayman Register and the Register shall be changed by the General Partner to reflect the identity of the new trustee or other fiduciary upon receipt of such notice and the execution and delivery of such documents as the General Partner shall require in connection with such change.  Pending the receipt of such notice and documentation, the Fund and the General Partner shall be entitled to rely on the Cayman Register for all purposes in connection with the affected interest.

(h)     <u>Transfers of Interests of Natural Persons, Trusts, etc</u>.  If the Limited Partner is or becomes, at any time prior to the termination of the Fund, (*i*) a natural person, (*ii*) a

*Confidential*

trust any portion of which is treated (under subpart E of part I of subchapter J of chapter 1 of subtitle A of the Code) as owned by a natural person or (*iii*) an entity disregarded for federal income tax purposes and owned (or treated as owned) by a natural person or a trust described in clause (ii) hereof, then, notwithstanding any other provision of this Agreement, the General Partner shall have full authority to form and operate an investment vehicle that is not treated as any of the Persons described in clause (i), (ii) or (iii) above and Transfer the Limited Partner's interest in the Fund to such investment vehicle. If requested by the General Partner, the Limited Partner shall execute any and all documents, opinions, instruments and certificates as the General Partner shall have reasonably requested or that are otherwise required to effectuate the foregoing. Notwithstanding the prior sentence, the General Partner shall have the power to execute such documents on behalf of the Limited Partner as set forth in Section 12.2(h).

## ARTICLE XI

## WINDING UP AND DISSOLUTION OF THE FUND

11.1 . The Fund's affairs shall be wound up upon the first to occur of any of the following events:

(a)    the expiration of the Term as provided in Section 1.4;

(b)    the last Business Day of the first Fiscal Year following the end of the Investment Period in which all assets acquired or agreed to be acquired by the Fund have been sold or otherwise disposed of;

(c)    in accordance with Section 2.7;

(d)    the determination in good faith by the General Partner to wind-up the Fund because it has determined that there is a substantial likelihood that due to a change in the text, application or interpretation of the provisions of the U.S. federal securities laws (including the Securities Act, the Investment Company Act and the Advisers Act), or any other applicable statute, regulation, case law, administrative ruling or other similar authority (including changes that result in the Fund being taxable as a corporation or association under U.S. federal income tax law), the Fund cannot operate effectively in the manner contemplated herein (including with respect to the General Partner's ability to receive the amounts distributable to it with respect to the Limited Partner pursuant to Sections 6.3 and 11.2), after the General Partner has used its commercially reasonable efforts to remedy the circumstances resulting in the General Partner's determination pursuant to this Section 11.1(d);

(e)    an order or direction of a court of competent jurisdiction; or

(f)   in the General Partner's sole discretion if the Limited Partner at any time becomes a Defaulting Partner.

11.2   <u>Winding Up Procedure</u> .

(a)   <u>Liquidation of Assets</u>.  Upon the commencement of the winding-up of the Fund, the General Partner (or, if the commencement of the winding-up of the Fund should occur by reason of Section 11.1(c) or the General Partner is unable to act as liquidator, a liquidating trustee of the Fund or other representative designated by the Limited Partner, *provided* that if a liquidator, liquidating trustee or other representative is so appointed, no further Management Fees shall thereafter be payable to the Manager) shall use its commercially reasonable efforts to liquidate all of the assets of the Fund in an orderly manner, *provided* that if in the judgment of the General Partner (or such liquidating trustee or other representative) an asset of the Fund should not be liquidated, then such asset shall be distributed in accordance with Section 11.2(b) (other than any assets in the Segregated Reserve Account, which shall be distributed as provided in Section 11.3), and *provided, further*, that the General Partner (or such liquidating trustee or other representative) shall attempt to liquidate sufficient assets of the Fund to satisfy in cash (or make reasonable provision in cash for) the debts and liabilities referred to in clauses (i) and (ii) of Section 11.2(b).

(b)   <u>Application and Distribution of Proceeds of Liquidation and Remaining Assets</u>.  The General Partner (or the liquidating trustee or other representative referred to in Section 11.2(a)) shall apply the proceeds of the liquidation referred to in Section 11.2(a) and any remaining Fund assets (other than any assets, whether or not liquidated, in the Segregated Reserve Account, which shall be distributed as provided in Section 11.3), and shall distribute any such proceeds and assets, as follows and in the following order of priority:

(i)   <u>First</u>, to (*A*) creditors in satisfaction of the debts and liabilities of the Fund, to the extent permitted by law, whether by payment thereof or the making of reasonable provision for payment thereof (other than any loans or advances that may have been made by any of the Partners to the Fund), and (*B*) the expenses of liquidation, whether by payment thereof or the making of reasonable provision for payment thereof, and (*C*) the establishment of any reasonable reserves (which may be funded by a liquidating trust) to be established by the General Partner (or liquidating trustee or other representative) in amounts determined by it to be necessary for the payment of the Fund's expenses, liabilities and other obligations (whether fixed or contingent);

(ii)   <u>Second</u>, to the Partners, if any, that made loans or advances to the Fund in satisfaction of such loans and advances, whether by payment thereof or the making of reasonable provision for payment thereof; and

(iii)   <u>Third</u>, to the Partners in accordance with Article VI.

*Confidential*

If the General Partner (or liquidating trustee or other representative) has received a prior written notice that a distribution of Securities to be made pursuant to clause (iii) of the preceding sentence of this Section 11.2(b) would cause a Material Adverse Effect on the Limited Partner, the General Partner (or liquidating trustee or other representative) shall distribute such Securities to a third Person designated in such notice by the Limited Partner.

(c)    Time for Liquidation, etc. A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Fund and the discharge of liabilities to creditors so as to enable the General Partner (or liquidating trustee or other representative) to seek to minimize potential losses upon such liquidation. The provisions of this Agreement shall remain in full force and effect during the period of winding up and, subject to Section 13.11, shall terminate upon the filing of a Notice of Dissolution of the Fund with the Registrar of Exempted Limited Partnerships as provided in Section 11.4.

11.3  Clawback. Subject to Sections 2.5 and 9.2, if, after giving effect to all distributions made pursuant to Sections 6.3 and 11.2, but before giving effect to this Section 11.3, with respect to any Limited Partner other than a Defaulting Limited Partner, either

(a)    the General Partner has received distributions pursuant to Sections 6.3 and 11.2 attributable to such Limited Partner that exceed 20% (or in the event of any increases or reductions to such percentage, calculated with the the applicable increased or reduced percentages) of the excess of (*i*) the cumulative amount distributed to the Limited Partner and to the General Partner attributable to the Limited Partner pursuant to this Section 6.3 over (*ii*) the Capital Contributions of the Limited Partner described in Section 6.3(a), or

(b)    the distributions received by such Limited Partner pursuant to Sections 6.3 and 11.2 are not sufficient to provide such Limited Partner with an 8% annualized effective internal rate of return on the Capital Contributions of such Limited Partner used to fund (*i*) the cost of Portfolio Investments (computed from the due dates specified in the applicable Drawdown Notices until the dates distributions are made pursuant to Sections 6.3 and 11.2) and (*ii*) Organizational Expenses and Fund Expenses (computed from the due dates specified in the applicable Drawdown Notices until the dates distributions are made pursuant to Sections 6.3 and 11.2),

then, subject to the next sentence, the General Partner shall contribute to the Fund the lesser of

(A)    the greater of the amount of the excess of such distributions over such 20% (or other applicable increased or reduced percentages) described in clause (a) and the amount of the shortfall described in clause (b), and

(B)    the amount of distributions received by the General Partner pursuant to Sections 6.3 and 11.2 attributable to the Limited Partner, less the sum of (*1*) the

*Confidential*

maximum amount of Tax Distributions that were made or that could have been made to the General Partner (assuming that the Fund had sufficient Distributable Cash therefor and had made no other distributions), (2) the additional tax liability that would have been incurred by the General Partner (or any Person whose tax liability is determined by reference to the income of the General Partner), based on the assumptions used in computing Tax Distributions, if each Security distributed in kind to the General Partner had been sold by the General Partner immediately after distribution for its value (as determined for purposes of Section 6.7), and (3) the amount of any payment made by, or distributions deemed to have been distributed to, the General Partner pursuant to Section 6.12, in the case of each of subclauses (1), (2) and (3), relating to the General Partner's right to receive distributions pursuant to Sections 6.3 and 11.2 attributable to the Limited Partner,

and the Fund shall, subject to Section 6.12 and applicable law, distribute such amount to the Limited Partner. The General Partner's obligation under this Section 11.3 with respect to the Limited Partner shall, subject to applicable law, first be satisfied by distributing to the Limited Partner the proceeds of liquidation of the assets in the Segregated Reserve Account up to the amount of such obligation; to the extent such proceeds exceed such obligation, such excess shall, subject to applicable law, be distributed to the General Partner, and to the extent such obligation is not satisfied by such proceeds, the General Partner shall contribute to the Fund an amount sufficient to satisfy the balance of such obligation. Contributions pursuant to this Section 11.3 shall be made by or on behalf of the General Partner either in cash or, at the election of the General Partner, by the return of Securities previously distributed to the General Partner by the Fund valued at their Value at the time returned to the Fund, *provided* that such Securities shall be Marketable Securities in the hands of the Limited Partner (assuming the Limited Partner has no other interest in the Portfolio Company to which such Marketable Securities relate). The members of the General Partner shall execute a separate several (but not joint) guarantee in favor of the Fund in respect of the obligations of the General Partner under this Section 11.3 (the "Clawback Guarantee"), the form of which is attached hereto as **Exhibit B**. The General Partner hereby covenants and agrees to maintain in the operative agreements among its members an obligation on the part of each of its members, severally, but not jointly, to contribute to the General Partner an amount equal to such member's *pro rata* share of the General Partner's obligations under this Section 11.3, and of the General Partner to contribute such amount to the Fund.

    11.4 <u>Dissolution</u>. Following the completion of the foregoing provisions of this Article XI, the General Partner (or the liquidating trustee or other representative referred to in Section 11.2(a)) shall execute, acknowledge and cause to be filed a Notice of Dissolution of the Fund with the Registrar of Exempted Limited Partnerships of the Cayman Islands, *provided* that the winding up of the Fund will not be deemed complete and such Notice of Dissolution will not be filed by the General Partner (or such

liquidating trustee or other representative) prior to the third anniversary of the last day of the Term unless otherwise required by law.

## ARTICLE XII

## AMENDMENTS; POWER OF ATTORNEY

12.1 <u>Amendments</u>.

(a)    <u>General</u>.  Any modifications of or amendments to this Agreement duly adopted in accordance with the terms of this Agreement may be executed in accordance with Section 12.2.  The terms and provisions of this Agreement (including any provision calling for the consent, approval, review or waiver of the members of the Advisory Committee) may be modified or amended at any time and from time to time with the written consent of the General Partner and the Limited Partner. For the avoidance of doubt, for purposes of applying Section 12.1, a modification or amendment of a capitalized term defined in this Agreement does not constitute a modification or amendment of the provisions in which such defined term is used and shall not otherwise be considered to alter the terms or application of such provision.

(b)    <u>Certain Amendments Not Requiring Limited Partner Consent</u>. Notwithstanding anything to the contrary in this Agreement, the General Partner may, without the consent of the Limited Partner:

(i)    enter into agreements with Persons that are Transferees pursuant to the terms of this Agreement, providing in substance that such Transferees will be bound by this Agreement and will become Substitute Partners;

(ii)    amend this Agreement as may be required to implement a Transfer of the Limited Partner's interest or the admission of any Substitute Partner in accordance with the terms of this Agreement;

(iii)    amend this Agreement (*A*) to satisfy any requirements, conditions, guidelines or opinions contained in any opinion, directive, order, ruling or regulation of the SEC, the Internal Revenue Service or any other U.S. federal or state or non-U.S. governmental agency, or in any U.S. federal or state or non-U.S. statute, compliance with which the General Partner deems to be in the best interest of the Fund, or (*B*) to change the name of the Fund;

(iv)    amend this Agreement as may be necessary or advisable to comply with the Advisers Act, with the SEC and the FCC Rules, and any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures;

*Confidential*

(v)     amend this Agreement to cure any ambiguity or correct or supplement any provision hereof that may be incomplete or inconsistent with any other provision hereof, so long as such amendment under this clause (v) does not adversely affect the interest of the Limited Partner; and

(vi)    amend this Agreement in accordance with Sections 2.5, 4.3 and 4.5.

(c)     Notices of Amendments.  Within a reasonable period of time after the adoption of any amendment in accordance with this Section 12.1, the General Partner shall send to the Limited Partner a copy of such amendment or a written notice describing such amendment.

(d)     Execution of Amendments.  Upon obtaining such approvals required by this Agreement and without further action or execution by any other Person, including the Limited Partner, (i) any amendment to this Agreement may be implemented and reflected in a writing executed solely by the General Partner and (ii) the Limited Partner shall be deemed a party to and bound by such amendment of this Agreement.

12.2 Power of Attorney.  To the fullest extent permitted by applicable law, the Limited Partner does hereby irrevocably constitute and appoint the General Partner and its officers, or the successor thereof as general partner of the Fund and its officers, with full power of substitution, the true and lawful attorney-in-fact and agent of such Partner, to execute, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all instruments, documents and certificates that may from time to time be required by the laws of the Cayman Islands, the United States, the State of Delaware, the State of New York, any other jurisdiction in which the Fund conducts or plans to conduct business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid existence and investment and other activities of the Fund, including the power and authority to execute, verify, swear to, acknowledge, deliver, record and file:

(a)     all certificates and other instruments, including any amendments to this Agreement or to the Certificate, that the General Partner determines to be appropriate to (i) form, qualify or continue the Fund as an exempted limited partnership (or a partnership in which the limited partners have limited liability) in the Cayman Islands and all other jurisdictions in which the Fund conducts or plans to conduct business and (ii) admit such Partner as the Limited Partner in the Fund;

(b)     all instruments that the General Partner determines to be appropriate to reflect any amendment to this Agreement or the Certificate (i) to satisfy any requirements, conditions, guidelines or opinions contained in any opinion, directive, order, ruling or regulation of the SEC, the Internal Revenue Service, or any other U.S. federal or state or non-U.S. governmental agency, or in any U.S. federal or state or non-U.S. statute, compliance with which the General Partner deems to be in the best interest of the Fund,

*Confidential*

(*ii*) to change the name of the Fund or (*iii*) to cure any ambiguity or correct or supplement any provision hereof that may be incomplete or inconsistent with any other provision herein contained so long as such amendment under this clause (iii) does not adversely affect the interest of the Limited Partner;

(c)     all instruments that the General Partner determines to be appropriate in connection with the formation or operation of any Alternative Investment Fund and the Transfer of the Limited Partner's interest in the Fund to any such Alternative Investment Fund, including the admission of the Limited Partner to any such Alternative Investment Fund;

(d)     all conveyances and other instruments that the General Partner determines to be appropriate to reflect and effect the dissolution, winding up and termination of the Fund in accordance with the terms of this Agreement, including the filing of a Notice of Dissolution as provided for in Article XI;

(e)     all instruments relating to (*i*) Transfers of interests in the Fund or the admission of Substitute Partners, (*ii*) the treatment of a Defaulting Partner or (*iii*) any change in the Capital Commitment of the Limited Partner, all in accordance with the terms of this Agreement;

(f)     all amendments to this Agreement duly approved and adopted in accordance with this Agreement;

(g)     certificates of assumed name and such other certificates and instruments as may be necessary under the fictitious or assumed name statutes from time to time in effect in the Cayman Islands and in all jurisdictions in which the Fund conducts or plans to conduct investment or other activities;

(h)     all instruments that the General Partner determines to be appropriate in connection with forming and operating an investment vehicle and the Transfer of the Limited Partner's interest in the Fund to such investment vehicle, including the admission of the Limited Partner to such investment vehicle, all as contemplated by Section 10.1(h) hereof and by section 5.10 of the Subscription Agreement; and

(i)     with the consent of the Limited Partner, any other instruments determined by the General Partner to be necessary or appropriate in connection with the proper conduct of the investment or other activities of the Fund and that do not adversely affect the interest of the Limited Partner.

Such attorney-in-fact and agent shall not, however, have the right, power or authority to amend or modify this Agreement, when acting in such capacities, except to the extent authorized herein. The Limited Partner hereby agrees not to revoke this power of attorney. To the fullest extent permitted by law, this power of attorney shall survive and not be

*Confidential*

affected by the dissolution, bankruptcy, disability or incapacity of the Limited Partner and shall extend to the Limited Partner's successors and assigns. To the fullest extent permitted by applicable law, this power of attorney may be exercised by such attorney-in-fact and agent for the Limited Partner by a single signature of the General Partner acting as attorney-in-fact with or without listing the Limited Partner executing an instrument. Any Person dealing with the Fund may conclusively presume and rely upon the fact that any instrument referred to above, executed by such attorney-in-fact and agent, is authorized and binding, without further inquiry. If required, the Limited Partner shall execute and deliver to the General Partner, within five Business Days after receipt of a request therefor, such further designations, powers of attorney or other instruments as the General Partner shall determine to be necessary for the purposes hereof consistent with the provisions of this Agreement, including as required by any applicable state statute or other similar legal requirement. This power of attorney granted hereby is intended to secure a proprietary interest of the General Partner and the performance of the obligations of each relevant Limited Partner under this Agreement.

## ARTICLE XIII

## MISCELLANEOUS

13.1 <u>Notices</u>. Each notice relating to this Agreement shall be in writing and shall be delivered (*a*) in person, by registered or certified mail or by private courier, overnight or next-day express mail, or (*b*) by fax, email or other electronic means (including posting notices on an online investor reporting website, with notification by email), with such confirmation as the General Partner deems appropriate under the circumstances. All notices to the Limited Partner shall be delivered to it at the address, email address or fax number set forth on the Limited Partner's Subscription Agreement (including the Exhibits thereto), or to such other address, email address or fax number as the Limited Partner shall have furnished to the Fund in writing. All notices to the General Partner shall be delivered to the General Partner at Reynolds & Reynolds, 6700 Hollister, Houston, TX 77040, attn. Robert Burnett, with a copy to Robert Brockman, 333 West Friar Tuck Lane, Houston, TX 77024, Attention: Chief Compliance Officer, or such other address or addresses, email address or addresses, or fax number or numbers, as the Fund or the General Partner shall have furnished to the Limited Partner in writing. The Limited Partner may designate a new address for notices by giving written notice to that effect to the General Partner. Unless otherwise specifically provided in this Agreement, a notice given in accordance with the foregoing clause (a) shall be deemed to have been effectively given give Business Days after such notice is mailed by registered or certified mail, return receipt requested, and one Business Day after such notice is sent by FedEx or other one-day service provider, to the proper address, or at the time delivered when delivered in person or by private courier. A notice given in accordance with the foregoing clause (b) to the General Partner or to the Limited Partner by fax, email or other electronic

*Confidential*

72

means shall be deemed to have been effectively given when sent without error notice on the first Business Day after being sent.

13.2 <u>Counterparts; Signatures</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.  Any signature on the signature page of this Agreement may be an original or a fax or electronically transmitted signature.

13.3 <u>Table of Contents and Headings; Terms Generally</u>.  The table of contents and the headings of the articles, sections and subsections of this Agreement are inserted for convenience of reference only and shall not be deemed to constitute a part hereof or affect the interpretation hereof.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  When the words "include," "includes" and "including" are followed by a list of one or more items, such list shall be deemed to be illustrative only and shall not be deemed to be an exclusive listing.  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (*a*) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (*b*) all references herein to Articles and Sections shall be construed to refer to Articles and Sections of this Agreement unless otherwise stated herein, (*c*) the words "discretion" and "sole discretion" shall be construed to have the same meaning and effect and (*d*) the word "or" shall be construed to be used in the inclusive sense of "and/or."

13.4 <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of the Partners, the Initial Limited Partner and the Covered Persons, and shall be binding upon the parties, and, subject to Section 10.1, their respective successors, permitted assigns and, in the case of individual Covered Persons, heirs and legal representatives.

13.5 <u>Severability</u>.  Every term and provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

13.6 <u>Further Actions</u>.  The Limited Partner shall execute and deliver such other certificates, agreements and documents, and take such other actions, as may reasonably be requested by the General Partner in connection with the formation of the Fund and the achievement of its purposes or to give effect to the provisions of this Agreement, in each case as are not inconsistent with the terms and provisions of this Agreement, including any documents that the General Partner determines to be necessary or appropriate to form, qualify or continue the Fund as a limited partnership in all jurisdictions in which the Fund conducts or plans to conduct its investment and other activities and all such

*Confidential*

agreements, certificates, tax statements and other documents as may be required to be filed by or on behalf of the Fund.

13.7 <u>Determinations of the Partners</u>. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any other agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement a Partner is permitted or required to make a decision, consent, vote, make a judgment or take an action (*a*) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, such Partner shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Fund or any other Person, or (*b*) in its "good faith" or under another express standard, such Partner shall act under such express standard and shall not be subject to any other or different standard. If any questions should arise with respect to the operation of the Fund that are not specifically provided for in this Agreement or the Partnership Law, or with respect to the interpretation of this Agreement, the General Partner is hereby authorized to make a final determination with respect to any such question and to interpret this Agreement in good faith, and its determination and interpretation so made shall be final and binding on all parties, absent manifest error. Notwithstanding any other provision of this Agreement, including the preceding provisions of this Section 13.7, the Partners shall comply with the implied contractual covenant of good faith and fair dealing. To the fullest extent permitted by applicable law, the parties hereto acknowledge that the terms of this Agreement are the result of negotiations, and therefore agree that this Agreement shall be construed without regard to, or aid of, any canon or rule requiring construction against the party causing this Agreement to be drafted.

13.8 <u>Non-Waiver</u>. No provision of this Agreement shall be deemed to have been waived unless such waiver is given in writing, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor such waiver was given.

13.9 <u>Applicable Law</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE CAYMAN ISLANDS. The Partners hereby submit to the nonexclusive jurisdiction of the courts of the Cayman Islands and to the courts of the jurisdiction in which the principal office of the General Partner is located (and, if the principal office is located in the United States, of the federal district court having jurisdiction over the location of the principal office) for the resolution of all matters pertaining to the enforcement and interpretation of this Agreement.

*Confidential*

13.10       Confidentiality.

(a)      General. The Limited Partner shall keep confidential and shall not disclose (and shall cause its representatives (including its representatives on the Advisory Committee), to keep confidential and not disclose), without the prior written consent of the General Partner any information with respect to the Fund, any Related Investment Fund, any Portfolio Company or any Affiliate of any of the foregoing, *provided* that the Limited Partner may disclose any such information:

(i)       as has become generally available to the public other than as a result of the breach of this Section 13.10 by the Limited Partner or any agent or Affiliate of the Limited Partner;

(ii)      as may be required to be included in any report, statement or testimony required to be submitted to any municipal, state or national regulatory body having jurisdiction over the Limited Partner, *provided* that the Limited Partner shall, to the extent permitted by applicable law, give prior notice thereof to the General Partner to enable the Fund, the General Partner or the Manager to seek a protective order or similar relief;

(iii)     as may be required in response to any summons or subpoena or in connection with any litigation, *provided* that the Limited Partner shall, to the extent permitted by applicable law, give prior notice thereof to the General Partner to enable the Fund, the General Partner or the Manager to seek a protective order or similar relief;

(iv)     to the extent necessary in order to comply with any law, order, regulation or ruling applicable to the Limited Partner, *provided* that the Limited Partner shall, to the extent permitted by applicable law, give prior notice thereof to the General Partner to enable the Fund, the General Partner or the Manager to seek a protective order or similar relief;

(v)      to its employees, directors and professional advisors (including the Limited Partner's auditors and counsel), *provided* that such Persons are advised of the confidentiality obligations contained herein;

(vi)     as may be required in connection with an audit by any taxing authority;

(vii)    that constitutes the "tax treatment" or "tax structure" of the Fund. As used in this paragraph, the term "tax treatment" refers to the purported or claimed U.S. federal income tax treatment and the term "tax structure" refers to any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment, *provided* that, for the avoidance of doubt, except to the extent otherwise established in published guidance by the U.S. Internal Revenue Service, "tax treatment" or "tax structure" shall not include the following (and thus disclosure of the following shall not be permitted

under this Section 13.10(a)(vii)): (*A*) the name of, or contact information for, or any other similar identifying information regarding the Fund, any Related Investment Fund or any of their investments (including the names of any employees or affiliates thereof), (*B*) any performance information relating to the Fund or any Related Investment Fund and (*C*) any other information not related to the tax structure or tax treatment of the Fund. Nothing in this Section 13.10(a)(vii) shall limit the ability of the Limited Partner to make any disclosure to the Limited Partner's tax advisors or to the U.S. Internal Revenue Service or any other taxing authority.

(b)    General Partner Disclosure or Non-Disclosure.  Notwithstanding any other provision of this Agreement, to the fullest extent permitted by applicable law, the General Partner shall have the right to keep confidential from the Limited Partner for such period of time as the General Partner determines is reasonable (*i*) any information that the General Partner reasonably believes to be in the nature of trade secrets and (*ii*) any other information (*A*) the disclosure of which the General Partner believes is not in the best interest of the Fund or could damage the Fund or any Related Investment Fund or any of their investments or (*B*) that the Fund, any Related Investment Fund, the General Partner, the Manager or any of their Affiliates, or the officers, employees or directors of any of the foregoing, is required by law or by agreement with a third Person to keep confidential. For the avoidance of doubt, the General Partner may disclose any information concerning the Fund or the Limited Partner necessary to comply with applicable laws and regulations, including any anti-money laundering or anti-terrorist laws or regulations, and the Limited Partner shall provide the General Partner, promptly upon request, all information that the General Partner reasonably deems necessary to comply with such laws and regulations.

13.11    Survival of Certain Provisions.  Sections 6.11, 6.12 and 13.10 and Article IX shall survive the termination or expiration of this Agreement and the dissolution, winding up and termination of the Fund and the withdrawal of any Partner.

13.12    Entire Agreement.  This Agreement and the Subscription Agreements constitute the entire agreement among the Partners and between the Partners and the Initial Limited Partner with respect to the subject matter hereof and supersede any prior agreement or understanding among them with respect to such subject matter. The representations and warranties of the Fund, the General Partner and the Limited Partner in and the other provisions of the Subscription Agreement shall survive the execution and delivery of this Agreement.

13.13    No Third Party Beneficiaries.  Except with respect to the Covered Persons a person which is not a party to this Agreement shall not have any rights under the Contracts (rights of Third Parties) Law, 2014 (as amended) to enforce any term of this Agreement. Notwithstanding any other provision of this Agreement, including the foregoing, the consent of or notice to any person who is not a party to this Agreement shall not be required for any termination, rescission or agreement to any variation, waiver, assignment, novation, release or settlement under this Agreement at any time.

*Confidential*

No Partner nor any Covered Person shall have any duty or obligation to any creditor of the Fund to make any contributions to the Fund pursuant to Section 5.2 or any other provision of this Agreement or to cause the General Partner to deliver to any Partner a Drawdown Notice.

13.14    <u>Compliance with Anti-Money Laundering Requirements</u>. Notwithstanding any other provision of this Agreement to the contrary, the General Partner, in its own name and on behalf of the Fund, shall be authorized without the consent of any Person, including any other Partner, to take such action as it determines in its sole discretion to be necessary or advisable to comply with any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures, including the actions contemplated by the Subscription Agreement.

13.15    <u>No Political Contributions by Fund</u>. No money or property of the Fund shall be paid, used or offered (*a*) to aid any political party, committee or organization, or any other entity organized for political purposes, or (*b*) to aid any candidate for political office, or in connection with any election (including any referendum or proposed constitutional amendment) or for any political purpose whatever, or (*c*) for lobbying in connection with legislation or regulations.

13.16    <u>Currency</u>. The term "dollar" and the symbol "$," wherever used in this Agreement, shall mean the United States dollar.

*Confidential*