**EXHIBIT 2**

**Execution Version**

## MASTER TRANSACTION AGREEMENT

This Master Transaction Agreement (this "Agreement"), dated as of July 1, 2019 (the "Effective Date"), is by and among Falcata Tech Investments Fund I, L.P., a Cayman Islands exempted limited partnership (the "Fund"), FTI GP I, LLC, a Delaware limited liability company (the "General Partner"), Point Investments Ltd., a Bermuda corporation (the "Limited Partner"), Falcata Capital LLC, a Delaware limited liability company (the "Manager"), Robert T. Brockman ("Brockman Sr."), Robert T. Brockman II ("Brockman Jr."; and together with Brockman Sr., the "Brockmans"), Robert D. Burnett ("Burnett"), Norman T. Barras ("Barras"), William A. Hiers III ("Hiers"), and Matthew T. Zachary ("Zachary") (collectively, the "Parties" and each, a "Party"). Capitalized terms used herein without definition have the meaning set forth in the Fund's Amended and Restated Exempted Limited Partnership Agreement dated as of April 20, 2018 (as amended, the "Fund LPA").

### RECITALS

A. The Limited Partner is the sole limited partner of the Fund; and the General Partner is the sole general partner of the Fund. As of the date hereof, (i) the Limited Partner has made aggregate Capital Contributions to the Fund of $83,612,562 (of which $74,626,866 constituted Capital Contributions of the Limited Partner used to fund the cost of Portfolio Investments) and (ii) the General Partner has made aggregate capital contributions to the Fund of $395,772.

B. Burnett and the Brockmans are the sole owners of the Manager.

C. Burnett, Brockman Sr. and Barras are the sole Class A Members of the General Partner; Hiers and Zachary are the sole Class B Members of the General Partner; and there are no other equity holders of the General Partner.

D. Brockman Sr. has not made any capital contribution to the General Partner.

E. Burnett, Brockman Sr. and Brockman Jr. have made capital contributions to the Manager equal to $10,000, $10,000 and $980,000, respectively.

F. The Parties wish to amend the Fund LPA, the organizational documents of the Manager and the General Partner, the Management Agreement, dated as of April 20, 2018, among the Fund, the General Partner and the Manager (the "Management Agreement"), and the Subscription Agreement between the Limited Partner and the Fund, dated April 20, 2018 (the "Subscription Agreement"; and together with the Fund LPA, the organizational documents of the Manager and the General Partner, and the Management Agreement, collectively, the "Underlying Documents").

G. The Fund and the Limited Partner desire for the Fund to sell all of its assets and for the Fund to liquidate as soon as is commercially practicable (as reasonably determined by the General Partner and the Manager taking into account relevant market, financial, business and other factors but in all cases subject to the terms of this Agreement), understanding that none of the Fund, the General Partner nor the Limited Partner wishes for the Fund to sell Portfolio Investments at stressed or discounted sale prices (the date when all of the Portfolio Investments of the Fund have been sold for cash and/or Marketable Securities, the "Complete Exit Date") (for the avoidance of doubt, the Fund may own only "Temporary Investments" after the Complete Exit Date).

H. The Parties wish to terminate the Fund's Investment Period and to take certain other actions described herein and, to the extent any one or more of the actions described herein are inconsistent with any Underlying Document(s) and/or other agreements among any one or more of the Parties, to amend such Underlying Documents and/or such other agreements to permit and take such actions.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the Parties hereby agree that the Underlying Documents are (notwithstanding any other provision of the Underlying Documents and/or other agreements among any one or more of the Parties to the contrary) hereby amended as follows:

1. **Fund LPA and Management Agreement**.

1.1.   Investment Period. The Investment Period is hereby terminated. Notwithstanding anything in the Fund LPA or any other Underlying Document to the contrary, without the consent of the Limited Partner (which consent may be withheld in its sole and absolute discretion), the Fund shall not be permitted to make any further investments (whether funded through Capital Contributions or reinvestment of Distributable Cash) other than (a) Temporary Investments and (b) one or more Follow-On Investments with respect to XpressDocs Holdings, Inc. not to exceed US$11,000,000 (Eleven Million US Dollars) in the aggregate (the "Follow-on Cap").

1.2.   Management Fees.

1.2.1. Notwithstanding anything else to the contrary in any Underlying Document, from and after the Effective Date, the Management Fee shall be equal to the amounts specified in Schedule 1 attached hereto. The Management Fee shall be payable quarterly in advance (pro-rated and refundable for any partial quarters). Notwithstanding the foregoing, for the period beginning on July 1, 2019 and ending on June 30, 2020, the Management Fee shall be payable according to the following schedule: (a) for the quarter beginning on July 1, 2019 and ending on September 30, 2019, the Management Fee shall be equal to $2,575,000 (the "Initial Management Fee") and (b) the Management Fee payable for the three subsequent quarters shall be equal to $625,000 per quarter. The General Partner, the Fund, the Manager and the Limited Partner hereby acknowledge and agree that the Fund currently has cash on hand sufficient to pay one hundred percent (100%) of the Initial Management Fee and that the Fund shall not require an additional Capital Contribution from the Limited Partner after the date hereof to pay such amount.

1.2.2. In the event that the Fund Transfers any Portfolio Investments, then the Management Fee shall be reduced (but not increased) to an amount equal to the then applicable Management Fee set forth in Schedule 1 multiplied by the New Management Fee Percentage, subject to a minimum annual Management Fee of $500,000 for any period prior to June 30, 2026. The "New Management Fee Percentage" is a fraction (expressed as a percentage) measured immediately after the Transfer of any Portfolio Investment where (x) the numerator equals the cost of the remaining Portfolio Investments of the Fund measured immediately after the applicable Transfer and (y) the denominator equals the total aggregate cost of all Portfolio Investments of the Fund (whether or not any such Portfolio Investments were subsequently Transferred by the Fund).

1.3. <u>Fund Expenses</u>. From and after the Effective Date, the Manager and the General Partner shall be solely responsible for and shall bear all Fund Expenses; provided, however, that the Fund shall still be responsible for and shall bear (a) the Management Fee as set forth in Section 1.2 of this Agreement and (b) any Damages to the extent provided in Section 9.1(a) of the Fund LPA, and taxes and other governmental charges levied on the Fund (the amounts in clauses (a) and (b) are referred to herein as "<u>Continuing Fund Expenses</u>").

1.4. <u>Capital Calls</u>. Unless the Limited Partner otherwise consents (which consent may be withheld in the Limited Partner's sole and absolute discretion), neither the General Partner nor the Fund shall be permitted to issue Drawdown Notices nor shall the Limited Partner be required to fund any Drawdown except for Capital Contributions made for Continuing Fund Expenses and Follow-On Investments (subject to the Follow-on Cap). For the avoidance of doubt, (a) the foregoing shall not alter the obligations of the Partners to return distributions pursuant to Section 9.2 of the Fund LPA and (b) Drawdown Notices and Drawdowns shall be made pro rata amongst the General Partner and the Limited Partner based on their respective initial Capital Commitments specified in Section 5.1 of the Fund LPA.

1.5. <u>Term</u>. Unless the Limited Partner otherwise consents (which consent may be withheld in the Limited Partner's sole and absolute discretion), the Fund, the General Partner and the Manager shall use their reasonable best efforts to effect the sale of all or substantially all of the assets of the Fund as soon as commercially practicable but in any event no later than the date falling seven (7) years after the Effective Date (the "<u>Wind-Up Deadline</u>"), with the goal of obtaining the best and highest price therefor from a buyer(s) that the General Partner reasonably determines has the financial wherewithal to consummate such transaction(s). Following the sale of all or substantially all of the assets the Fund, the General Partner shall wind-up, liquidate and dissolve the Fund as contemplated by Section 11.2 of the Fund LPA.

1.6. <u>Removal</u>. If the Complete Exit Date has not occurred on or prior to the Wind-Up Deadline, then the Limited Partner may, in its sole and absolute discretion, (a) remove the General Partner as the Fund's general partner and appoint a replacement general partner of the Fund and (b) remove the Manager and appoint a replacement manager of the Fund. In the event that the General Partner is removed as the Fund's general partner pursuant to this Section 1.6, then the provisions of Section 2.5 of the Fund LPA shall apply to such removal; provided, however, that the 50% reduction set forth in Section 2.5(c) of the LPA shall not apply and the General Partner shall be entitled to receive all distributions that otherwise would have been distributable to it pursuant to the Fund LPA (as modified by Section 1.7 of this Agreement) as if it had not been removed.

1.7. <u>Revised Carried Interest Calculation</u>.

    1.7.1. If the Complete Exit Date occurs:

        (a) on or before the fourth anniversary of the Effective Date, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in

cash and/or Marketable Securities promptly following release from escrow), then clauses (b), (c) and (d) of Section 6.3 of Fund LPA shall be disregarded and, after the Limited Partner receives cumulative distributions in an amount equal to all Capital Contributions made by the Limited Partner, then the Limited Partner shall receive 70% of all distributions in excess of such amount and the General Partner shall receive 30% of all distributions in excess of such amount (i.e., the General Partner shall receive its Carried Interest allocation (at a rate of 30%) without requiring the Limited Partner to receive the 8% preferred return as contemplated by Section 6.3(b) of the existing Fund LPA);

(b) after the fourth anniversary of the Effective Date but on or before the fifth anniversary of the Effective Date, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in cash and/or Marketable Securities promptly following release from escrow), then (i) the reference to "8%" in Section 6.3(b) of the Fund LPA shall be replaced with "2%" and (ii) the references in clauses (c) and (d) of Section 6.3 to "20%" and "80%" shall be replaced with references "30%" and "70%", respectively;

(c) after the fifth anniversary of the Effective Date but on or before the sixth anniversary of the Effective Date, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in cash and/or Marketable Securities promptly following release from escrow), then (i) the reference to "8%" in Section 6.3(b) of the Fund LPA shall be replaced with "5%" and (ii) the references in clauses (c) and (d) of Section 6.3 to "20%" and "80%" shall be replaced with references "30%" and "70%", respectively;

(d) after the sixth anniversary of the Effective Date but on or before the Wind-Up Deadline, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in cash and/or Marketable Securities promptly following release from escrow), then the references in clauses (c) and (d) of Section 6.3 to "20%" and "80%" shall be replaced with references "30%" and "70%", respectively; or

    (e) after the Wind-Up Deadline, then the Carried Interest distributions shall not be subject to modification by this Agreement and Section 6.3 of the Fund LPA shall be in full force and effect as provided in the Fund LPA as it existed immediately prior to the adoption of the Standstill (defined below).

  1.7.2. If some but not all of the Portfolio Investments are sold prior to the sixth anniversary of the Effective Date, then that portion (if any) of such proceeds that may be subject to the revised Carried Interest allocations shall instead be held in escrow by the Fund (to the extent that the General Partner may be entitled to receive same) and such escrowed amounts shall be later released to the Limited Partner and/or General Partner once it is determined whether the General Partner and/or the Limited Partner (as applicable) is entitled to some or all of such amount(s).

  1.7.3. Notwithstanding the portion of Section 6.3 under the heading "Reduction of Carried Interest Allocation", the Limited Partner shall not be permitted to reduce the applicable percentage allocation of Carried Interest as set forth in such section.

1.8.  <u>Special Removal Conduct</u>. If any Party (other than the Limited Partner) materially breaches any provision of this Agreement, which breach has not been cured (to the extent curable) within thirty (30) days after the earlier of (x) written notice from the Limited Partner of such breach and (y) either the General Partner or the Manager having actual knowledge of an intentional breach of this Agreement, then the Limited Partner may (x) remove the General Partner as the Fund's general partner and appoint a replacement general partner of the Fund and (y) remove the Manager and appoint a replacement manager of the Fund. For the avoidance of doubt, a material breach of any provision of Sections 2.1 through 2.6 of this Agreement (inclusive) shall not be curable for purpose of this Section 1.8.

1.9.  <u>Veto on Certain Sales</u>. The Fund shall not, without the prior written consent of the Limited Partner (which consent may be withheld in its sole and absolute discretion), either (x) Transfer less than all of the Portfolio Investments or (y) Transfer the Portfolio Investments for an aggregate purchase price that is less than the aggregate Capital Contributions of the Limited Partner to the Fund measured as of the time of the consummation of such sale.

1.10.  <u>Indemnification</u>. For the avoidance of doubt, the Brockmans shall only be deemed Covered Persons eligible for indemnification pursuant to Section 9.1 of the Fund LPA for Claims relating to or arising out of transactions that took place prior to the Effective Date, subject to compliance with the requirements of Section 9.1 of the Fund LPA.

1.11.  <u>Change of Control</u>. Notwithstanding Section 10.1(e) of the Fund LPA, to the extent that the actions described herein may constitute a Transfer of the General Partner's interest in the Fund, the Limited Partner consents to such Transfer. Further, to the extent that any of the actions described herein may be deemed an "assignment" (within the meaning of the Advisers Act) of the General Partner's interest in the Fund or of the Manager's obligations under the Management Agreement, the Limited Partner has reviewed and approved such assignment as contemplated by Section 205(a) of the Advisers Act.

2. **Organization Documents of the Fund, General Partner and Manager.**

2.1. <u>Redemption of Brockman Sr.'s Interest in the Manager</u>. Effective as of the Effective Date, the Manager hereby redeems all of the membership interests in the Manager held by Brockman Sr. for $14,201.

2.2. <u>Redemption of Brockman Jr.'s Interest in the Manager</u>. Effective as of the Effective Date, the Manager hereby redeems all of the membership interests in the Manager held by Brockman Jr. for $1,322,740.

2.3. <u>Manager Ownership/Participation in Management Fees etc</u>. The Brockmans shall not be entitled to receive and shall not participate in, in each case directly or indirectly, any portion of the profits or losses of the Manager, including without limitation the Management Fees, allocable to and/or arising from any period on or after December 31, 2018 (the "Separation Date"). From and after the Effective Date, the Brockmans shall cease to own and shall not be permitted to own (directly or indirectly) any equity or economic interest in the Manager.

2.4. <u>Participation in the Management of the Fund, General Partner and Manager</u>. From and after the Effective Date, the Brockmans shall not participate, directly or indirectly, in the management or governance of the Fund, the General Partner or the Manager (whether as a manager, officer or otherwise).

2.5. <u>Redemption of Brockman Sr.'s Interest in the General Partner</u>. Effective as of the Effective Date, the General Partner hereby redeems all of the membership interests of Brockman Sr. in the General Partner for $1 (One US Dollar).

2.6. <u>General Partner Ownership/Participation in Carried Interests etc</u>. From and after the Separation Date, the Brockmans shall not be entitled to receive and shall not participate in, whether directly or indirectly, any portion of the profits or losses of the General Partner, including without limitation the Carried Interest. From and after the Effective Date, the Brockmans shall cease to own and shall not be permitted to own (directly or indirectly) any equity or economic interest in the General Partner.

2.7. <u>Transactions with the Brockmans</u>. The Brockmans shall not, directly or indirectly, enter into any transactions with the Fund or its Portfolio Investments. The Brockmans shall use their best efforts to reduce and eliminate any and all transactions, whether direct or indirect, with the Manager and/or the General Partner; provided that to the extent any such transactions cannot be eliminated then such transactions shall be (a) in writing and (b) on arm's-length and market terms, and the General Partner and the Manager shall provide copies of all such agreements (and any amendments thereto) to the Limited Partner.

2.8. <u>Activities of the General Partner and the Manager</u>. From and after the date hereof, (a) the General Partner shall have no business or other activities other than acting as the general partner of the Fund and activities incidental thereto and (b) the Manager shall have no business or other activities other than acting as the manager of the Fund and activities incidental thereto. For the avoidance of doubt, the foregoing shall in no way prohibit Affiliates of the General Partner or the Manager, including but not limited to Burnett and any other principal or employee of the General Partner, the Manager or their respective Affiliates, from conducting

any other business or activity, including but not limited to providing investment advisory services to private investment funds.

3. **Standstill Agreement**. As of the Effective Date, that certain letter agreement dated February 7, 2019 (as amended) by and among the Fund, the Limited Partner, the General Partner, the Manager and the other parties thereto is hereby terminated (the "Standstill").

4. **Representations and Warranties of the Parties**. Each Party (as to itself only), severally and not jointly, represents and warrants to the other Parties as of the date hereof as follows:

   4.1. Authorization of Agreement. Such Party is (a) an individual or (b) an entity duly organized validly existing and in good standing under the laws of the jurisdiction of its organization. Such Party has the full right, power and authority to enter into, and to consummate the transactions contemplated by, this Agreement and otherwise to carry out its respective obligations hereunder, and the execution and delivery of, and performance by such Party of its obligations contemplated by, this Agreement have been duly authorized by all necessary corporate or similar action on the part of such Party, to the extent applicable. This Agreement constitutes a valid and legally binding obligation of such Party, enforceable against such Party in accordance with its terms.

   4.2. No Conflicts. Neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated hereby, does or will (a) if such Party is not an individual, violate any provision of such Party's organizational documents, (b) conflict with, violate or constitute a default under any agreement, credit facility, debt or other instrument or understanding to which such Party is bound, or (c) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which such Party is subject.

   4.3. Consents. No authorization, consent, approval or other order of, or declaration to or filing with, any governmental agency or body or other person is required for the valid authorization, execution, delivery or performance by such Party of this Agreement or the consummation of the transaction contemplated hereby.

5. **Releases**.

In partial consideration of the Fund, the Limited Partner, the Manager and the General Partner entering into this Agreement, each of the Brockmans, on behalf of himself and his heirs, executors, administrators, successors and/or assigns (collectively, the "Releasors"), hereby releases, effective as of the date of this Agreement, (a) the Fund, the Limited Partner, the Manager and the General Partner and (b) each and every director, manager, officer, employee, member, owner, agent and/or attorney of the Fund, the Limited Partner, the Manager and/or the General Partner and any of the heirs, executors, administrators, successors and assigns of any of those persons (each person described in the foregoing clauses (a) and (b), a "Releasee"), from any and all actions, causes of action, suits, debts, obligations, liabilities, contracts, controversies, agreements, promises, damages, judgments, claims or demands whatsoever, of whatever kind and based on whatever legal theory, that any Releasor ever had, now has or hereafter can, shall or may have against any Releasee, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to and including the date of this Agreement; provided that, notwithstanding the foregoing, none of the Brockmans releases or waives any rights to which he is entitled under this Agreement.

6. **Miscellaneous**.

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, excluding its conflicts of laws principles. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement. This Agreement may not be assigned or delegated by any party without the consent in writing of the other parties. This Agreement may not be amended, and no provision may be waived, without the consent in writing of the other parties. This Agreement constitutes the entire agreement among the parties regarding the subject matter hereof. If any provision of this Agreement is not fully valid and enforceable, then such provision will be valid and enforceable the fullest extent permitted and such invalidity or unenforceability shall not affect any other provision hereof. The parties hereto will take all further actions reasonably necessary to effect the intent and purposes hereof. The parties hereto agree that nothing in this Agreement shall affect the Limited Partner's status as a limited partner or cause the Limited Partner to be considered a general partner of the Fund.

**[SIGNATURE PAGES FOLLOW]**